**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHAEL ROP, STEWART KNOEPP, and ALVIN WILSON,

Plaintiffs,

v.

THE FEDERAL HOUSING FINANCE AGENCY, MELVIN L. WATT, in his official capacity as Director of the Federal Housing Finance Agency, and THE DEPARTMENT OF THE TREASURY,

Defendants.

Case No. 1:17-cv-00497

**PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Michael Rop, Stewart Knoepp, and Alvin Wilson hereby allege as follows:

# I. INTRODUCTION

1. This is an action challenging both past and ongoing abuses of power by a federal agency that operates wholly outside the system of limited and divided government established by the Constitution. It is no exaggeration to say that the Director of the Federal Housing Finance Agency ("FHFA") is one of the most powerful people in the world. This Nation's multi-trillion dollar housing finance market, and familiar features of that market such as readily available 30-year fixed rate mortgages, are built on the foundation of two federally chartered, privately owned entities—the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (respectively, "Fannie" and "Freddie," and, together, the "Companies"). Since September 2008, when FHFA exercised its regulatory authority to force Fannie and Freddie into conservatorship, FHFA has wielded plenary control over the Companies' operations. FHFA's regulation and operation of the Companies is largely unconstrained by *any* of the three branches

of the federal government—FHFA does not depend on Congressional appropriations for funding, its Director answers to no one (not even the President), and many of its actions are unreviewable by the courts. FHFA's unbounded authority over Fannie and Freddie and the housing finance market is patently irreconcilable with our constitutional system of limited and divided government authority. FHFA has abused its unchecked authority to expropriate tens of billions of dollars of value from private parties and siphoned it to the federal government. The provisions of law purporting to allow such abuse must be struck down, and the deleterious consequences flowing from those provisions must be undone.

2. FHFA was established in 2008 as an independent agency unlike any other in our Nation's history. While virtually every other federal agency that Congress has insulated from presidential control is headed by an expert multi-member board that must operate through compromise and consensus, FHFA is led by a single Director who claims sweeping, unchecked powers. Other independent federal agencies are subjected to close congressional oversight through the appropriations process, but FHFA is permitted to self-fund by imposing assessments on the entities it regulates with no need to seek further authorization from Congress. And by statute, judicial review is generally unavailable when FHFA makes decisions as the regulator and conservator for Fannie and Freddie. No other federal agency enjoys this combination of near total insulation from oversight by *all three* branches of government, and it is difficult to imagine a scheme more at odds with the Founders' vision of a federal government of limited and divided powers accountable to the People through their elected representatives.

3. Further magnifying the potential for abuse that FHFA's structure invites, Congress failed to articulate *any* principle to guide FHFA's exercise of its vast discretion when it acts as the Companies' conservator. Although FHFA is statutorily authorized as conservator to

sign contracts in the Companies' names, to transfer or sell their assets, and to exercise most of the rights of their shareholders, FHFA claims that it is not required to act as a fiduciary for the Companies or their shareholders. Indeed, FHFA claims that it is not even required to exercise its conservatorship powers in a manner that furthers the *public* interest but instead is free to do whatever *it determines* is best for *itself*, with no judicial review or oversight from anyone.

4. For more than four years, during much of the time when the housing sector was recovering from the 2008 financial crisis, this agency of vast and unchecked powers was led by an *acting* Director who was neither nominated by the President nor confirmed by the Senate. The Appointments Clause requires Senate confirmation of all principal officers of the United States to ensure that these key officials are ultimately accountable to the People. It is highly unusual for an important federal agency such as FHFA to operate for even one year under the leadership of an acting principal officer, and the lengthy tenure of FHFA's acting Director was clearly unconstitutional.

5. The Framers understood the threat of concentrated and democratically unaccountable governmental power, and their wisdom in establishing a Constitution that does not permit such concentrations of power is well illustrated by FHFA's short history. Months after FHFA was established in the summer of 2008, it forced the Companies into conservatorship and signed a contract on their behalf that awarded the Department of Treasury most—but not all—of the Companies' equity in exchange for a commitment from Treasury to provide capital that the Companies did not need. Under FHFA's management in the years that followed, the Companies made a series of accounting errors that caused them to gratuitously draw on Treasury's funding commitment, thus increasing the size of the Companies' dividend obligations to Treasury at the expense of all other shareholders. And just as it became clear that these accounting errors would

need to be reversed and that the Companies could emerge from conservatorship and deliver value to their private shareholders, FHFA agreed to the Net Worth Sweep—an amendment to the terms of Treasury's investment in the Companies that gifts *all* of the Companies' net assets and comprehensive income to Treasury in perpetuity.

6. The Net Worth Sweep is just the clearest manifestation of FHFA's overarching policy to operate the Companies for the exclusive benefit of the federal government, destroy the investments of the Companies' private shareholders, dissipate the Companies' assets, and ultimately eliminate the Companies altogether. This policy has inflicted severe economic harm on Plaintiffs and the Companies' other private shareholders, and it is precisely the type of abuse of power that the separation of powers is designed to prevent.

## II. JURISDICTION AND VENUE

7. This action arises under the U.S. Constitution. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

8. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is an action against agencies of the United States and an officer of the United States in his official capacity, one of the Plaintiffs resides in this judicial district, and no real property is involved in the action.

## III. PARTIES

9. Plaintiff Michael Rop is a resident of Calhoun County, Michigan. Mr. Rop owns shares of Fannie Mae common stock.

10. Plaintiff Stewart Knoepp is a resident of Washtenaw County, Michigan. Mr. Knoepp owns common and preferred shares of both Fannie Mae and Freddie Mac stock.

11. Plaintiff Alvin Wilson is a resident of Genesee County, Michigan. Since 2009, Mr. Wilson has continuously owned shares of Fannie Mae common stock, Fannie Mae preferred stock, and Freddie Mac preferred stock. Since 2010, Mr. Wilson has continuously owned shares of Freddie Mac common stock.

12. Defendant FHFA is, and was at all relevant times, an independent agency of the United States Government headed by a single Director or acting Director. FHFA was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"). FHFA is located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.

13. Defendant Melvin L. Watt is the Director of FHFA. His official address is Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024. He is being sued in his official capacity.

14. Defendant Department of the Treasury is an executive agency of the United States Government. Treasury is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

## IV. FACTUAL ALLEGATIONS

### Fannie and Freddie

15. Fannie is a for-profit, stockholder-owned corporation organized and existing under the Federal National Mortgage Act. Freddie is a for-profit, stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act. The Companies' business includes purchasing and guaranteeing mortgages originated by private banks and bundling the mortgages into mortgage-related securities that can be sold to investors.

16. Fannie and Freddie are owned by private shareholders, and their stock is publicly traded. Fannie was chartered by Congress in 1938 and originally operated as an agency of the

Federal Government. In 1968, Congress reorganized Fannie into a for-profit corporation owned by private shareholders. Freddie was established by Congress in 1970 as a wholly-owned subsidiary of the Federal Home Loan Bank System. In 1989, Congress reorganized Freddie into a for-profit corporation owned by private shareholders.

17. Before being forced into conservatorship, both Fannie and Freddie had issued common stock and several series of preferred stock that were marketed and sold to community banks, insurance companies, and countless other institutional and individual investors. The various series of preferred stock of the Companies are in parity with each other with respect to their claims on income (i.e., dividend payments) and claims on assets (i.e., liquidation preference or redemption price), but they have priority over the Companies' common stock for these purposes. The holders of common stock are entitled to the residual economic value of the firms.

18. Before 2007, Fannie and Freddie were consistently profitable. In fact, Fannie had not reported a full-year loss since 1985, and Freddie had never reported a full-year loss since becoming owned by private shareholders. In addition, both Companies regularly declared and paid dividends on their preferred and common stock.

## Congress Establishes the Federal Housing Finance Agency as An Independent Agency Headed by a Single Director

19. From 1992 until 2008, the Companies were regulated by the Office of Federal Housing Enterprise Oversight ("OFHEO")—an office within the Department of Housing and Urban Development. OFHEO was not an independent agency. Its Director was nominated by the President and confirmed by the Senate, and he could be removed from office by the President for any reason. *See* Housing and Community Development Act of 1992 § 1312 (previously codified at 12 U.S.C. § 4512). To fund OFHEO's operations, Congress permitted the office to impose annual assessments on the Companies "to the extent provided in appropriation Acts." Housing

and Community Development Act of 1992 § 1316(a) (previously codified at 12 U.S.C. § 4516). Federal statute required that OFHEO's annual spending plans be included in the President's budget. *Id.* § 1316(g)(3). The President's control over OFHEO's Director and the fact that OFHEO was subject to the congressional appropriations process ensured that the office remained accountable to the People through their democratically elected representatives.

20. During the summer of 2008, Congress passed and President Bush signed HERA, which established FHFA as the successor to OFHEO. Unlike its predecessor, FHFA is an "independent" agency, 12 U.S.C. § 4511(a); 44 U.S.C. § 3502(5), and it is headed by a Director who is only removable "for cause by the President," 12 U.S.C. § 4512(b)(2). To further insulate FHFA from presidential influence, HERA also provides that when FHFA acts as conservator it "shall not be subject to the direction or supervision of any other agency of the United States." *Id.* § 4617(a)(7). Also unlike OFHEO, FHFA is funded through assessments that are "not . . . construed to be Government or public funds or appropriated money." *Id.* § 4516(f)(2). As a result, FHFA is neither subject to presidential control nor constrained by the congressional appropriations process.

21. Unlike almost all other independent agencies in our Nation's history, FHFA is headed by a single individual rather than a multi-member board or commission. This highly unusual feature of FHFA's structure poses a serious threat to individual liberty and violates the separation of powers. In the absence of direct control by the democratically elected President, the usual multi-member leadership structure of independent agencies acts as a substitute check on the excesses of any individual leader of an independent agency. The traditional multi-member structure guards against arbitrary decision making and protects individual liberty by preventing the concentration of power in the hands of any one person. Independent agencies headed by

multi-member boards are forced to account for multiple viewpoints, adopt compromises that result in less extreme decisions, and better resist capture by interest groups. FHFA's unusual structure prevents those affected by its decisions from enjoying the benefits of multi-member leadership, and as a result FHFA has made a series of arbitrary decisions that have significantly harmed the Companies' private shareholders.

22. The fact that FHFA is headed by a single individual also means that the President has less influence over its decisions than the decisions made by independent agencies headed by multi-member commissions. When an independent agency is run by a commission with multiple members who serve staggered terms and with a chairperson who the President designates, the President inevitably can influence the agency's decisions by appointing one or more commission members and selecting the chairperson. Many statutes that create multi-member commissions also require bipartisan membership, thus guaranteeing that at least some members will belong to the President's political party. FHFA's Director, in contrast, serves a five-year term and may remain in office indefinitely if the Senate refuses to confirm a successor. 12 U.S.C. § 4512(b)(2), (4). As a result, FHFA's Director could remain in office during the entire four-year term of a President from a different political party, all the while pursuing policies directly at odds with those of the incumbent President. Indeed, FHFA's current Director is a former Democratic Congressman, and his five-year term will not expire until January 2019—*two years* after a Republican President was sworn into office. As a result of FHFA's unusual structure, it is more insulated from presidential influence than virtually any other independent federal agency.

23. FHFA's status as an independent agency headed by a single Director makes it different from almost every other independent agency in our Nation's history. Indeed, Plaintiffs are aware of only two agencies that were similarly structured when FHFA was created in 2008:

the Office of Special Counsel and the Social Security Administration. The Office of Special Counsel has a narrow jurisdiction that mainly involves government personnel rules, its current structure was established in 1978, and the Reagan and Carter Administrations both argued against this structure on separation of powers grounds. *See* Removal Power, 2 Op. O.L.C. 120, 120 (1978) (concluding that the Special Counsel "must be removable at will by the President"); President Ronald Reagan, Memorandum of Disapproval on a Bill Concerning Whistleblower Protection (Oct. 26, 1988), *available at* https://goo.gl/NOPy85 (vetoing bill relating to Office of Special Counsel due to "serious constitutional concerns" about the Office's status as an independent agency). The Social Security Administration was headed by a multi-member board until 1994. When it was restructured, President Clinton issued a signing statement arguing that the change was constitutionally problematic. *See* President William J. Clinton, Statement on Signing the Social Security Independence and Program Improvements Act of 1994 (Aug. 15, 1994), *available at* https://goo.gl/odVumQ ("[I]n the opinion of the Department of Justice, the provision that the President can remove the single Commissioner only for neglect of duty or malfeasance in office raises a significant constitutional question."). Both the Office of Special Counsel and the Social Security Administration are subject to the annual congressional appropriations process, which subjects both agencies to a significant measure of congressional oversight that does not apply to FHFA.

24. Two years after HERA established FHFA, Congress created the Consumer Financial Protection Bureau ("CFPB"), which is also an independent agency headed by a single Director. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act § 1011(b)(1), Pub. L. No. 111-203, 124 Stat. 1376, 1964 (2010). The Executive Branch has taken the position that the CFPB's structure violates the separation of powers, and the Department of Justice recently

filed a brief before the en banc D.C. Circuit explaining that "limitations on the President's authority to remove a single agency head are a recent development to which the Executive Branch has consistently objected." Brief for the United States as Amicus Curiae at 3, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Mar. 17, 2017).

25. It is not constitutional for any independent federal agency to operate under the direction of a single individual, but this structure is especially problematic in FHFA's case because it has vast authority over a critical sector of the United States economy. FHFA is "responsible for the oversight of vital components of the secondary mortgage markets," regulates entities that "provide more than $5.8 trillion in funding for the U.S. mortgage markets and financial institutions," and oversees programs that "have helped millions of Americans remain in their homes." FHFA, *About FHFA: Who We Are & What We Do*. FHFA's current Director has said under oath that his agency is "charged with directing the largest conservatorships in U.S. history in support of the Nation's multi-trillion dollar mortgage finance system"—a system that underpins the entire housing sector and thus directly affects every American. The housing sector accounts for over 15% of the Nation's Gross Domestic Product, and as a result FHFA has an almost unrivaled effect on a broad swath of the economy. As FHFA's former longtime acting Director has written, "the entire housing system . . . rel[ies] almost entirely on [FHFA's] decisions," Michael Bright & Ed DeMarco, Why Housing Reform Still Matters, Milken Institute Center for Financial Markets 3 (June 2016).

## FHFA Claims Sweeping Conservatorship Powers Over the Companies and Their Shareholders But Refuses to Acknowledge Any Intelligible Statutory Principle To Guide Its Exercise of Discretion

26. HERA empowers FHFA to exercise "[g]eneral supervisory and regulatory authority" over the Companies, 12 U.S.C. § 4511(b); 12 U.S.C. 4501 note, and also authorizes

FHFA to place the Companies into conservatorship under certain specified conditions, *see* 12 U.S.C. § 4617(a). While the statute includes a lengthy recitation of powers FHFA "may" exercise as conservator, FHFA has claimed that it says nothing about what the conservator *should* do. Under this reading of HERA, Congress has failed to articulate an intelligible principle to guide FHFA in the exercise of its conservatorship powers.

27. When it acts as conservator, FHFA has successfully argued that its powers are "extraordinarily broad." *Perry Capital LLC v. Mnuchin*, 848 F.3d 1072, 1087 (D.C. Cir. 2017). Indeed, FHFA has consistently taken the position that as conservator it has "plenary operational authority," Final Opening Brief of Appellees FHFA, Watt, Fannie, and Freddie at 11, *Perry Capital LLC v. Lew*, No. 14-5243 (D.C. Cir. Mar. 7, 2016), and may "operate Fannie and Freddie as it sees fit," FHFA Memorandum in Supp. of Mot. to Dismiss at 15, *Collins v. FHFA*, No. 16-cv-3113 (S.D. Tex. Jan. 9, 2017), ECF No. 24 (quotation marks omitted).

28. HERA says that as conservator FHFA "*may* . . . take over the assets of and operate . . . and conduct all business of the regulated entity; collect all obligations and money due the regulated entity . . . ; perform all functions of the regulated entity . . . ; and provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator." 12 U.S.C. § 4617(b)(2)(B) (emphasis added). HERA also provides that FHFA "*may*, as conservator . . . , transfer or sell any asset or liability of the regulated entity in default" without consent, *id.* § 4617(b)(2)(G) (emphasis added), and that it "*may*" exercise the "incidental" power to "take any action authorized by [12 U.S.C. § 4617], which the Agency *determines* is in the best interests of the regulated entity or the Agency." *Id.* § 4617(b)(2)(J) (emphasis added). Taken together, FHFA has successfully argued that these provisions authorize it as conservator to operate the Companies and dispose of their assets in any manner.

29. HERA also says that as conservator, FHFA "*may* . . . take such action as *may* be . . . necessary to put the regulated entity in a sound and solvent condition; and . . . appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." *Id.* § 4617(b)(2)(D) (emphasis added). Although this provision could be read as imposing on FHFA the mandatory obligations of common-law conservators, who have a fiduciary duty to seek to preserve and conserve assets while working to return their wards to soundness and solvency, FHFA has successfully argued before other courts that the provision's use of the word "may" makes FHFA's pursuit of a common-law conservator's mission entirely optional. As the D.C. Circuit explained in agreeing with FHFA's interpretation of the statute, FHFA's conservatorship powers are "framed in terms of expansive grants of permissive, discretionary authority," and FHFA's exercise of these powers is "permissive rather than obligatory." *Perry Capital*, 848 F.3d at 1088. Thus, while HERA says that as conservator FHFA "may" work to preserve and conserve the Companies' assets, under FHFA's interpretation of the statute Congress has not provided any guidance as to how the conservator should go about deciding whether to pursue that mission as opposed to managing the Companies or disposing of their assets to some other end.

30. Under FHFA's interpretation of HERA, the statute not only gives the conservator sweeping operational authority over the Companies and unbounded discretion to do as it pleases with their assets but also provides that as conservator FHFA "immediately succeed[s] to . . . all rights, titles, powers, and privileges of . . . any stockholder" in the Companies. 12 U.S.C. § 4617(b)(2)(A). With limited exceptions, courts have interpreted this language as making FHFA the successor to derivative claims that shareholders could otherwise file on the Companies' behalf, *Perry Capital*, 848 F.3d at 1104–05, and this provision also makes FHFA the successor

to shareholders' rights to inspect the Companies' books and records, *Pagliara v. Federal Home Loan Mortg. Corp.*, 203 F. Supp. 3d 678, 685 (E.D. Va. 2016). As conservator, FHFA thus controls the Companies themselves *and* many of the rights of their private shareholders. As with its overall authority to manage the Companies, FHFA's interpretation of its statutory authority over shareholder rights does not include an intelligible principle to guide the conservator in its decisions about how to exercise these rights.

31. HERA also says that FHFA "may" exercise the "incidental power" to "take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity *or the Agency*." 12 U.S.C. 4617(b)(2)(J) (emphasis added). FHFA understands this provision to allow it to use its conservatorship powers to advance *its own* interests when those interests conflict with the interests of the Companies and their shareholders. And since the statute does not say how FHFA should go about determining what is in its own interests, FHFA's interpretation of this incidental power effectively empowers it to do whatever it wants with the Companies and their assets.

32. Further compounding the lack of an intelligible principle to guide FHFA's exercise of its discretion when it acts as conservator, HERA also severely restricts the availability of judicial review of FHFA's actions as conservator. Most significantly, HERA specifies that "no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator." 12 U.S.C. § 4617(f). A number of other provisions of HERA impose additional limitations on judicial review of FHFA's actions as conservator, receiver, or regulator. *See id.* § 4617(b)(2)(A)(i); *id.* § 4617(b)(5)(E); *id.* § 4617(b)(11)(D); *id.* § 4623(d). While none of these provisions bars constitutional claims like those raised in this suit, HERA's restrictions on judicial review further insulate FHFA from the mechanisms the

Constitution creates to protect individual rights from arbitrary decisions by the federal government.

**Fannie and Freddie Are Forced into Conservatorship**

33. Although Congress passed HERA amidst the decline in home prices and financial turmoil of 2008, the Companies were well-positioned to weather those events and were never at any meaningful risk of insolvency. While banks and other financial institutions involved in the mortgage markets had heavily invested in increasingly risky mortgages in the years leading up to the financial crisis, Fannie and Freddie took a more conservative approach, insuring primarily 30-year fixed-rate conforming mortgages that were far safer than those insured by the nation's largest banks. And although both Companies recorded losses in 2007 and the first two quarters of 2008—losses that largely reflected a temporary decline in the market value of their holdings caused by declining home prices—they continued to generate enough cash to easily pay their debts and retained billions of dollars of capital that could be used to cover any future losses.

34. Neither Company was in danger of insolvency in 2008. Indeed, during the summer of 2008, OFHEO Director James Lockhart, who would later become FHFA's first Director, told CNBC that "both of these companies are adequately capitalized, which is our highest criteria." And on July 13, 2008, Director Lockhart issued a statement emphasizing that "the Enterprises' $95 billion in total capital, their substantial cash and liquidity portfolios, and their experienced management serve as strong supports for the Enterprises' continued operations."

35. Thanks to the Companies' healthy financial condition in mid-2008, they had the capacity to raise additional capital through the financial markets. Indeed, at this time Fannie had roughly $700 billion in unencumbered liquid assets that were available to be pledged as

collateral for purposes of raising capital, and it had identified a number of private investors who were prepared to provide additional capital.

36. The Companies' sound financial condition during this period is further illustrated by the decision by Fannie's Board of Directors to declare dividends on both its preferred and common stock in August 2008 and by FHFA's subsequent decision as conservator to direct Fannie to pay those dividends out of cash available for distribution in late September 2008. It is a fundamental principle of corporate law that a company may not declare dividends when it is insolvent, and dividends that a company improperly declares when insolvent may not be lawfully paid. Fannie's Board thus could not have lawfully declared dividends in August 2008 unless the Company was solvent at that time, and the Board's decision to declare those dividends showed its confidence that Fannie was financially healthy. Furthermore, it is evident that FHFA agreed that Fannie was solvent when it declared dividends in August 2008 because, rather than halting or voiding the dividends that the outgoing Fannie Board had declared, FHFA took the position that Fannie was legally obligated to pay them even *after* conservatorship was imposed in early September 2008.

37. Despite the Companies' comparatively strong financial position amidst the crisis, FHFA initiated a long-term policy of seizing control of Fannie and Freddie and operating them for the exclusive benefit of the federal government. On September 6, 2008, FHFA directed the Companies' boards to consent to conservatorship. Given that the Companies were not in financial distress and were in no danger of defaulting on their debts, the Companies' directors were confronted with a Hobson's choice: face intense regulatory scrutiny from FHFA as retaliation for rejecting conservatorship, or submit to FHFA's demands and receive a grant of

immunity for personal liability under 12 U.S.C. § 4617(a)(6). FHFA ultimately obtained the Companies' consent by threatening to seize them if they did not acquiesce.

38. When it publicly announced the conservatorships, FHFA promised that it would operate Fannie and Freddie as a fiduciary until they were stabilized. As FHFA acknowledged, the Companies' stock remains outstanding during conservatorship and "continue[s] to trade," *FHFA Fact Sheet, Questions and Answers on Conservatorship* 3, https://goo.gl/DV4nAt, and Fannie's and Freddie's stockholders "continue to retain all rights in the stock's financial worth," *id.* Director Lockhart testified before Congress that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest. Sept. 25, 2008, Hearing, U.S. House of Representatives, Committee on Financial Services, H.R. Hrg. 110-142 at 29-30, 34.

39. FHFA also said at the time that conservatorship would be temporary: "Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship." *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2. Investors were entitled to rely on these official statements of the purposes of conservatorship, and public trading in Fannie's and Freddie's stock was permitted to, and did, continue.

40. In short, the Companies were not in financial distress when they were forced into conservatorship. The Companies' boards acquiesced to conservatorship under extreme pressure from FHFA and based on the expectation that FHFA would operate the Companies as a fiduciary with the goal of preserving and conserving their assets and managing them in a safe and solvent manner. And in publicly announcing the conservatorships, FHFA confirmed that the Companies'

private shareholders continued to hold an economic interest that would have value, particularly as the Companies generated profits in the future. *See FHFA Fact Sheet, Questions and Answers on Conservatorship* 2.

## FHFA and Treasury Enter into the Preferred Stock Purchase Agreements

41. In addition to authorizing FHFA to act as the Companies' conservator, HERA also gave the Treasury Department temporary authority to purchase securities from the Companies. *See* 12 U.S.C. §§ 1455(*l*), 1719(g). HERA expressly stated that Treasury could not exercise this authority without the Companies' consent: "Nothing in this subsection requires [Fannie or Freddie] to issue obligations or securities to [Treasury] without mutual agreement between [Treasury] and the [Companies]." 12 U.S.C. §§ 1455(*l*)(1)(A), 1719(g)(1)(A). HERA further provided that Treasury's statutory authority to purchase the Companies' securities would expire at the end of 2009. 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4).

42. On September 7, 2008, the day after FHFA forced the Companies into conservatorship despite their stable financial condition, Treasury exercised its statutory authority to purchase the Companies' securities. Acting in its capacity as the Companies' conservator, FHFA agreed to Treasury's purchases on the Companies' behalf, and the two federal agencies entered into the Preferred Stock Purchase Agreements (PSPAs).

43. The PSPAs are materially identical for both Companies. Under the original agreements, Treasury committed to provide up to $100 billion to each Company to ensure that it maintained a positive net worth. For quarters in which either Company's liabilities exceed its assets under Generally Accepted Accounting Principles, the PSPAs authorize draws upon Treasury's commitment in an amount equal to the difference between liabilities and assets.

44. In return for Treasury's funding commitment, FHFA agreed to provide Treasury with several forms of consideration that together would entitle Treasury to much—but not all—of the Companies' accumulated capital and future profits. With the Companies still able to raise additional funding in the capital markets and at no risk of failing to generate enough cash to cover their expenses, this was an extraordinarily one-sided agreement that the Companies would not have agreed to had they still been under private management.

45. Under the PSPAs, Treasury received several forms of consideration in return for its funding commitment. First, FHFA agreed to sell Treasury warrants to purchase 79.9% of the common stock of each Company at a nominal price. Exercising these warrants would entitle Treasury to up to 79.9% of all future profits of the Companies, subject to the Companies' obligation to satisfy their dividend obligations with respect to their preferred stock and to share the remaining 20.1% of those profits with private common shareholders. As Treasury noted at the time, the warrants "provide[d] potential future upside to the taxpayers." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

46. As further consideration for Treasury's funding commitment, Treasury also received 1 million shares of senior preferred stock ("Government Stock") in each Company. Treasury's Government Stock in each Company had an initial liquidation preference of $1 billion. This liquidation preference increases by one dollar for each dollar the Companies draw on Treasury's funding commitment. In the event that the Companies liquidate, Treasury is entitled to recover the full amount of the liquidation preference before any other preferred or common shareholder receives anything.

47. In addition to payments in the event that the Companies are liquidated, the Government Stock also entitled Treasury to receive, at the Companies' election, either: (i) a

cumulative cash dividend equal to 10% of the value of Treasury's outstanding liquidation preference; or (ii) a 12% increase in the amount of Treasury's liquidation preference. If the Companies decided not to pay the dividend in cash, the resulting increase in the size of Treasury's liquidation preference would amount to an in-kind dividend payment of additional Government Stock. After any such in-kind dividend payment, the PSPAs provided that the dividend rate would increase to 12% (payable either in cash or in kind, as just described) until such time as full cumulative dividends were paid in cash, at which point the rate would return to 10%. Thus, the Companies never were required to pay a cash dividend to Treasury but rather had the discretion to pay dividends in kind. Moreover, there was never any risk that the Companies would become insolvent due to the payment of cash dividends since it would have been illegal under state law for either Company to pay a dividend that would have caused it to become insolvent.

48. FHFA officials repeatedly confirmed their understanding that the PSPAs were designed to allow the Companies to pay the Government Stock dividends in kind—with additional Government Stock—rather than in cash. A document attached to a September 16, 2008, email between FHFA officials expressly states that PSPA dividends may be "paid in-kind." Another FHFA document says that Treasury's Government Stock pays "10 percent cash dividend (12 percent payment-in-kind)." In an internal October 2008 email to Mario Ugoletti—who was then a Treasury official, but later moved to FHFA and was a key point of contact with Treasury in the development of the Net Worth Sweep—another Treasury official indicated that Treasury's consultant wanted to know "whether we expect [Fannie and Freddie] to pay the preferred stock dividends in cash or to just accrue the payments." Mr. Ugoletti did not forget about this feature of the PSPAs when he moved to FHFA. Indeed, he acknowledged the option to

pay dividends "in kind" in an email that he sent the very day the Net Worth Sweep was announced.

49. Treasury likewise understood the PSPAs to permit in kind dividend payments. Upon entering the PSPAs Treasury released a fact sheet stating that, "[t]he senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash . . . ." U.S. TREASURY DEP'T OFFICE OF PUB. AFFAIRS, FACT SHEET: TREASURY SENIOR PREFERRED STOCK PURCHASE AGREEMENT (Sept. 7, 2008), https://goo.gl/ynb3TC. In an October 2008 email to Treasury and FHFA officials, a Treasury consultant sought to clarify whether Fannie and Freddie "intend[ed] to pay cash at 10 percent or accrue at 12 percent as a matter of policy." An internal Treasury document says that the dividend rate "may increase to the rate of 12 percent if, in any quarter, the dividends are not paid in cash." And in 2012, as Treasury contemplated replacing the existing dividend structure with the Net Worth Sweep, Treasury told the SEC that the dividend rate on the original PSPAs would be 12% "if elected to be paid in kind." Treasury Presentation to SEC, GSE Preferred Stock Purchase Agreements (PSPA), Overview and Key Considerations at 9, June 13, 2012.

50. The Companies shared this understanding of the terms of their agreements with Treasury. Fannie's and Freddie's CFOs have testified that they were aware of the payment-in-kind option. Various Freddie documents say that "[t]he dividend becomes 12% if Freddie Mac is unable to pay the dividend through organic income," that "[t]he senior preferred stock will pay quarterly cumulative dividends at a rate of 10% per year or 12% in any quarter in which dividends are not paid in cash," and that Treasury's stock "[p]ays quarterly cumulative dividend rate at 10% per year, or 12% in any quarter in which dividends are not paid in cash." Similarly, Fannie documents say that Treasury's senior preferred stock "has an annual dividend rate of

10%, which could increase to 12% if not paid in cash," and that "[i]f at any time . . . the Company does not pay the cash dividends in a timely manner, . . . the annual dividend rate will be 12%."

51. An in-kind dividend payment would not have decreased the amount of Treasury's remaining funding commitment because only when the Companies receive "funding under the Commitment" does the commitment's size decrease. Fannie and Freddie Amended and Restated Senior Preferred Stock Purchase Agreements ("PSPA") § 1. Thus, as the Congressional Research Service has acknowledged, under the PSPAs' original terms the Companies could "pay a 12% annual senior preferred stock dividend indefinitely." N. ERIC WEISS, CONG. RESEARCH SERV., RL34661, FANNIE MAE'S AND FREDDIE MAC'S FINANCIAL PROBLEMS (Aug. 10, 2012). In other words, because of the payment-in-kind option, there was no risk—none whatsoever—that the PSPAs would force Fannie and Freddie to exhaust Treasury's funding commitment to facilitate the payment of dividends.

52. Finally, the PSPAs provided for the Companies to pay Treasury a quarterly periodic commitment fee "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." PSPA § 3.2(a). The periodic commitment fee was to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive it for up to a year at a time. Treasury repeatedly exercised this option and never deemed it necessary to receive a periodic commitment fee under the PSPAs. Even if the fee had been charged, the Companies were always free under the express terms of the PSPAs to pay the fee in-kind with additional senior preferred stock rather than in cash, a fact that Freddie's auditor recognized. *See* PSPA § 3.2(c) ("At the election of Seller, the Periodic Commitment Fee may be

paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock . . . .”).

53. The PSPAs were “structure[d]” to “enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed.” Action Memorandum for Secretary Paulson (Sept. 7, 2008). Nevertheless, while Treasury’s commitment remains outstanding, Fannie and Freddie generally are prohibited from paying down amounts added to the liquidation preference due to draws from Treasury’s commitment. *See* Fannie and Freddie Government Stock Certificates § 3(a). The PSPAs also prohibit Fannie and Freddie from declaring and paying dividends on any securities junior to Treasury’s Government Stock unless full cumulative dividends have been paid to Treasury on its Government Stock for the then-current and all past dividend periods.

54. On May 6, 2009, FHFA and Treasury amended the PSPAs to increase Treasury’s funding commitment to each Company from $100 billion to $200 billion. On December 24, 2009—one week before Treasury’s temporary statutory authority to purchase the Companies’ securities expired—the agencies again amended the terms of Treasury’s funding commitment. Instead of resetting the commitment at a specific dollar amount, the second amendment established a formula to allow Treasury’s total commitment to each Company to exceed (but not fall below) $200 billion depending upon any net worth deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012.

## Director Lockhart Resigns and Edward DeMarco Serves as FHFA’s Acting Director for Over Four Years

55. As the Director of OFHEO when HERA became law, James Lockhart automatically became the first person to serve as FHFA’s independent Director. *See* 12 U.S.C. § 4512(b)(5). Mr. Lockhart forced the Companies into conservatorship and signed the original

PSPAs on their behalf in September 2008. He remained in office for the first eleven months that the Companies were in conservatorship. On August 5, 2009, Mr. Lockhart publicly announced that he would resign at the end of the month.

56. HERA provides that "[i]n the event of the . . . resignation . . . of the Director, the President shall designate" one of FHFA's three Deputy Directors "to serve as acting Director until . . . the appointment of a successor" who is nominated by the President and confirmed by the Senate. *Id.* § 4512(f). Each of FHFA's Deputy Directors is appointed by FHFA's Director. *Id.* § 4512(c)–(e). In accordance with HERA, on August 25, 2009, President Obama designated Edward DeMarco to serve as FHFA's acting Director. At the time, Mr. DeMarco was FHFA's Senior Deputy Director for Housing Mission and Goals. Mr. DeMarco had previously been appointed to that post by Mr. Lockhart.

57. Acting agency heads normally serve only temporarily, during the time necessary for the President to nominate and the Senate to confirm someone to permanently fill the position. But President Obama waited 15 months after Director Lockhart's resignation, until November 15, 2010, to nominate Joseph A. Smith, Jr., to be FHFA's Director. It quickly became clear that the Senate would not confirm Mr. Smith, and the nomination was returned to the President on December 22, 2010. President Obama did not again attempt to fill the vacancy created by Mr. Lockhart's resignation until May 2013, when he nominated Congressman Melvin L. Watt. After more than seven months, the Senate confirmed Mr. Watt on December 10, 2013. Mr. Watt was sworn into office on January 6, 2014.

58. From August 2009 until January 2014, Mr. DeMarco led FHFA as the independent agency's acting Director. Mr. DeMarco's 52-month tenure was only eight months shy of the full five-year term that a Senate-confirmed FHFA Director would have served. *See* 12

U.S.C. § 4512(b)(2). And during the great majority of the time Mr. DeMarco was acting Director, there was no pending nomination from the President to fill the important post that Mr. DeMarco occupied. It is highly unusual for an acting agency head to remain in office for even one year. The fact that FHFA did not have a Senate-confirmed Director for over four years, during much of the time when the Nation's housing market was recovering from the 2008 financial crisis, is extraordinary and deeply troubling.

59. During his time as acting Director, Mr. DeMarco was responsible for an important shift in FHFA's overall approach to operating the Companies as their conservator. Whereas Mr. Lockhart at least paid lip service to the goal of helping the Companies rebuild capital and returning them to private control, Mr. DeMarco undertook a policy aimed at ultimately winding down the Companies and doing so in a manner that guaranteed their private shareholders would unnecessarily lose all the value of their investments. As explained in greater detail below, under Mr. DeMarco's supervision, the Companies drew vast, unneeded sums from Treasury's funding commitment to cover paper losses caused by unjustified accounting decisions. And when it became apparent that even these accounting errors had not eliminated the economic value of private investors' shares and that the Companies would still be able to rebuild capital and emerge from conservatorship, Mr. DeMarco ensured that this could not happen by imposing the Net Worth Sweep on August 17, 2012—*three years* into his tenure as acting Director.

60. Despite Mr. DeMarco's commitment to operate the Companies for the exclusive financial benefit of the federal government, he publicly disagreed with and resisted some of the Obama Administration's most significant housing finance policies. Most notably, Mr. DeMarco refused to approve the Administration's proposal that the Companies reduce the

principal on certain mortgages in an effort to jumpstart the recovery in housing prices. Mr. DeMarco's bitter dispute with the Administration over this issue spilled into the public arena in the summer of 2012, with the release of a letter from Treasury Secretary Geithner in which he said that he was "concerned by [Mr. DeMarco's] continued opposition" to principal reduction and suggested that Mr. DeMarco was not moving to address issues in the housing sector "with a sense of urgency and force commensurate with the scale of the remaining challenges." Letter from Timothy F. Geithner, Secretary of the Treasury, to Edward DeMarco, Acting Dir., FHFA (July 31, 2012), http://goo.gl/BGbWJR. Despite these criticisms, Secretary Geithner's letter acknowledged that under Mr. DeMarco's leadership FHFA remained "an independent federal agency," and Secretary Geithner recognized that "as its Acting Director," Mr. DeMarco had "the sole legal authority to make this decision." *Id.* An internal Treasury document prepared just before the Net Worth Sweep was announced in August 2012 reflects the same understanding: "we recognize that as an independent regulator and conservator of [Fannie and Freddie], FHFA is <u>solely</u> responsible for the ultimate decision of whether or not the [Companies] may participate" in principal reduction.

61. Despite these vehement policy disagreements, the Obama Administration recognized that the President could not fire Mr. DeMarco due to his status as the head of an independent agency. On August 3, 2012, HUD Secretary Shaun Donovan acknowledged that "some ha[d] called for [Mr. DeMarco] to be fired" but told reporters "[t]hat is not authority that the president has." Rob Blackwell, *HUD Chief: Obama Can't Fire FHFA's DeMarco*, NAT'L MORTGAGE NEWS (Aug. 3, 2012), http://goo.gl/Ql039i. The Obama Administration reached that conclusion despite its desire for new leadership at FHFA. As early as October 2011, Politico reported that Mr. DeMarco had "resisted White House and Treasury Department pressure to step

down." Joseph Williams, *Housing head at home with criticism*, POLITICO (Oct. 26, 2011), https://goo.gl/erPH3t.

62. Mr. DeMarco appears to have likewise understood that, even though he was FHFA's *acting* Director, he was statutorily entitled to act independently from the President. Responding to criticism from Obama Administration allies in 2011, Mr. DeMarco said: "I'm an independent regulator. . . . I'm not trying to be a friend or foe to anyone." *Id.* And in March 2012, Mr. DeMarco complained in an interview with the Financial Times that "the environment of the last number of months have shown substantial attempt to influence or direct an independent regulator." Shahien Nasiripour, *US regulator points finger over Freddie and Fannie*, FINANCIAL TIMES (Mar. 25, 2012).

63. Even if Mr. DeMarco had acceded to the Obama Administration's pressure to resign—something that under HERA the President could not force him to do—Mr. DeMarco could only have been replaced by one of FHFA's three Deputy Directors. 12 U.S.C. § 4512. Mr. DeMarco was himself one of those Deputy Directors, and the other two were appointed by Mr. DeMarco or Mr. Lockhart. Representative Barney Frank, who was at the time the ranking member of the House Financial Services Committee, told a reporter that FHFA's Deputy Directors "support DeMarco's strategies" and "would likely continue the same foreclosure policies that have so angered Democrats and housing advocates." Mike Lillis, *Rep. Frank joins calls for top Fannie, Freddie regulator to be replaced*, THE HILL (Mar. 11, 2012), https://goo.gl/kK9YrF.

**Under FHFA's Management, the Companies Adopt**
**Unjustified Accounting Policies**
**that Improperly Increase Their Draws on Treasury's Funding Commitment**

64. Starting in the third quarter of 2008—when FHFA took control of the Companies as conservator—the Companies began to make wildly pessimistic and unrealistic assumptions about their future financial prospects. Those assumptions triggered adjustments to the Companies' balance sheets, most notably write-downs of significant tax assets and the establishment of large loan loss reserves, which caused the Companies to report large non-cash losses. Although reflecting nothing more than faulty accounting assumptions about the Companies' future prospects and having no effect on the cash flow the Companies were generating, these non-cash losses temporarily decreased the Companies' reported net worth by hundreds of billions of dollars. For example, in the first year and a half after imposition of the conservatorship, Fannie reported $127 billion in losses, but only $16 billion of that amount reflected *actual* credit-related losses. Upon information and belief, FHFA directed Fannie and Freddie to record these excessive non-cash losses, which forced the Companies to make unnecessary and improper draws on Treasury's funding commitment.

65. By the end of 2011, the Companies' reported net worth had fallen by $100 billion as a result of the decision to write down the value of their deferred tax assets. A deferred tax asset is an asset that may be used to offset future tax liability. Under Generally Accepted Accounting Principles, if a company determines that it is unlikely that some or all of a deferred tax asset will be used, the company must establish a "valuation allowance" in the amount that is unlikely to be used. In other words, a company must write down a deferred tax asset if it is unlikely to be used to offset future taxable profits. Shortly after FHFA took control of the Companies, the Companies began to prepare their financial statements based on the implausible

assumption that they would *never again* generate taxable income and that their deferred tax assets were therefore worthless. That arbitrary and unjustifiable decision dramatically reduced the Companies' reported net worth.

66. The decision to designate excessive loan loss reserves was another important factor in the artificial decline in the Companies' reported net worth during the early years of conservatorship. Loan loss reserves are an entry on the Companies' balance sheets that reduces their reported net worth to reflect anticipated losses on the mortgages they own. Beginning when FHFA took control of the Companies in the third quarter of 2008 and continuing through 2009, the Companies were forced to provision additional loan loss reserves far in excess of the credit losses they were actually experiencing. The extent to which excess loan loss reserve provisioning reduced the Companies' reported net worth is dramatically illustrated by the following chart, which compares the Companies' loan loss reserve provisioning to their actual credit losses since 2006. As the chart shows, FHFA caused the Companies to make grossly excessive loan loss reserve provisions in 2008 and 2009. The excessive nature of these loan loss provisions was readily apparent by 2012, and the inevitable reversals would appear as income on the Companies' balance sheet.

**Loan Loss Reserve Provisions vs. Credit Expenses**




Source: Company Financials

(1) Credit losses based on net charge-offs (charge-offs less recoveries), plus foreclosed property expense. Charge-offs taken in relation to credit-impaired loans of Fannie Mae have been reversed, and replaced with ultimately realized

(2) Provisions shown include stated provisions, plus foreclosed property expense for Fannie Mae, and REO expense and Transfers for Freddie Mac. Note, stated provisions based on provisions only and excludes impact of provision reversals

67. Despite the fact that the Companies' mortgage portfolios were safer than the similar portfolios held by banks involved in the mortgage business, banks were much more accurate—and, with the consent of their regulators, far less aggressive—in reducing their net worth to reflect expected future loan losses. The following chart illustrates this fact:




68. Ultimately, the Companies drew a total of $187 billion from Treasury, in large part to fill the holes in the Companies' balance sheets created by these artificial non-cash losses. Including Treasury's initial $1 billion liquidation preference in each Company, Treasury's liquidation preference for its Government Stock amounts to approximately $117 billion for Fannie and approximately $72 billion for Freddie. Approximately $26 billion of these combined amounts were drawn simply to pay the 10% dividend payments owed to Treasury. (In other words, FHFA requested draws to pay Treasury this $26 billion in cash that was not otherwise available rather than electing to pay the dividends in kind. Had the dividends been paid in kind, FHFA would not have had to draw from—and, consequently, reduce the remaining size of—Treasury's commitment to pay them.) Thus, Treasury actually disbursed approximately $161 billion to the Companies, primarily reflecting the results of the questionable accounting decisions discussed above.

## The Companies Return to Profitability and Stability

69. As already explained, the "losses" Fannie and Freddie experienced under conservatorship were driven primarily by temporary and unrealistically pessimistic accounting decisions, not by a failure to generate enough revenue to cover expenses. Indeed, although the Companies reported significant declines in their net worth due to unjustified accounting decisions, throughout the conservatorship they have had more than enough cash reserves and operational revenues to cover their expenses.

70. In 2012, Fannie and Freddie began generating consistent profits notwithstanding the anchor of their overstated loss reserves and the write-down of their deferred tax assets. Fannie has not drawn on Treasury's commitment since the fourth quarter of 2011, and Freddie has not drawn on Treasury's commitment since the first quarter of 2012. In fact, in the first two quarters of 2012, the Companies posted sizable profits totaling more than $11 billion.

71. By 2012, the Companies were well-positioned to continue generating robust profits for the foreseeable future. Fannie's and Freddie's financial results are strongly influenced by home prices. And as FHFA's Home Price Index shows, the market reached its bottom in 2011:




72. The improving housing market was coupled with stricter underwriting standards at Fannie and Freddie. As a result—and as FHFA knew—Fannie- and Freddie-backed loans issued after 2008 had dramatically lower serious delinquency rates than loans issued between 2005 and 2008. The strong quality of these newer "vintages" of loans boded well for the Companies' future financial prospects.

73. Together, the Companies' return to robust profitability and the stable recovery of the housing market showed in early 2012 that the Companies could in time redeem Treasury's Government Stock and that value remained in their privately owned preferred and common stock. Indeed, a presentation sent to senior Treasury officials in February 2012 indicated that "Fannie and Freddie could have the earnings power to provide taxpayers with enough value to repay Treasury's net cash investments in the two entities." The Companies' financial performance and outlook only further improved in the ensuing months. In the weeks leading up to the Net Worth Sweep, one Treasury official observed that Freddie's second quarter 2012

results were "very positive," and a report circulated among senior FHFA officials said that the agency deserved a "high five" for the Companies' strong financial outlook.

74. Furthermore, as a result of Fannie's and Freddie's return to sustained profitability, it was clear that the overly pessimistic accounting decisions weighing down the Companies' balance sheets would have to be reversed. Due to these inevitable reversals, by early August 2012, FHFA knew that Fannie and Freddie were poised to generate massive profits well in excess of the Companies' dividend obligations to Treasury—profits that would make the $11 billion the Companies generated in the first half of 2012 look small by comparison.

75. By August 2012, FHFA knew that the Companies' reserves for loan losses far exceeded their actual losses. These excess loss reserves artificially depressed the Companies' net worth, and reversing them would increase the Companies' net worth accordingly. A July 2012 FHFA presentation recognized that starting in 2008 the Companies had set aside loan loss reserves far in excess of their actual losses. And FHFA officials attended a meeting of Freddie's Loan Loss Reserve Governance Committee on August 8, 2012—days before the Net Worth Sweep was announced.

76. Another principal driver of the outsized profits that the Companies would inevitably generate was the mandated release of the Companies' deferred tax asset valuation allowances. By mid-2012, Fannie and Freddie had combined deferred tax asset valuation allowances of nearly $100 billion. Under relevant accounting rules, those valuation allowances would have to be reversed if the Companies determined that it was more likely than not that they would generate taxable income and therefore be able to use their deferred tax assets. As early as 2011, it was known within Fannie that the valuation allowance would be reversed; the only question was the precise timing.

77. Indeed, by the time the Net Worth Sweep was announced, it was apparent to FHFA that Fannie and Freddie would soon be in a position to reverse the valuation allowances for their deferred tax assets. On July 13, 2012, Bradford Martin, Principal Advisor in FHFA's Office of Conservatorship Operations, broadly circulated within FHFA minutes from a July 9, 2012, Fannie executive management meeting. The recipients of the email included acting Director DeMarco and Mr. Ugoletti. The minutes stated that Fannie Treasurer David Benson "referred to the next 8 years as likely to be 'the golden years of [Fannie and Freddie] earnings.' " Projections were attached to the email containing the following slide:

Verification and Review in Progress

DRAFT

**Annual view of net "repayment" to the US Government**

A228

Fannie Mae ($ in billions)

| | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Comprehensive Income* | | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 12.9 | 12.2 | 11.6 | 11.2 | 10.9 | 11.2 |
| *Preferred Dividend Payment* | 19.8 | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.1 | 12.1 | 12.1 | 12.1 | 12.2 | 12.2 |
| *Residual Equity* | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.8 | 2.5 | 2.5 | 2.0 | 1.0 | 0.0 | 0.0 |
| Cumulative Dividends | 19.8 | 31.4 | 43.2 | 55.3 | 67.6 | 79.8 | 92.0 | 104.1 | 116.3 | 128.4 | 140.6 | 152.8 |
| Cumulative Infusion | (116.1) | (116.1) | (119.0) | (121.2) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.7) | (122.7) |
| Net "Repayment" to Gov't | *(96.3)* | *(84.7)* | *(75.8)* | *(65.9)* | *(53.9)* | *(41.7)* | *(29.5)* | *(17.4)* | *(5.2)* | *6.9* | *18.9* | *30.1* |
| SPSPA Funding Cap | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 |
| Remaining Funding under SPSPA | 124.8 | 124.8 | 122.0 | 119.7 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.3 | 118.3 |

Combined GSE "repayment" could occur in 2020

Freddie Mac ($ in billions)

| | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Comprehensive Income* | | 7.3 | 8.1 | 8.9 | 9.4 | 9.8 | 10.2 | 9.8 | 9.4 | 9.1 | 8.9 | 9.0 |
| *Preferred Dividend Payment* | 16.3 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 |
| *Residual Equity* | 0.0 | 3.1 | 4.5 | 6.6 | 9.2 | 12.2 | 15.2 | 17.7 | 19.9 | 21.8 | 23.4 | 25.2 |
| Cumulative Dividends | 16.3 | 23.5 | 30.8 | 38.0 | 45.2 | 52.5 | 59.7 | 66.9 | 74.1 | 81.4 | 88.6 | 95.8 |
| Cumulative Infusion | (72.2) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) |
| Net "Repayment" to Gov't | *(55.9)* | *(48.8)* | *(41.6)* | *(34.3)* | *(27.1)* | *(19.9)* | *(12.6)* | *(5.4)* | *1.8* | *9.1* | *16.3* | *23.5* |
| SPSPA Funding Cap | 220.5 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 |
| Remaining Funding under SPSPA | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 |

**Our approach is analogous to analyses by Moody's, OMB, and Millstein.**

Note: Numbers may not foot due to rounding

Confidential – Restricted 14 FannieMae

78. Those projections expressly stated the assumption that Fannie would not be paying taxes because it would be using its deferred tax assets—and if Fannie was expecting to use its deferred tax assets, it would have to release the valuation allowance it had established for

them. FHFA knew this; indeed, FHFA accountants were monitoring the Companies' deferred tax assets situation, and FHFA knew that the Companies' audit committees were assessing the status of the valuation allowances on a quarterly basis. In addition, Fannie CFO Susan McFarland testified that in July 2012, she highlighted the potential release of the valuation allowance at a Fannie executive committee meeting attended by at least one FHFA official. Ms. McFarland also testified that FHFA was on notice that she had told senior Treasury officials during an August 9, 2012, meeting that she expected Fannie to report roughly $50 billion in profits within the next year as a result of the recognition of deferred tax assets.

79. While Mr. Ugoletti stated in a sworn declaration in the United States District Court for the District of Columbia, "based on personal knowledge of the facts," that FHFA did not "envision[ ] at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013," his deposition testimony in another case contradicted that statement and reveals that he had no basis for making this assertion: "I don't know who else in FHFA or what they knew about the potential for that [i.e., that the deferred tax assets might be written back up in 2013], but . . . our accountants were monitoring this situation, they were monitoring . . . whether to revalue, they had to do it all the time, revalue or not revalue, and I do not recall knowing about that this was going to be an issue until really '13 when it became imminent that, oh, this has to happen now, and I don't know what anybody else thought about it."

80. In the summer of 2012, FHFA also anticipated that the Companies would soon generate sizable additional income thanks to suits they had brought against other financial institutions for securities law violations and fraud in the sale of private-label securities between 2005 and 2007. Although FHFA was aware of the recoveries the Companies were likely to

obtain through these suits even before the Companies were placed in conservatorship, the Companies were not permitted to aggressively pursue their claims against many of the Nation's largest banks until the financial crisis had ended. In 2013 and 2014, the Companies recovered over $18 billion from financial institutions via settlements of such claims and suits. FHFA knew in August 2012 that the Companies would reap substantial profits from such settlements.

81. In sum, by August 2012 FHFA knew that Fannie and Freddie were poised to reverse billions of dollars of loan loss reserves, to add tens of billions of dollars of deferred tax assets to their balance sheets, and to receive billions more through the settlement of claims against other large financial institutions. This inevitable income, coupled with the Companies' strong earnings from their day-to-day operations, meant that they would generate profits well in excess of their dividend obligations to Treasury for the foreseeable future.

**FHFA and Treasury Amend the PSPAs To Expropriate Private Shareholders' Investments and Ensure Fannie and Freddie Can Never Rebuild Capital or Exit Conservatorship**

82. On August 17, 2012, days after the Companies had announced their return to profitability and just as it was becoming clear that they had regained the earnings power to redeem Treasury's Government Stock and exit conservatorship, FHFA and Treasury amended the PSPAs for a third time. The third amendment imposed the Net Worth Sweep, under which the Companies are required to pay Treasury a quarterly dividend starting in 2013 and continuing forever that is equal to their entire net worth, less a small capital buffer that decreases by $600 million every year and reaches zero starting in 2018. Thus, rather than paying Treasury a fixed 10% cash or 12% in kind dividend, the Companies are now required to pay Treasury *all*—100%—of their comprehensive income and retained assets in perpetuity. Since the Net Worth

Sweep guarantees that Treasury will receive all of the Companies' comprehensive income anyway, the third amendment suspended the periodic commitment fee.

83. In publicly explaining and defending the Net Worth Sweep, FHFA and Treasury have claimed that it was necessary to restructure the dividend on the Government Stock because the Companies could not afford a cash dividend equal to 10% of Treasury's liquidation preference. According to this explanation, in 2012 the Companies were at risk of falling into a "death spiral" in which they would exhaust Treasury's funding commitment by repeatedly borrowing money from Treasury to pay dividends on the Government Stock, thus increasing the size of Treasury's liquidation preference and the Companies' future dividend obligations to Treasury.

84. Several facts show that the purported "circular dividend" problem FHFA has used to explain the Net Worth Sweep was entirely illusory and is a mere pretext for its actions. First, as explained above, the original terms of the PSPAs entitled the Companies to pay Treasury's dividends in kind with additional stock, thus avoiding the need to make draws on Treasury's funding commitment to finance cash dividends they could not otherwise afford. In fact, Jeffrey Foster, one of the architects of the Net Worth Sweep at Treasury, has testified that he could not identify any "problems of the circularity [in dividend payments that] would have remained had the [payment-in-kind] option been adopted."

85. Second, FHFA and Treasury considered an alternative to the arrangement they ultimately adopted that would have had the Net Worth Sweep only kick in if Treasury's remaining funding commitment fell below $100 billion. A 2011 Treasury memorandum also acknowledged that any threat to Treasury's funding commitment from dividend payments potentially could be addressed by "converting [Treasury's] preferred stock into common or

cutting or deferring payment of the dividend (under legal review).” The only plausible explanation for the decision not to embrace one of the readily available and obvious alternatives to the Net Worth Sweep is that FHFA knew that these alternatives would allow the Companies to rebuild capital in contravention of its plans to wipe out private shareholders and wind down the Companies.

86. Third, the structure and timing of the Net Worth Sweep—coming when the Companies were about to add tens of billions of dollars to their balance sheets—had the effect of *reducing* the amount of money available to guarantee that the Companies would maintain a positive net worth. Given the Companies’ return to profitability, there was no imminent risk in 2012 that Fannie and Freddie would be depleting Treasury’s funding commitment—that risk was at its lowest point since the start of the conservatorships. Communications within FHFA and Treasury in the months leading up to the Net Worth Sweep confirm that fact by indicating that the Companies’ debt investors regarded Treasury’s funding commitment as sufficient.

87. If FHFA had been genuinely concerned about preserving Treasury’s funding commitment in 2012, it would have delayed imposing the Net Worth Sweep so long as the Companies maintained a substantial positive net worth. Instead, it imposed the Net Worth Sweep at a time when it knew that the near-term effect would be to transfer to Treasury massive profits that the Companies could have otherwise retained as a capital buffer and used to avoid making draws on Treasury’s funding commitment in any subsequent unprofitable quarters. FHFA has acknowledged that the Net Worth Sweep increases the chances of further draws on Treasury’s funding commitment, observing that the Companies “are constrained by the PSPAs from building capital” and that the lack of retained capital combined with “mark-to-market volatility from the [Companies’] derivatives portfolio” has the effect of increasing “the likelihood of

negative net worth in future quarters." Thus, even if FHFA believed that the Companies could not generate enough profits in the long term to finance a 10% dividend on Treasury's investment, it would not have imposed the Net Worth Sweep when it did if the goal was to preserve Treasury's funding commitment. Doing so only increased the likelihood of future draws.

88. Furthermore, the Companies did not benefit from the third amendment's suspension of the periodic commitment fee. Treasury had consistently waived the periodic commitment fee before the third amendment, and the original PSPAs provided that Treasury could only set the amount of such a fee with the agreement of the Companies and at a market rate. And that rate likely would have been, at most, a small fraction of the outstanding amount of Treasury's commitment. Freddie forecasted its "sensitivity" to imposition of a periodic commitment fee as follows: "Our sensitivity to a commitment fee based on remaining commitment available beginning in 2013 of $149 billion shows that a 25 bps fee results in a $0.4 billion annual impact on Stockholders' Equity." Even Freddie's forecast was too high; Treasury charged AIG the equivalent of a 9 bps annual fee for six years as part of a financial commitment it made to that company in 2009. Further, the purpose of the fee was to compensate Treasury for its ongoing support in the form of the commitment to invest in the Companies' Government Stock. By the time of the Net Worth Sweep, the 10% return on the Government Stock and the warrants for 79.9% of the common stock provided a more than adequate return on the government's standby commitment, and thus any additional fee would have been inappropriate. In August of 2012, the Companies had returned to stable profitability and were no longer drawing from Treasury's commitment. Given the Companies' return to profitability, the market rate for the periodic commitment fee in 2012 and thereafter would have been zero. Finally, even if a market-rate fee had been agreed between Treasury and FHFA and imposed pursuant to the

PSPAs, the Companies had sufficient market power to pass the entire amount of this fee through to their customers—as the Companies do for other operating and financing costs—without affecting profitability or the value of the Companies' stock.

89. For the foregoing reasons, Mr. Ugoletti's statement, in his sworn declaration to the District Court for the District of Columbia, that the value of the periodic commitment fee was "incalculably large" is wholly inaccurate. Indeed, Mr. Ugoletti subsequently testified that he could not recall discussing his idea that the value of the fee was incalculably large with anyone at FHFA or Treasury, that he did not know whether anybody shared that view, that he is neither "an expert on periodic commitment fees," nor "in the business of calculating" such fees, and that he did not know whether anyone at FHFA or Treasury ever tried to calculate the value of the periodic commitment fee. Mr. DeMarco also testified that he could not recall anyone at FHFA attempting to quantify what the periodic commitment fee would have been in the absence of the Net Worth Sweep.

90. Rather than seeking to avert a purported "death spiral" or relieve the Companies of the burden of an "incalculably large" periodic commitment fee, FHFA's real reason for imposing the Net Worth Sweep was to further its objectives of expropriating private shareholders' investments for the benefit of the federal government and winding down the Companies. Even before the Net Worth Sweep, FHFA had resolved under acting Director DeMarco's leadership to operate Fannie and Freddie with the aim of "minimiz[ing] losses on behalf of taxpayers," FHFA, A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIPS: THE NEXT CHAPTER IN A STORY THAT NEEDS AN ENDING 7 (Feb. 21, 2012)—a goal that ignores a simple reality: no such losses have been incurred, and Treasury will soon have realized an $83 billion profit on its investment in the Companies. Despite this fact, FHFA has made clear that its

"overriding objectives" are to operate Fannie and Freddie to serve the federal government's policy goals of "[g]etting the most value for taxpayers and bringing stability and liquidity to housing finance . . . ." *Id*. at 21. Director Watt summed up the situation succinctly when stating that he does not "lay awake at night worrying about what's fair to the shareholders" but rather focuses on "what is responsible for the taxpayers." Nick Timiraos, *FHFA's Watt 'Comfortable' with U.S. Sweep of Fannie, Freddie Profits*, WALL STREET JOURNAL MONEY BEAT BLOG (May 16, 2014, 3:40 PM), http://goo.gl/Tltl0U.

91. Following FHFA's lead, Fannie's management has publicly acknowledged that it does not routinely consider the interests of private shareholders when operating the company. Timothy Mayopoulos, Fannie's CEO, said that his company's management is "not looking to maximize profits for investors" and that he is "less interested in what happens to Fannie Mae as a legal entity." Fannie has also expressly disavowed any fiduciary duty to its private shareholders in its SEC filings. *See* Fannie Mae 2014 Annual Report at 1 (Form 10-K) (Feb. 20, 2015), http://goo.gl/FZofs6 ("Our directors do not have any fiduciary duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, [or] the holders of our equity or debt securities . . . unless specifically directed to do so by the conservator.").

92. The Net Worth Sweep furthered FHFA's goal of enriching the federal government at private shareholders' expense. As FHFA has explained, the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers." FHFA, 2012 REP. at 13. Treasury similarly explained when the Net Worth Sweep was announced that this change would require that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to

benefit taxpayers." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012).

93. The Net Worth Sweep, in short, effectively nationalized the Companies and confiscated the existing and potential value of all privately held equity interests, including the stock owned by Plaintiffs. Indeed, the government itself has stated in a brief in another case that an "interest in residual profits is the defining feature of an equity interest in a corporation." *Starr International Co. v. United States*, at 24, No. 2015-5103 (Fed. Cir. June 1, 2016). After the Net Worth Sweep, Treasury has the right to all residual profits, and it hence owns all the equity. The economic rights of all other equity holders have been eliminated.

94. As a Staff Report from the Federal Reserve Bank of New York acknowledged, the Net Worth Sweep "effectively narrows the difference between conservatorship and nationalization, by transferring essentially all profits and losses from the firms to the Treasury." W. Scott Frame, et al., *The Rescue of Fannie Mae and Freddie Mac* at 21, FEDERAL RESERVE BANK OF NEW YORK STAFF REPORTS, no. 719 (Mar. 2015). The Economist stated the obvious in reporting that the Net Worth Sweep "squashe[d] hopes that [Fannie and Freddie] may ever be private again" and, as a result, "the companies' status as public utilities . . . appear[ed] crystal clear." Fannie Mae and Freddie Mac, *Back to Black*, THE ECONOMIST, Aug. 25, 2012, *available at* http://goo.gl/1PHMs.

95. FHFA also imposed the Net Worth Sweep to further its goal of reforming the Nation's housing finance system by winding down Fannie and Freddie and ensuring that they could not exit conservatorship under private control. In its 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac." FHFA, 2012 REP. at 13. FHFA Acting Director

Edward DeMarco informed a Senate Committee that the Net Worth Sweep would further this goal, explaining that "recent changes to the PSPAs, replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking & Urban Affairs 3 (Apr. 18, 2013). In short, the Net Worth Sweep is central to the FHFA's plan to "wind[] up the affairs of Fannie and Freddie." Remarks of Edward J. DeMarco, Getting Our House in Order at 6 (Wash., D.C., Oct. 24, 2013).

96. As a result of the Net Worth Sweep, it is clear that FHFA will not allow Fannie and Freddie to exit conservatorship but rather will continue to operate them essentially as wards of the state, unless and until Congress takes action. Indeed, FHFA's website states that "FHFA will continue to carry out its responsibilities as Conservator" until "Congress determines the future of Fannie Mae and Freddie Mac and the housing finance market." FHFA as Conservator of Fannie Mae and Freddie Mac, http://goo.gl/PjyPZb. This is consistent with the testimony of former acting Director DeMarco, who stated that he had no intention of returning Fannie and Freddie to private control under charters he perceived to be "flawed." Mr. Ugoletti also testified that FHFA's objective "was not for Fannie and Freddie Mac to emerge from conservatorship."

97. The timing of the Net Worth Sweep was driven by the Companies' return to profitability. Rather than worry over exhausting Treasury's funding commitment, the "risk" that concerned FHFA was that Fannie and Freddie would recognize extraordinary profits that would allow them to begin rebuilding their capital levels and position themselves to exit conservatorship and deliver value to their private shareholders.

98. The Net Worth Sweep is particularly egregious because it makes the Companies unique in financial regulation. All other financial institutions are required to retain minimum levels of capital that ensure that they can withstand the vicissitudes of the economic cycle and are prohibited from paying dividends when they are not adequately capitalized. The FDIC's Risk Management Manual of Examination Policies explains why capital is critical to any financial institution: "It absorbs losses, promotes public confidence, helps restrict excessive asset growth, and provides protection to [market participants]." For this reason, in all other contexts financial regulators work to ensure that financial institutions maintain minimum capital levels.

99. The Companies, in contrast, are not allowed to retain capital but instead must pay their entire net worth over to Treasury as a quarterly "dividend." In other words, whereas other financial institutions are subject to *minimum* capital standards, the Net Worth Sweep makes the Companies subject to a capital *maximum*—any amount of retained capital that they hold in excess of a small and diminishing capital buffer is swept to Treasury on a quarterly basis. The effect of the Net Worth Sweep is thus to force the Companies to operate in perpetuity on the brink of insolvency and to immediately nullify the rights of private shareholders to any return *of* their principal or any return *on* their principal (i.e., in the form of dividends). *See Perry Capital*, 848 F.3d at 1126 (Brown, J., dissenting) ("The Net Worth Sweep fundamentally transformed the relationship between the Companies and Treasury: a 10 percent dividend became a sweep of the Companies' near-entire net worth; an in-kind dividend option disappeared in favor of cash payments; the ability to retain capital above and beyond the required dividend payment evaporated; and, most importantly, the Companies lost any hope of repaying Treasury's liquidation preference and freeing themselves from its debt."). In other contexts, federal regulators understand such an arrangement to be fundamentally unsafe and unsound. Indeed,

Director Watt has described the Companies' inability to build capital reserves under the Net Worth Sweep as a "serious risk" that erodes investor confidence in the Companies because they have "no ability to weather quarterly losses." Director Watt recently reiterated this point, noting that he has "expressed [his] concerns both publicly and privately about the prospect that [the Net Worth Sweep] and other factors . . . dramatically increase the likelihood of additional draws" on Treasury's funding commitment.

100. This dramatic departure from accepted practices of financial regulation is demonstrated by the following chart, which compares the equity to assets ratio of Fannie and Freddie to that maintained by other large insurers:




101. FHFA's departure from sound and solvent operation has not gone unnoticed by Congress. Representatives Stephen Lee Fincher (R-TN) and Mick Mulvaney (R-SC) wrote to

Treasury Secretary Jack Lew and Director Watt in February 2016 to express their view that "[i]t is extremely troubling" that Fannie and Freddie "are being specifically directed to deplete their capital reserves. . . . In a post-Dodd-Frank world, Fannie and Freddie will be the only significant financial institutions not voluntarily or mandatorily raising their capital; instead, they are being told to lower their capital—to zero. This does not make sense." Representative Michael Capuano (D-MA) has expressed similar sentiments, observing that "Fannie and Freddie are basically being used as a piggy bank by the Treasury, and at some point they will lose the lawsuits being brought on by investors and owe someone an awful lot of money."

102. Forcing the Companies to operate in an inherently unsafe and unsound condition also has deleterious effects on their borrowing costs, which is a major expense for both Companies. As former Acting Director DeMarco has admitted, if the Companies are highly leveraged and have a relatively small amount of capital then, all other things being equal, their cost of borrowing will be higher.

103. Rather than furthering the mission of a traditional conservator by putting Fannie and Freddie in a sound and solvent condition, the Net Worth Sweep's reduction and eventual elimination of the Companies' capital reserves *increases* the likelihood of additional Treasury investment in the Companies while eliminating the possibility that private shareholders will ever recover any value from their investment. Fannie has acknowledged as much, describing the Net Worth Sweep as a "risk factor," Fannie Mae 2012 Annual Report at 46–47 (Form 10-K) (Apr. 2, 2013), http://goo.gl/rGVpQq, and observing that the Net Worth Sweep prevents Fannie from "retain[ing] capital to withstand a sudden, unexpected economic shock." Press Release, Statement by Kelli Parsons, Senior Vice President and Chief Communications Officer, on Stress Test Results (Apr. 30, 2014), http://goo.gl/g4pSNB.

104. FHFA fully understood that stripping capital out of a financial institution is the antithesis of operating it in a sound manner. Indeed, former acting Director DeMarco has testified that capital levels are "a key component of the safety and soundness of a regulated financial institution" and that, as a general matter, he thought that there should be more capital in the Companies to increase their safety and soundness.

105. FHFA's recognition of the importance of capital levels is further demonstrated by an event that took place shortly after the Net Worth Sweep was announced. Fannie initially determined that it should reverse its deferred tax assets valuation allowance as of December 31, 2012. Doing so, however, would reduce the amount of Treasury's remaining funding commitment under the formula established by the second amendment to the PSPAs. FHFA strongly opposed this reduction of the funding commitment, which it viewed as a form of capital available to the Companies: "Capital is key driver for composite rating of critical concerns. The reduction in capital capacity from the U.S. Treasury and the PSPA agreements places undue risk on the future of Fannie Mae in conservatorship." Indeed, FHFA threatened Fannie that "if the amount of funds available under the agreement was reduced as a result of [Fannie] releasing the valuation allowance in the fourth quarter of 2012, [FHFA] would need to ensure the preservation of [Fannie's] remaining capital and undertake regulatory actions that could severely restrict [Fannie's] operations, increase [Fannie's] costs, or otherwise substantially limit or change [Fannie's] business in order to ensure the continued safety and soundness of [Fannie's] operations." As a result of this pressure from FHFA, Fannie reconsidered its decision and waited until the following quarter to release its valuation allowance, when the reversal would no longer affect the size of Treasury's funding commitment under the PSPAs. Waiting this extra quarter preserved approximately $34 billion of Treasury's funding commitment. The Net Worth Sweep,

by contrast, has *reduced* the capital available to Fannie by a much larger amount—$130 billion, to date.

106. In sum, in adopting the Net Worth Sweep, FHFA abandoned a traditional conservator's goals of preserving and conserving assets and restoring its wards to a sound and solvent condition. Instead, the purpose and effect of the Net Worth Sweep is to expropriate private shareholders' investments in the Companies while ensuring that Fannie and Freddie cannot rebuild capital and exit conservatorship under private control.

**The Federal Government Reaps Massive Profits from Its Investment**
**<u>In the Companies Due to the Net Worth Sweep</u>**

107. As FHFA anticipated, Fannie and Freddie have been extraordinarily profitable since the imposition of the Net Worth Sweep. From January 2013 through the end of the second quarter of 2017, the Companies will have paid $215.6 billion in Net Worth Sweep "dividends"—over $130 billion more than they would have paid under the prior contractual arrangement.

108. As FHFA also anticipated, Fannie's 2013 net income included the release of over $50 billion of the company's deferred tax asset valuation allowance. The release of this valuation allowance underscores Fannie's financial strength, as it demonstrates Fannie's expectation that it will generate sizable taxable income moving forward. Fannie relied on the following evidence of future profitability in support of the release of its valuation allowance:

- Its profitability in 2012 and the first quarter of 2013 and expectations regarding the sustainability of these profits;
- Its three-year cumulative income position as of March 31, 2013;
- The strong credit profile of the loans it had acquired since 2009;

- The significant size of its guaranty book of business and its contractual rights for future revenue from this book of business;
- Its taxable income for 2012 and its expectations regarding the likelihood of future taxable income; and
- That its net operating loss carryforwards will not expire until 2030 through 2031 and its expectation that it would utilize all of these carryforwards within the next few years.

109. Freddie's 2013 earnings also reflect the Company's decision to release a sizeable (in excess of $20 billion) deferred tax asset valuation allowance. Freddie relied on the following evidence in support of its release of its valuation allowance:

- Its three-year cumulative income position as of September 30, 2013;
- The strong positive trend in its financial performance over the preceding six quarters, including the quarter ended September 30, 2013;
- The 2012 taxable income reported in its federal tax return which was filed in the quarter ended September 30, 2013;
- Its forecasted 2013 and future period taxable income;
- Its net operating loss carryforwards do not begin to expire until 2030; and
- The continuing positive trend in the housing market.

110. The Net Worth Sweep has proven to be immensely profitable for the federal government. The table below lists only the dividends Fannie and Freddie have paid under the Net Worth Sweep, and it does not include the $55.2 billion in dividends paid to Treasury before that time:

**Dividend Payments Under the Net Worth Sweep**
**(in billions)**

| | Fannie | Freddie | Combined |
|---|---|---|---|
| **2013** | **$82.4** | **$47.6** | **$130.0** |
| **2014** | **$20.6** | **$19.6** | **$40.2** |
| **2015** | **$10.3** | **$5.5** | **$15.8** |
| **2016** | **$9.7** | **$4.9** | **$14.6** |
| **2017**[1] | **$8.3** | **$6.7** | **$15.0** |
| **Total** | **$131.3** | **$84.3** | **$215.6** |

111. As the above chart shows, the Companies will soon have paid Treasury over $215 billion in "dividends" under the Net Worth Sweep. Had they instead been paying 10% cash dividends, they would have paid Treasury approximately $85 billion. The following chart shows how imposition of the Net Worth Sweep dramatically increased the size of the Companies' dividend payments to Treasury:

[1] Expected Net Worth Sweep dividend payments through the first two quarters of 2017.




112. Had the Companies used their quarterly profits in excess of Treasury's 10% dividend to partially retire Treasury's senior preferred stock, Treasury's remaining investment in the Companies would today be roughly $6 billion. But rather than using the Companies' massive profits to rebuild capital or reduce their dividend obligations to Treasury, the Net Worth Sweep required the Companies to simply gift these funds over to Treasury in exchange for nothing. As explained above, FHFA knew that the Net Worth Sweep would result in this massive financial windfall for the federal government.

113. But for the Net Worth Sweep, Fannie and Freddie would have $130 billion of additional capital to cushion them from any future downturn in the housing market and to

reassure debtholders of the soundness of their investments. Instead, because of the Net Worth Sweep, the Companies are required to operate at the edge of insolvency, with no prospect of ever generating value for private shareholders, rendering the Companies fundamentally unsafe and unsound and more likely to require an additional—albeit entirely avoidable—government bailout in the future.

114. The dramatically negative impact of the Net Worth Sweep on the Companies' private shareholders is demonstrated by Fannie's results in the first quarter of 2013. At the end of the first quarter Fannie's net worth stood at $62.4 billion. Under the prior versions of the PSPAs, if Fannie chose to declare a cash dividend it would have been obligated to pay Treasury a dividend of only $2.9 billion, and the balance—$59.5 billion—would have been credited to its capital. Private shareholders would have been entitled to a pro rata share of any additional amount of that residual capital paid out to Treasury in dividends. The Net Worth Sweep, however, required Fannie to pay Treasury $59.4 billion, while private shareholders were left with nothing.

115. Through the Net Worth Sweep, FHFA has ensured that the Companies cannot operate independently and must remain permanent wards of the federal government. FHFA has announced that, during the conservatorship, existing statutory and FHFA-directed regulatory capital requirements will not be binding on the Companies. And at the end of 2012, Fannie had a deficit of core capital in relation to statutory minimum capital of $141.2 billion. This deficit decreased to $88.3 billion by the end of the first quarter of 2013. When adjusted for the $59.4 billion dividend payment to Treasury, however, Fannie's core capital deficit jumped back up to $147.7 billion. Thus, because of the Net Worth Sweep, Fannie was in a ***worse*** position with respect to its core capital than it was before the record-breaking profitability it achieved in the

first quarter of 2013. This situation will persist perpetually under the Net Worth Sweep. Indeed, despite generating over $132 billion in comprehensive income since the Net Worth Sweep has been in effect, Fannie's core capital deficit remains at nearly $140 billion.

116. The Net Worth Sweep has become a major revenue source for the United States Government at the expense of Plaintiffs and other private shareholders. For example, the federal government's record-breaking $53.2 billion surplus for the month of December 2013 was driven in large part by the $39 billion swept from Fannie and Freddie. Fannie's and Freddie's outsize dividend payments in 2013 also extended by approximately two months Treasury's ability to meet federal obligations during the debt ceiling crisis.

117. Treasury has disbursed $116.1 billion to Fannie under the PSPAs, and Treasury will soon have recouped a total of $162.6 billion from Fannie in the form of purported "dividends." Treasury has disbursed $71.3 to Freddie under the PSPAs and Treasury will soon have recouped a total of $108.2 billion from Freddie in the form of purported "dividends." At the end of June 2017, Fannie and Freddie will have collectively paid Treasury approximately $83.3 billion more than they have received.

118. Yet, under the Net Worth Sweep, these dividend payments do not reduce the liquidation preference or otherwise redeem any of Treasury's Government Stock. Instead, the liquidation preference of Treasury's Government Stock in the Companies remains at approximately $189 billion (due to the Companies' draws and the $1 billion initial valuation of Treasury's Government Stock in each) and will remain at that amount regardless of how many billions of dollars the Companies pay to Treasury in "dividends" going forward.

## FHFA Defends the Net Worth Sweep and Engages in Other Ongoing Conduct that Harms the Companies and Their Private Shareholders

119. Even after it became clear that the Net Worth Sweep had recklessly squandered tens of billions of dollars that the Companies could have otherwise retained as capital, FHFA has used its conservatorship powers to block shareholder suits aimed at overturning the Net Worth Sweep or obtaining compensation from those responsible. FHFA has used its status as the successor to most shareholder derivative claims under 12 U.S.C. § 4617(b)(2)(A) to obtain dismissal of shareholder derivative suits brought against FHFA, the Treasury Department, and the Companies' auditors. FHFA's conduct in litigation related to the Net Worth Sweep makes clear that it is committed to a policy of not permitting any such shareholder derivative suits related to this topic to go forward.

120. In entering into and defending the Net Worth Sweep, FHFA has also disregarded the fiduciary duties that state law normally applies to a corporation's management. If FHFA had fiduciary duties to the Companies or their shareholders, its decision to approve and defend the Net Worth Sweep would be a patently unlawful act of self-dealing and a clear violation of the duties of loyalty and care. But when FHFA acts as conservator under HERA, it has successfully argued that it has no duty to prioritize the interests of shareholders above its own interests. In defending the Net Worth Sweep in other cases, FHFA has repeatedly argued that the decision's severe adverse consequences for the Companies and private shareholders do not matter because FHFA determined that the Net Worth Sweep would be in *its own* best interests. In adopting and defending the Net Worth Sweep, FHFA has thus openly disregarded the limits that state law would otherwise impose on the Companies' management.

121. FHFA's approval of the Net Worth Sweep also authorized its contractual counterparty—the Treasury Department—to engage in conduct that would have otherwise

violated HERA and the Administrative Procedure Act. In entering into the Net Worth Sweep, Treasury acted arbitrarily and capriciously and it violated HERA, which does not permit Treasury to purchase the Companies' securities after 2009. But on the theory that 12 U.S.C. § 4617(f) not only bars judicial review of *FHFA's* actions as conservator but also the actions of third parties with whom FHFA contracts, courts have dismissed Administrative Procedure Act claims against Treasury. *See Perry Capital*, 848 F.3d at 1096–97. Thus, by contracting with Treasury, FHFA was able to use its unparalleled conservatorship powers to effectively change the law and empower a federal agency to engage in conduct that would have otherwise violated federal statutes.

122. Moreover, FHFA's defense of the Net Worth Sweep is just one manifestation of its ongoing policy of seeking to destroy the investments of the Companies' private shareholders while winding down the Companies and preventing them from rebuilding capital. Starting before the Net Worth Sweep and continuing to the present day, FHFA has ordered the Companies to pay quarterly dividends on Treasury's Government Stock in cash, even though these dividends could be paid in kind. This quarterly decision to order the payment of cash dividends is especially harmful after the Net Worth Sweep because the Companies' calculated net worth includes changes in the value of both cash and non-cash assets. In the first quarter of 2013, for example, over $50 billion of Fannie's profitability resulted from the release of the Company's deferred tax assets valuation allowance—the same non-cash asset that previously created massive paper losses for the Company. As a result, Fannie was required to "fund [its] second quarter dividend payment of $59.4 billion primarily through the issuance of debt securities." Fannie, 2013 First Quarter Report, at 42. Borrowing money to pay an enormous dividend on a non-cash profit (due to an accounting reversal) is without precedent in any

conservatorship and places the Companies in an inherently unsafe and unsound financial position.

123. FHFA's decision to direct the Companies to declare and pay Treasury's dividends in cash not only forces the Companies to pay out vast sums of cash to Treasury but also compels them to make interest payments on subordinated debt that they could otherwise defer. When the Companies were forced into conservatorship, both had significant amounts of outstanding subordinated debt. Under the terms of their agreements with subordinated debt holders, the Companies were entitled to defer paying interest on that debt when their retained capital fell below a specified threshold. If the Companies chose to exercise this option, however, they would be contractually obliged not to pay cash dividends on any stock—including Treasury's Government Stock. Despite announcing during the early days of conservatorship that Fannie's capital reserves had fallen below levels that entitled it to withhold subordinated debt payments, FHFA directed Fannie to continue making these interest payments, citing the fact that deferring subordinated debt payments would have required Fannie to stop paying cash dividends on its stock. Similarly, Freddie disclosed that FHFA directed it to continue paying interest on its subordinated debt and not to exercise its contractual right to defer those payments. FHFA's decision to direct the Companies to make unnecessary subordinated debt payments that could have been used to build up their capital reserves shows that it is operating the Companies with the aim of maximizing dividend payments to Treasury and with no concern for the soundness and safety of the Companies, the preservation of their assets, or the interests of private shareholders.

124. Exercising both its conservatorship and its regulatory powers, FHFA has also in recent years directed the Companies to develop the Common Securitization Platform—a de

facto merger of the information technology systems the Companies use to issue mortgage-backed securities. FHFA has described the Common Securitization Platform as a "cornerstone[]" of housing finance reform that is intended to facilitate the entry of new competitors into the mortgage securitization business. The Common Securitization Platform is also part of FHFA's broader effort to force the Companies to issue "single securities"—mortgage-backed securities with identical characteristics that financial markets will regard as interchangeable. As with the Common Securitization Platform, the ultimate goal of FHFA's single security initiative is to change the basic structure of the Nation's housing finance market to advantage the Companies' competitors—and potentially to pave the way for eliminating Fannie and Freddie entirely.

125. FHFA's effort to use its powers to transform the Nation's housing finance system to the disadvantage of the Companies and their shareholders is further illustrated by "credit risk transfer" deals the Companies have agreed to under FHFA's direction. Under these deals, the Companies pay investors to share a portion of the risk associated with the portfolios of mortgages the Companies guarantee. Such risk-sharing deals are a priority for FHFA because they further its policy goal of increasing the role of financial institutions other than the Companies in the housing-finance markets. But because institutional investors have shown little interest in participating in these risk-sharing arrangements, the Companies have been forced to enter into them at FHFA's direction on extremely unfavorable terms. As the prospectuses associated with these deals acknowledge, in many instances investors are being paid considerable sums to enter into risk-sharing arrangements in which the investors would only lose money if mortgage-default rates precipitously rose far beyond the default rates that occurred during the height of the 2008 financial crisis. Entering into such deals is economically irrational for the Companies. On information and belief, FHFA understands this fact but is nevertheless

imposing uneconomic credit-risk transfers on the Companies to further its housing finance reform policy goals.

126. When FHFA makes decisions as conservator or regulator, it is not accountable to the President, has little or no direction from Congress, and is largely immune from judicial review. Indeed, due to conservatorship, even the public scrutiny that would otherwise apply to the Companies' management is ineffectual because the Companies' SEC filings cannot effectively disclose information known only to FHFA. As Freddie recently explained in an SEC filing, its disclosure controls are "not effective" because it cannot "provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure under the federal securities laws."

127. Without any meaningful oversight, FHFA continues to pursue both conservatorship and regulatory policies aimed at destroying the Companies and the investments of their private shareholders. It is highly unlikely that FHFA would be permitted to continue to pursue these reckless and arbitrary policies, which significantly harm private property interests, if it were subject to the moderating influence of leadership by a multi-member commission or supervision by the President.

# CLAIMS FOR RELIEF

## COUNT I

## Violation of the President's Constitutional Removal Authority Against FHFA as Both Regulator and Conservator and Treasury

128. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

129. The Constitution provides that the "executive Power shall be vested in a President," U.S. CONST. art. II, § 1, cl. 1, and that "he shall take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3. Those provisions vest all executive power in the President of the United States and give the President the constitutional authority to remove federal agency heads from office at will. Although the Supreme Court has recognized a limited exception to this important constitutional principle for certain independent agencies headed by expert, multi-member commissions, *see generally Humphrey's Executor v. United States*, 295 U.S. 602 (1935), that exception does not apply to FHFA.[2]

130. By making FHFA's head a single Director rather than a multi-member board and eliminating the President's power to remove the Director at will, HERA violates the President's constitutional removal authority. An independent agency headed by a single Director is virtually unprecedented in our Nation's history and threatens individual liberty by impermissibly concentrating power in a single person who is not the President. In addition, the fact that FHFA is headed by a single Director who serves a five-year term means that the President has less influence over FHFA's decisions than the influence the President enjoys over independent agencies that are headed by multi-member boards or commissions.

[2] Although a ruling in Plaintiffs' favor would be entirely consistent with *Humphrey's Executor*, Plaintiffs preserve the argument that the Supreme Court should overrule that decision.

131. The constitutional defect in FHFA's structure is exacerbated by the fact that FHFA has broad power over the housing sector, a vital part of the economy that represents over 15% of Gross Domestic Product. FHFA oversees entities that provide more than $5.8 *trillion* in funding for the U.S. mortgage markets and financial institutions, and it has arbitrarily used its conservatorship and regulatory authority in an effort to unilaterally reform this vast sector of the economy to the disadvantage of the Companies and their shareholders.

132. Neither Congress nor the President can negate the Constitution's structural requirements by signing or enacting (and thereby acceding to) HERA. "Perhaps an individual President"—or Congress—"might find advantages in tying his own hands," the Supreme Court has noted, "[b]ut the separation of powers does not depend on the views of individual Presidents"—or particular Congresses. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010). The Constitution's separation of powers does not depend "on whether 'the encroached-upon branch approves the encroachment.' " *Id.* (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

133. "The diffusion of power" away from the President and to FHFA's Director, "carries with it a diffusion of accountability. . . . Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.' " *Id.* (quoting THE FEDERALIST NO. 70, at 476 (Alexander Hamilton) (J. Cooke ed., 1961)).

134. FHFA is subject to the Constitution's separation of powers when it acts as conservator. As conservator, FHFA is authorized to make decisions that bind third parties—including both the Companies and their shareholders—and FHFA does not act as a fiduciary for these third parties. Rather, FHFA claims the authority to act in *its own* best interests as an agency

of the United States government. FHFA also claims the authority as conservator to ignore state law and to authorize third parties (including other federal agencies) to violate federal statutes. Accordingly, as conservator, FHFA exercises the sovereign power of the United States government and it therefore must comply with the separation of powers.

135. FHFA's decision to impose the Net Worth Sweep is subject to the separation of powers because it effected an expropriation of private property for the benefit of the federal government. The Net Worth Sweep is unlike the standard conservatorship situation in which the conservator is merely enforcing the rights or defending claims and paying the bills of its ward. For this reason, the Net Worth Sweep would be subject to the separation of powers even if many of FHFA's other actions as conservator were not.

136. Even if FHFA were never subject to the Constitution's separation of powers when it acts as conservator, it would still clearly be subject to the separation of powers when it acts as regulator. FHFA acted in its capacity as regulator when it forced the Companies into conservatorship, and that initial decision made it possible for FHFA to later approve the Net Worth Sweep in its capacity as the Companies' conservator. The fact that FHFA was operating in violation of the separation of powers when it initially imposed the conservatorships infects its subsequent decision as conservator to agree to the Net Worth Sweep. Furthermore, even during conservatorship the Companies remain subject to oversight by FHFA as regulator, and FHFA as conservator could not have agreed to the Net Worth Sweep or ordered the Companies to pay dividends without authorization from FHFA as regulator. *See* 12 C.F.R. § 1237.12(a), (b) (providing that "a regulated entity shall make no capital distribution while in conservatorship" except with authorization from "[t]he Director," i.e., FHFA as regulator).

137. The Net Worth Sweep visits new injuries on the Companies' private shareholders that they did not experience when the conservatorships were initially imposed. It only became clear when FHFA agreed to the Net Worth Sweep that FHFA's operation of the conservatorships would result in the total expropriation of private shareholders' investments. Furthermore, given FHFA's assurances when it initially imposed the conservatorships that it would manage the Companies with the aim of preserving and conserving their assets and rehabilitating them to a sound and solvent condition, the Companies' shareholders did not have adequate notice or incentive to contest the initial decision to impose the conservatorships in 2008.

138. Plaintiffs are suffering ongoing injuries as a result of FHFA's misuse of the Companies' resources and private shareholders' rights and its continuing efforts to adopt housing-finance policies that disadvantage the Companies and their shareholders. These ongoing injuries are being visited upon Plaintiffs as a result of both decisions by FHFA as conservator and decisions by FHFA as regulator.

139. To remedy the violation of the President's constitutional removal authority alleged in this Count, the Court should: (1) vacate the third amendment to the PSPAs because it was adopted by FHFA when it was operating as an independent agency headed by a single person; and (2) declare that henceforth FHFA is no longer an independent agency and strike down the provisions of HERA that purport to make FHFA independent from the President, including 12 U.S.C. §§ 4511(a), 4512(b)(2), and 4617(a)(7).

## COUNT II
## Violation of the Separation of Powers
## Against FHFA as Both Regulator and Conservator and Treasury

140. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

141. Even if it were otherwise constitutional for an independent agency to operate under the leadership of a single individual, this feature of FHFA's structure would still violate the Constitution's structure when combined with other aspects of HERA that further insulate FHFA from oversight by *any* of the three branches of the federal government.

142. In addition to operating without any supervision by the President, FHFA also has no meaningful direction or supervision from Congress. HERA gives FHFA vast power over the Companies and their shareholders, but FHFA has successfully argued for an interpretation of the statute that fails to articulate *any* overarching policy that FHFA must pursue when it exercises its powers as conservator. HERA also exempts FHFA from the appropriations process by permitting FHFA to self-fund through fees it assesses on the entities it regulates without any oversight from Congress. *See* 12 U.S.C. § 4516(f)(2). Very few independent federal agencies are exempted from the appropriations process, and FHFA and the CFPB are the only two such agencies headed by a single Director. Exemption from the appropriations process not only diminishes congressional oversight of an independent agency but also reduces the President's influence over the agency since the agency need not seek the President's assistance to obtain funding from Congress.

143. HERA also forbids judicial review of a vast array of actions FHFA takes as regulator or conservator. *See* 12 U.S.C. §§ 4617(b)(2)(A)(i), (b)(5)(E); (b)(11)(D), (f); *id.* § 4623(d). These limitations on judicial review of FHFA's actions are even more extensive than those that apply to the CFPB. As a result of the statutory restrictions on judicial review of

FHFA's actions, the courts are powerless to ensure that FHFA complies with federal law. FHFA has repeatedly abused these restrictions on judicial review by making numerous arbitrary decisions that have gratuitously dissipated the Companies' assets and severely harmed the property interests of the Companies' private shareholders.

144. The purpose of the Constitution's separation of powers is to divide power so as to guard against arbitrary decisions that diminish the rights of private individuals. The Constitution's structure is also designed to ensure that the organs of the federal government remain accountable to the People through their democratically elected representatives. FHFA is not subject to meaningful direction or oversight by *any* of the three branches of government created by the Constitution. The absence of any check on FHFA's actions by the Executive, Legislative, or Judicial Branches makes FHFA the least accountable federal agency in our Nation's history and violates the Constitution's structure and the separation of powers.

145. To remedy the violation of the Constitution alleged in this Count, the Court should: (1) vacate the third amendment to the PSPAs because it was adopted by FHFA when it was operating without any meaningful direction or oversight by the Executive, Legislative, or Judicial Branches; and (2) declare that henceforth FHFA is no longer an independent agency and strike down the provisions of HERA that make FHFA unaccountable to any of the three Branches of the federal government.

## COUNT III
## Violation of the Appointments Clause
## Against FHFA as Conservator and Treasury

146. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

147. The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all principal officers of the United States. U.S CONST. art. II, § 2, cl. 2. The Appointments Clause permits Congress to "vest the Appointment of such *inferior* Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* (emphasis added). However, *principal* officers may only assume office by being nominated by the President and confirmed by the Senate.

148. As the head of an independent federal agency, the Director of FHFA is a principal officer of the United States under the Appointments Clause. Accordingly, this office may only be filled by someone who is nominated by the President and confirmed by the Senate.

149. When there is a vacancy in a position that must be filled by a principal officer, the Constitution permits an inferior officer to *temporarily* assume the responsibilities of the position in an acting capacity. However, the Appointments Clause necessarily limits the period during which someone who has not been nominated by the President and confirmed by the Senate may serve as an acting principal officer. If there were no such temporal limit, the President could abuse the appointments power by designating acting principal officers to serve indefinitely, thus frustrating the Senate's constitutional role in the selection of principal officers. Similarly, if the independent head of a federal agency could select his own acting successor to serve indefinitely—so long as the Senate refused to confirm any presidential nominee—this would unconstitutionally diminish the President's appointment power.

150. The Appointments Clause "is more than a matter of etiquette or protocol; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (quotation marks omitted). Accordingly, the Appointments Clause's limit on the maximum length of an acting principal officer's tenure is judicially enforceable.

151. The Office of Legal Counsel has opined that someone may only serve as an acting principal officer without Senate confirmation for "as long as is reasonable under the circumstances." Designation of Acting Director of OMB, 2003 WL 24151770, at *1 n.2 (June 12, 2003). The Office of Legal Counsel has said that the following considerations are relevant to whether an acting principal officer's tenure is reasonable under the Appointments Clause: "the specific functions being performed by the Acting Director; the manner in which the vacancy was created (death, long-planned resignation, etc.); the time when the vacancy was created (e.g., whether near the beginning or the end of a session of the Senate); whether the President has sent a nomination to the Senate; and particular factors affecting the president's choice (e.g., a desire to appraise the work of an Acting Director) or the President's ability to devote attention to the matter." Status of the Acting Director, OMB, 1 Op. O.L.C. 287, 289–90 (1977) (footnotes and citations omitted).

152. By the time Mr. DeMarco approved the Net Worth Sweep, he had been FHFA's acting Director for three years. This far exceeded the period that was reasonable under the circumstances. Mr. DeMarco took control of FHFA during a period of weakness in the housing market and undertook a series of actions over multiple years that ultimately resulted in the nationalization of two of the Nation's largest and most important financial institutions. Throughout Mr. DeMarco's lengthy tenure as acting Director, FHFA was not only the

Companies' regulator but also their conservator. Mr. DeMarco thus enjoyed far greater power over the Companies and their shareholders than FHFA's Director could have exercised under other circumstances. The vacancy that Mr. DeMarco filled as acting Director was created by the resignation of Mr. Lockhart, who gave the Obama Administration at least several weeks' notice of his planned departure. And when Mr. DeMarco approved the Net Worth Sweep, he had been FHFA's acting Director during parts of four separate Senate sessions. The President made little effort to replace Mr. DeMarco during the three years that preceded the Net Worth Sweep, sending the Senate only a single nominee, who the Senate rejected six weeks later. When Mr. DeMarco approved the Net Worth Sweep, no nomination to fill the vacancy had been pending in the Senate for 20 months. And far from delaying any nomination because it was considering Mr. DeMarco for the position and wanted to appraise his work, the Obama Administration publicly fought with Mr. DeMarco over housing policy and pressured him to step down as early as 2011. Under these circumstances, Mr. DeMarco's tenure as acting Director grossly exceeded the maximum period during which the Appointments Clause permits someone to temporarily serve as an acting principal officer without Senate confirmation.

153. Furthermore, the constitutional provisions that govern recess appointments show that it is *per se* unreasonable and unconstitutional for someone to serve as an acting principal officer for more than two years. The Recess Appointments Clause permits the President "to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. CONST. art. II, § 2, cl. 3. Since recess appointments expire at the end of the next Senate session and the Senate is required by the Twentieth Amendment to begin a new session every January 3, it is impossible for a recess appointee to hold office for more than two years. Two years is thus the maximum amount

of time that the Framers believed it would be reasonable for someone to act as a principal officer without Senate confirmation. Accordingly, Mr. DeMarco's service as FHFA's acting Director beyond that two-year limit was a *per se* violation of the Appointments Clause.

154. In addition, although Congress may by statute provide that, in the event of a vacancy, the occupant of a specific inferior office will by operation of law become an acting principal officer, the Constitution does not permit the President to *appoint* an acting principal officer. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 945–49 (2017) (Thomas, J., concurring). For the same reason, a principal officer may not appoint his acting successor by selecting from among multiple inferior officers. *See id.* President Obama chose Mr. DeMarco from among three possible candidates to serve as FHFA's acting Director. For this reason as well, Mr. DeMarco's appointment was unconstitutional.

155. To remedy the violation of the Appointments Clause alleged in this Count, the Court should vacate the third amendment to the PSPAs, which Mr. DeMarco approved at a time when he was unconstitutionally serving as FHFA's Director.

## COUNT IV
## Violation of the Nondelegation Doctrine
## Against FHFA as Conservator and Treasury

156. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

157. Article I, Section 1 of the Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." This text permits no delegation of legislative powers from Congress to any other organ of government. Under the nondelegation doctrine, Congress impermissibly delegates legislative power when it gives a federal agency discretion without articulating any intelligible principle to guide the agency's exercise of discretion. *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

158. The open-ended discretion to choose ends is the essence of legislative power; it is *this* power which Congress possesses but its agents necessarily lack and with which its agents cannot be endowed by mere legislation. Accordingly, under the nondelegation doctrine, "Congress must set *both* the 'boundaries' of the Executive's discretion *and* supply an 'intelligible principle' for the exercise of that discretion within those boundaries." *United States v. Nichols*, 784 F.3d 666, 676 (10th Cir. 2015) (Gorsuch, J., concurring).

159. Although HERA broadly defines the boundaries of FHFA's discretion as conservator by enumerating a list of permissive powers the agency may choose to exercise, under the interpretation of the statute that FHFA has successfully advanced in other litigation, Congress failed to articulate an intelligible principle to guide FHFA's exercise of discretion. Among other things, HERA authorizes FHFA as conservator to operate the Companies and conduct their business, 12 U.S.C. § 4617(b)(2)(B)(i), to contract on the Companies' behalf, *id.* § 4617(b)(2)(B)(v), and to transfer away their assets without prior approval, *id.* § 4617(b)(2)(G). But according to FHFA, nothing in HERA specifies the *ends* to which FHFA should exercise these or its other conservatorship authorities. HERA thus delegates legislative power to FHFA in violation of the Constitution.

160. Similarly, HERA provides that as conservator FHFA "immediately succeed[s]" to "all rights, titles, powers, and privileges . . . of any stockholder . . . with respect to the regulated entity and the assets of the regulated entity." 12 U.S.C. § 4617(b)(2)(A). Under this provision, during conservatorship FHFA has the exclusive authority to decide whether to exercise most shareholder rights, including the authority to decide whether most shareholder derivative suits may go forward. But under FHFA's interpretation of HERA, nothing in the

statute provides an intelligible principle to guide FHFA's discretion in the exercise of shareholder rights during conservatorship.

161. This constitutional flaw is exacerbated by the fact that HERA bars any judicial review that would "restrain or affect the exercise of powers or functions of [FHFA] as a conservator." 12 U.S.C. § 4617(f). By completely foreclosing judicial review of FHFA's exercise of its conservatorship powers or functions, this provision enables FHFA to take actions that would otherwise violate state and federal law. As a result, under FHFA's understanding of HERA, so long as FHFA is exercising its broadly defined conservatorship powers, it is free to disregard the fiduciary duties that state law would otherwise impose on the Companies' management, to enter into contracts authorizing other federal agencies to violate federal statutes, and generally to ignore *any* law other than the United States Constitution. This authority to disregard state and federal law greatly magnifies both the scope of FHFA's conservatorship powers and the potential for abuse of those powers. That FHFA is able to exercise this extraordinary power without any intelligible principle from Congress to guide its exercise of discretion is intolerable and a clear violation of the nondelegation doctrine.

162. FHFA abused its undirected discretion as conservator by imposing the Net Worth Sweep, which is antithetical to the mission of a traditional conservator and visited serious harm on the Companies' private shareholders.

163. To remedy the violation of the nondelegation doctrine alleged in this Count, the Court should vacate the third amendment to the PSPAs because FHFA imposed it at a time when it was operating the Companies as their conservator without any intelligible principle from Congress to guide its exercise of discretion.

## COUNT V
## Violation of the Private Nondelegation Doctrine
## Against FHFA as Conservator and Treasury

164. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

165. Plaintiffs allege in the alternative and solely for purposes of this Count that when FHFA acts as conservator it is a private entity and not the federal government. In other litigation, FHFA has vigorously defended this position, arguing in a case in the Southern District of Texas that its actions as conservator "are not . . . governmental for purposes of the Constitution." FHFA Mem. in Supp. of Mot. to Dismiss at 43, *Collins v. FHFA*, No. 16-cv-3113 (S.D. Tex. Jan. 9, 2017), ECF No. 24.

166. The Vesting Clauses award all Legislative power to Congress, U.S. CONST. art. I, § 1, all Executive power to the President, U.S. CONST. art. II, § 1, cl.1, and all Judicial power to the Supreme Court and any inferior federal courts established by Congress, U.S. COST. art. III, § 1, cl.1. Together, these provisions of the Constitution do not permit *any* delegation of Legislative, Executive, or Judicial power to a private entity. Indeed, authorizing a private entity to exercise any of the sovereign powers of the federal government constitutes "delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

167. Delegations of Executive power to a private entity are no more permissible than delegations of Legislative power to a private entity. "[I]f Congress could act as effectively without the President as with him" by assigning responsibility for executing the laws to a private entity, it would be able to aggrandize its own powers at the expense of the President. *See Printz v. United States*, 521 U.S. 898, 923 (1997). For this reason, the separation of powers does not permit delegations of Executive power to private entities.

168. Delegations of Vesting Clause power to a private entity are especially problematic—and *per se* unconstitutional—because they invite the use of the federal government's sovereign powers to further private interests. Far from guarding against such abuses of power, FHFA understands HERA to authorize it to do whatever it "determines is in the best interests of . . . [FHFA]" when acting as conservator. 12 U.S.C. § 4617(b)(2)(J)(ii). FHFA has specifically relied on this provision of HERA in defending the Net Worth Sweep, arguing that the harmful consequences for the Companies and their private shareholders do not matter because FHFA determined that the Net Worth Sweep was in *its own* best interests.

169. Irrespective of whether FHFA's conservatorship powers are characterized as Legislative or Executive, HERA clearly gives Vesting Clause power to FHFA. As conservator, FHFA has the power to ignore otherwise applicable state and federal law and to authorize violations of federal statutes by third parties. FHFA also has sweeping conservatorship powers over the Companies and their private shareholders—powers that FHFA claims it is free to exercise in a manner that is harmful to the interests of the Companies and their shareholders. FHFA necessarily exercises either Legislative or Executive power when it: (i) displaces state and federal law; and (ii) makes decisions in a non-fiduciary capacity that are binding on the Companies and their shareholders. FHFA did both of those things when it approved the Net Worth Sweep.

170. When it acts as conservator, FHFA does not function subordinately to an Executive Branch agency or any part of the federal government. To the contrary, HERA specifically provides that as conservator FHFA may not be subject to the direction or supervision of another federal agency and insulates FHFA from congressional, presidential, and judicial direction and oversight.

171. To remedy the violation of the Constitution alleged in this Count, the Court should vacate the third amendment to the PSPAs because, in adopting it, FHFA was acting as a private entity and exercising either Legislative or Executive power that may only be exercised by an organ of the federal government.

## PRAYER FOR RELIEF

172. WHEREFORE, Plaintiffs pray for an order and judgment:

a. Vacating and setting aside the third amendment to the PSPAs, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

b. Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the third amendment to the PSPAs, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

c. Enjoining Treasury and its officers, employees, and agents to return to Fannie and Freddie all dividend payments made pursuant to the Net Worth Sweep or, alternatively, recharacterizing such payments as a pay down of the liquidation preference and a corresponding redemption of Treasury's Government Stock rather than mere dividends;

d. Declaring that FHFA's structure violates the separation of powers, that FHFA may no longer operate as an independent agency, and striking down the provisions of HERA that purport to make FHFA independent from the President and unaccountable to any of the three Branches of the federal government, including 12 U.S.C. §§ 4511(a), 4512(b)(2), and 4617(a)(7);

e. Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

f. Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: June 1, 2017

*<u>/s/ Matthew T. Nelson</u>*

Matthew T. Nelson
Ashley G. Chrysler
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, N.W.
Grand Rapids, Michigan 49503-2487
616.752.2000
mnelson@wnj.com
achrysler@wnj.com

Attorneys for Plaintiffs

15910796