UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ROP, et al.,

      Plaintiffs,

                           File No. 1:17-CV-497

v.

                           HON. PAUL L. MALONEY

FEDERAL HOUSING FINANCE
AGENCY, et al.,

      Defendants.

_____/

## OPINION

This case represents yet another attempt by shareholders of Fannie Mae and Freddie Mac to undo an agreement struck by the conservator of those entities, the Federal Housing Finance Agency (FHFA), with the Department of the Treasury.  That agreement secured unlimited funding for Fannie and Freddie from Treasury in exchange for almost all of Fannie's and Freddie's future profits.  The shareholders were understandably disappointed by this arrangement because it rendered their shares worthless.  Thus far, however, all attempts to unwind the agreement have failed in courts across the country.  This case is headed for the same result.

## I.  Background

The agreement giving rise to this lawsuit is known as the "Third Amendment."  The Court of Appeals for the District of Columbia Circuit summarized the relevant factual background for the Third Amendment as follows:

### 1. The Origins of Fannie Mae and Freddie Mac

Created by federal statute in 1938, Fannie Mae originated as a government-owned entity designed to "provide stability in the secondary market for residential mortgages," to "increas[e] the liquidity of mortgage investments," and to "promote

access to mortgage credit throughout the Nation."  12 U.S.C. § 1716; *see id*. § 1717.
To accomplish those goals, Fannie Mae (i) purchases mortgage loans from
commercial banks, which frees up those lenders to make additional loans,
(ii) finances those purchases by packaging the mortgage loans into mortgage-
backed securities, and (iii) then sells those securities to investors.  In 1968,
Congress made Fannie Mae a publicly traded, stockholder-owned corporation.  *See*
Housing and Urban Development Act, Pub. L. No. 90-448, § 801, 82 Stat. 476, 536
(1968) (codified at 12 U.S.C. § 1716b).

Congress created Freddie Mac in 1970 to "increase the availability of mortgage
credit for the financing of urgently needed housing."  Federal Home Loan Mortgage
Corporation Act, Pub. L. No. 91-351, preamble, 84 Stat. 450 (1970).  Much like
Fannie Mae, Freddie Mac buys mortgage loans from a broad variety of lenders,
bundles them together into mortgage-backed securities, and then sells those
mortgage-backed securities to investors.  In 1989, Freddie Mac became a publicly
traded, stockholder-owned corporation.  *See* Financial Institutions Reform,
Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 731, 103 Stat. 183,
429-436.

Fannie Mae and Freddie Mac became major players in the United States' housing
market.  Indeed, in the lead up to 2008, Fannie Mae's and Freddie Mac's mortgage
portfolios had a combined value of $5 trillion and accounted for nearly half of the
United States mortgage market.  But in 2008, the United States economy fell into a
severe recession, in large part due to a sharp decline in the national housing market.
Fannie Mae and Freddie Mac suffered a precipitous drop in the value of their
mortgage portfolios, pushing the Companies to the brink of default.

### 2. The 2008 Housing and Economic Recovery Act

Concerned that a default by Fannie and Freddie would imperil the already fragile
national economy, Congress enacted the Recovery Act, which established FHFA
and authorized it to undertake extraordinary economic measures to resuscitate the
Companies.  To begin with, the Recovery Act denominated Fannie and Freddie
"regulated entit[ies]" subject to the direct "supervision" of FHFA, 12 U.S.C.
§ 4511(b)(1), and the "general regulatory authority" of FHFA's Director, *id.*
§ 4511(b)(1), (2).  The Recovery Act charged FHFA's Director with "oversee[ing]
the prudential operations" of Fannie Mae and Freddie Mac and "ensur[ing] that"
they "operate[ ] in a safe and sound manner," "consistent with the public interest."
*Id.* § 4513(a)(1)(A), (B)(i), (B)(v).

The Recovery Act further authorized the Director of FHFA to appoint FHFA as
either conservator or receiver for Fannie Mae and Freddie Mac "for the purpose of
reorganizing, rehabilitating, or winding up the[ir] affairs."  12 U.S.C. § 4617(a)(2).
The Recovery Act invests FHFA as conservator with broad authority and discretion
over the operation of Fannie Mae and Freddie Mac.  For example, upon
appointment as conservator, FHFA "shall . . . immediately succeed to . . . all rights,
titles, powers, and privileges of the regulated entity, and of any stockholder, officer,

or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity." *Id.* § 4617(b)(2)(A). In addition, FHFA "may . . . take over the assets of and operate the regulated entity," and "may . . . preserve and conserve the assets and property of the regulated entity." *Id.* § 4617(b)(2)(B)(i), (iv).

The Recovery Act further invests FHFA with expansive "[g]eneral powers," explaining that FHFA "may," among other things, "take such action as may be . . . necessary to put the regulated entity in a sound and solvent condition" and "appropriate to carry on the business of the regulated entity and preserve and conserve [its] assets and property[.]" 12 U.S.C. § 4617(b)(2), (2)(D). FHFA's powers also include the discretion to "transfer or sell any asset or liability of the regulated entity in default . . . without any approval, assignment, or consent," *id*. § 4617(b)(2)(G), and to "disaffirm or repudiate [certain] contract[s] or lease[s]," *id*. § 4617(d)(1). *See also id*. § 4617(b)(2)(H) (power to pay the regulated entity's obligations); *id*. § 4617(b)(2)(I) (investing the conservator with subpoena power).

Consistent with Congress's mandate that FHFA's Director protect the "public interest," 12 U.S.C. § 4513(a)(1)(B)(v), the Recovery Act invested FHFA as conservator with the authority to exercise its statutory authority and any "necessary" "incidental powers" in the manner that "the Agency [FHFA] determines is in the best interests of the regulated entity *or the Agency*." *Id.* § 4617(b)(2)(J) (emphasis added).

The Recovery Act separately granted the Treasury Department "temporary" authority to "purchase any obligations and other securities issued by" Fannie and Freddie. 12 U.S.C. §§ 1455(*l*)(1)(A), 1719. That provision made it possible for Treasury to buy large amounts of Fannie and Freddie stock, and thereby infuse them with massive amounts of capital to ensure their continued liquidity and stability.

Continuing Congress's concern for protecting the public interest, however, the Recovery Act conditioned such purchases on Treasury's specific determination that the terms of the purchase would "protect the taxpayer," 12 U.S.C. § 1719(g)(1)(B)(iii), and to that end specifically authorized "limitations on the payment of dividends," *id*. § 1719(g)(1)(C)(vi). A sunset provision terminated Treasury's authority to purchase such securities after December 31, 2009. *Id.* § 1719(g)(4). After that, Treasury was authorized only "to hold, exercise any rights received in connection with, or sell, any obligations or securities purchased." *Id.* § 1719(g)(2)(D).

Lastly, the Recovery Act sharply limits judicial review of FHFA's conservatorship activities, directing that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator." 12 U.S.C. § 4617(f).

\* \* \*

3

On September 6, 2008, FHFA's Director placed both Fannie Mae and Freddie Mac into conservatorship. The next day, Treasury entered into Senior Preferred Stock Purchase Agreements ("Stock Agreements") with Fannie and Freddie, under which Treasury committed to promptly invest billions of dollars in Fannie and Freddie to keep them from defaulting. Fannie and Freddie had been "unable to access [private] capital markets" to shore up their financial condition, "and the only way they could [raise capital] was with Treasury support." *Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Fin. Servs.*, 110th Cong. 12 (2008) (Statement of James B. Lockhart III, Director, FHFA).

In exchange for that extraordinary capital infusion, Treasury received one million senior preferred shares in each company. Those shares entitled Treasury to: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were dissolved; (ii) a dollar-for-dollar increase in that liquidation preference each time Fannie and Freddie drew upon Treasury's funding commitment; (iii) quarterly dividends that the Companies could either pay at a rate of 10% of Treasury's liquidation preference or a commitment to increase the liquidation preference by 12%; (iv) warrants allowing Treasury to purchase up to 79.9% of Fannie's and Freddie's common stock; and (v) the possibility of periodic commitment fees over and above any dividends.

The Stock Agreements also included a variety of covenants. Of most relevance here, the Stock Agreements included a flat prohibition on Fannie and Freddie "declar[ing] or pay[ing] any dividend (preferred or otherwise) or mak[ing] any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof" without Treasury's advance consent (unless the dividend or distribution was for Treasury's Senior Preferred Stock or warrants). J.A. 2451.

The Stock Agreements initially capped Treasury's commitment to invest capital at $100 billion per company. It quickly became clear, however, that Fannie and Freddie were in a deeper financial quagmire than first anticipated. So their survival would require even greater capital infusions by Treasury, as sufficient private investors were still nowhere to be found. Consequently, FHFA and Treasury adopted the First Amendment to the Stock Agreements in May 2009, under which Treasury agreed to double the funding commitment to $200 billion for each company.

Seven months later, in a Second Amendment to the Stock Agreements, FHFA and Treasury again agreed to raise the cap, this time to an adjustable figure determined in part by the amount of Fannie's and Freddie's quarterly cumulative losses between 2010 and 2012. As of June 30, 2012, Fannie and Freddie together had drawn $187.5 billion from Treasury's funding commitment.

4

Through the first quarter of 2012, Fannie and Freddie repeatedly struggled to generate enough capital to pay the 10% dividend they owed to Treasury under the amended Stock Agreements. FHFA and Treasury stated publicly that they worried about perpetuating the "circular practice of the Treasury advancing funds to [Fannie and Freddie] simply to pay dividends back to Treasury," and thereby increasing their debt loads in the process.

Accordingly, FHFA and Treasury adopted the Third Amendment to the Stock Agreements on August 17, 2012. The Third Amendment to the Stock Agreements replaced the previous quarterly 10% dividend formula with a requirement that Fannie and Freddie pay as dividends only the amount, if any, by which their net worth for the quarter exceeded a capital buffer of $3 billion, with that buffer decreasing annually down to zero by 2018. In simple terms, the Third Amendment requires Fannie and Freddie to pay quarterly to Treasury a dividend equal to their net worth—however much or little that might be. Through that new dividend formula, Fannie and Freddie would never again incur more debt just to make their quarterly dividend payments, thereby precluding any dividend-driven downward debt spiral. But neither would Fannie or Freddie be able to accrue capital in good quarters.

Under the Third Amendment, Fannie Mae and Freddie Mac together paid Treasury $130 billion in dividends in 2013, and another $40 billion in 2014. The next year, however, Fannie's and Freddie's quarterly net worth was far lower: Fannie paid Treasury $10.3 billion and Freddie paid Treasury $5.5 billion. *See* Fannie Mae, Form 10-K for the Fiscal Year Ended December 31, 2015 (Feb. 19, 2016); Freddie Mac, Form 10-K for the Fiscal Year Ended December 31, 2015 (Feb. 18, 2016). By comparison, without the Third Amendment, Fannie and Freddie together would have had to pay Treasury $19 billion in 2015 or else draw once again on Treasury's commitment of funds and thereby increase Treasury's liquidation preference. In the first quarter of 2016, Fannie paid Treasury $2.9 billion and Freddie paid Treasury no dividend at all. *See* Fannie Mae, Form 10-Q for the Quarterly Period Ended March 31, 2016 (May 5, 2016); Freddie Mac, Form 10-Q for the Quarterly Period Ended March 31, 2016 (May 3, 2016).

Under the Third Amendment, and FHFA's conservatorship, Fannie and Freddie have continued their operations for more than four years. During that time, Fannie and Freddie, among other things, collectively purchased at least 11 million mortgages on single-family owner-occupied properties, and Fannie issued over $1.5 trillion in single-family mortgage-backed securities.

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 599-602 (D.C. Cir. 2017) (footnotes omitted).

## II. Plaintiffs' Complaint

Plaintiffs Michael Rop, Stewart Knoepp, and Alvin Wilson own shares in Fannie, Freddie, or both.  They sue Treasury, the FHFA, and the FHFA's Director in his official capacity.[1]  Plaintiffs contend that the Third Amendment destroyed the value of their investments and continue to cause them harm by preventing them from receiving dividends and accruing gains on their shares.

Plaintiffs' complaint tells a slightly different version of the story set forth in *Perry Capital*. Plaintiffs' version is harshly critical of the FHFA's actions.  For instance, Plaintiffs question the need for any intervention by the FHFA in the first place.  Plaintiffs allege that Fannie and Freddie were in a "strong financial position" during the housing crisis and were not in danger of defaulting on their debts.  (Am. Compl. ¶ 37, ECF No. 17.)  Nevertheless, the FHFA "forced" Fannie and Freddie into accepting conservatorship by threatening to "seize" them or subject them to "intense regulatory scrutiny" if they did not agree to it.  (*Id.* ¶¶ 37, 40.)

Plaintiffs further allege that there was no risk that Fannie or Freddie would enter a so-called "dividend-driven downward spiral" without the Third Amendment; that prediction relied on financial assumptions that were "wildly pessimistic and unrealistic."  (*Id.* ¶ 65.)  According to Plaintiffs, it was clear by 2012 that Fannie and Freddie had returned to profitability and were in a position to exit conservatorship; however, the Third Amendment prevented that from happening. That agreement requires Fannie and Freddie to pay Treasury "*all . . .* of their comprehensive income and retained assets in perpetuity."  (*Id.* ¶ 84.)  Thus, while *Perry Capital* paints the FHFA as a benevolent savior for Fannie and Freddie, Plaintiffs contend that the FHFA used Fannie and Freddie to "enrich[] the federal government at private shareholders' expense."  (*Id.* ¶ 96.)

---

[1] At present, the FHFA's Director is Mark Calabria.

Plaintiffs' critical view of the FHFA's actions is not relevant here because Plaintiffs' lawsuit does not require the Court to review those actions. Instead, Plaintiffs' claims require the Court to examine the structure of the FHFA and the office of the person who directed it at the time of the Third Amendment.

### A. FHFA Structure and Leadership

Until 2008, an office within the Department of Housing and Urban Development, called the Office of Federal Housing Enterprise Oversight (OFHEO), regulated Fannie and Freddie. When Congress passed the Housing and Economic Recovery Act (HERA), it created the FHFA to replace that office. Unlike its predecessor, the FHFA is an "independent agency of the Federal Government." 12 U.S.C. § 4511(a). At the head of the FHFA is a single director, nominated by the President and confirmed by the Senate to serve "for a term of 5 years, unless removed before the end of such term *for cause* by the President." *Id.* § 4512(b)(2) (emphasis added).

Below the FHFA's Director are three Deputy Directors selected by the Director. *Id.* § 4512(c)-(e). In the event of "death, resignation, sickness, or absence" of the Director, the President must designate one of the three Deputy Directors to serve as "acting Director" until the Director returns or until the appointment of a new Director. *Id.* § 4512(f).

The FHFA's first Director was James Lockhart. He served as Director when the FHFA placed Fannie and Freddie into conservatorship, when the FHFA entered into the original Stock Agreements with Treasury, and when the FHFA entered into the First Amendment to those agreements. Lockhart resigned in August 2009. That same month, President Obama designated Deputy Director Edward J. DeMarco to serve as acting Director. As acting Director, DeMarco approved the Second Amendment and the Third Amendment to the Stock Agreements in December 2009 and August 2012, respectively.

7

Meanwhile, President Obama attempted to appoint a successor to Lockhart.  He nominated Joseph Smith for the Director role in November 2010.  The Senate, however, refused to vote on Smith's nomination and the President withdrew it the following month.  In May 2013, almost three years later, President Obama nominated Congressman Melvin Watt to be Director.  The Senate approved that nomination in December 2013 and Watt became Director in January 2014.  Watt served for 5 years until his term ended in January 2019.

At the end of Watt's term, President Trump designated Joseph Otting to serve as acting Director.  That same month, President Trump nominated Dr. Mark Calabria to succeed Watt.  The Senate confirmed Calabria and the President swore him in as Director in April 2019.[2]

### B. Plaintiffs' Claims

Plaintiffs assert five claims against Defendants.  In Count I of the amended complaint, Plaintiffs contend that the FHFA's structure—an independent agency headed by a single director removable only for cause—violates the President's authority in the Vesting Clause of Article II of the Constitution because it limits the President's ability to control the FHFA through the removal of its director.

In Count II, Plaintiffs' contend that the structure of the FHFA described in Count I violates the Constitution's separation of powers when combined with other aspects of HERA, including the following:  an alleged lack of "meaningful direction or supervision from Congress" over the FHFA; the FHFA's self-funding and exemption from the Congressional appropriations process; and statutory prohibitions on judicial review of the FHFA's actions.  (Am. Compl. ¶¶ 148-49.)

---

[2]  *See* Federal Housing Finance Agency, Leadership & Organization, https://www.fhfa.gov/AboutUs/Pages/Leadership-Organization.aspx (visited July 6, 2020).

Count III asserts that the Third Amendment is invalid because the FHFA's acting Director at the time, Edward DeMarco, was not appointed to, or serving in, his position in a constitutionally acceptable manner.

Count IV contends that the Third Amendment is invalid because the FHFA approved it while exercising legislative power impermissibly delegated to it by Congress.

Count V claims that, to the extent the FHFA acted as a nongovernmental entity when approving the Third Amendment, it exercised legislative power impermissibly delegated to a private entity.

### C. Relief

As relief, Plaintiffs ask the Court to vacate and set aside the Third Amendment. They also seek an injunction (1) prohibiting Defendants from taking any action pursuant to the Third Amendment, and (2) requiring Treasury to return to Fannie and Freddie all payments made pursuant to the Third Amendment. In addition, Plaintiffs ask the Court to declare that the FHFA's structure violates the separation of powers and to "strik[e] down the provisions of HERA that purport to make the FHFA independent from the President and unaccountable to any of the three Branches of the federal government, including 12 U.S.C. §§ 4511(a), 4512(b)(2), and 4617(a)(7)." (Am. Compl. ¶ 145.)

### III. Procedural History

Before the Court are the following motions: a motion to dismiss for failure to state a claim filed by Treasury (ECF No. 22); a motion to dismiss for lack of jurisdiction and for failure to state a claim filed by the FHFA and the FHFA Director (ECF No. 24); and a motion for summary judgment filed by Plaintiffs (ECF No. 30).

## IV.  Standards

### A.  Dismissal for Failure to State a Claim

Under Rule 12(b)(6), the Court may dismiss a complaint under for failure to state a claim

if the complaint fails "'to give the defendant fair notice of what the . . . claim is and the grounds

upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v.*

*Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations,

a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555;

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice.").  The court must determine

whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a

"'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted

unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Iqbal*, 556

U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### B.  Dismissal for Lack of Subject Matter Jurisdiction

Under Rule 12(b)(1), the Court may dismiss a complaint for lack of subject matter

jurisdiction.  "Whether a party has [Article III] standing is an issue of the court's subject matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."  *Lyshe v. Levy*, 854 F.3d 855, 857

(6th Cir. 2017).  "For purposes of ruling on a motion to dismiss for want of standing, [the Court]

must accept as true all material allegations of the complaint, and must construe the complaint in

favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  "A plaintiff must have standing for each claim pursued in federal court.  However, only one plaintiff needs to have standing in order for the suit to move forward." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (citations omitted).

### C.  Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (c); *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).  The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case.  Fed. R. Civ. P. 56(c)(1); *see Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 543 (6th Cir. 2014).  The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Once the moving party has carried its burden, the nonmoving party must set forth specific facts in the record showing there is a genuine issue for trial.  *Matsushita*, 475 U.S. at 587; *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010) ("After the moving party has met its burden, the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'") (quoting *Anderson*, 477 U.S. at 248).  In resolving a motion for summary judgment, the Court does not weigh the evidence and determine the truth of the matter; the Court determines only if there exists a genuine issue for trial.  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  The question is "whether the evidence presents a sufficient disagreement to require submission to

11

the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*,

477 U.S. at 251-52.

## V.  Jurisdiction

Defendants contend that Plaintiffs lack Article III standing to assert the separation-of-

powers claims in Counts I and II.  "Article III of the United States Constitution prescribes that

federal courts may exercise jurisdiction only where an actual 'case or controversy' exists."

*Parsons*, 801 F.3d at 709-10 (citing U.S. Const. art. III, § 2).  The following elements are necessary

to establish standing under Article III:

> First, Plaintiff must have suffered an injury in fact—an invasion of a legally-
> protected interest which is (a) concrete and particularized; and (b) actual or
> imminent, not conjectural or hypothetical.   Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to be
> fairly traceable to the challenged action of the defendant, and not the result of the
> independent action of some third party not before the court.  Third, it must be likely,
> as opposed to merely speculative, that the injury will be redressed by a favorable
> decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations

omitted).  "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege

facts demonstrating' each element."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting

*Warth*, 422 U.S. at 518).

### A.  Injury

Plaintiffs have satisfied the first element—a concrete and particularized injury—by

alleging harm to the value of their shares.  *See Collins v. Mnuchin*,  938 F.3d 553, 586 (5th Cir.

2019) (en banc) (holding that shareholders of Fannie and Freddie suffered "injury in fact" from

the Third Amendment because it "pump[ed] large profits to Treasury instead of restoring [Fannie's

and Freddie's] capital structure"), *cert. granted*, 2020 WL 3865248 (July 9, 2020); *Perry Capital*,

864 F.3d at 632 (holding that shareholders of Fannie and Freddie satisfied the Article III standing

requirement because they alleged that "the Third Amendment, by depriving them of their right to share in the Companies' assets when and if they are liquidated, immediately diminished the value of their shares").

## B. Causal Connection

Plaintiffs have satisfied the second element—a causal connection between the injury and the conduct complained of—because their injury is fairly traceable to the conduct of the FHFA and its acting Director, who approved the Third Amendment, and who were allegedly insulated from Presidential control.  *See Collins*, 938 F.3d at 586 (finding that the shareholders' injury for their separation-of-powers claim against the FHFA was "traceable to the removal protection" for the FHFA's Director).

Defendants contend that Plaintiffs cannot show a causal connection between the Director's removal protection and their alleged injury.  First, Defendants argue that the *acting* Director was not subject to the removal protection in HERA; thus, there is no connection between that allegedly unconstitutional provision and Plaintiffs' injury.  Second, Defendants argue that the outcome would have been the same even if the FHFA and its acting Director had been subject to complete control by the President.  Defendants note that Treasury was also a party to the Third Amendment. The Secretary of the Treasury was and is removable at will by the President; thus, if the President did not support the Third Amendment, he could have directed Treasury not to agree to it.

Defendants' arguments are misguided.  First, the extent of removal protection for the FHFA's acting Director is more of a merits question than a question of standing.  Defendants' argument requires the Court to interpret HERA and determine whether the removal restriction in 12 U.S.C. § 4512(b)(2) applies to the acting Director.  That issue is a contentious one.  *Compare Collins*, 938 F.3d at 589 (majority op.) (concluding that the removal restriction applies to the acting Director of the FHFA) *with Collins*, 938 F.3d at 621 (Costa, J., dissenting) (concluding that the

acting Director "was subject to full removal power").  In other words, it is part of the "controversy"
that Plaintiffs ask the Court to resolve.  The Court must be careful to "keep the merits of [a] claim
separate from the standing question."  *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 n.3
(6th Cir. 2020).

Defendants' second argument fails because Plaintiffs do not have to show that the outcome
would have been different without the separation-of-powers problem alleged in the complaint.  *See
Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2196 (2020) ("[A] a litigant
challenging governmental action as void on the basis of the separation of powers is not required
to prove that the Government's course of conduct would have been different in a 'counterfactual
world' in which the Government had acted with constitutional authority.") (quoting *Free
Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010)).  "In the
specific context of the President's removal power, [it is] sufficient that the challenger 'sustains[s]
injury' from an executive act that allegedly exceeds the official's authority."  *Id.* (quoting *Bowsher
v. Synar*, 478 U.S. 714, 721 (1986)).

Defendants insist that the rule in *Seila Law* and *Free Enterprise Fund* does not dictate the
result here because there is evidence of what would have happened in a "counterfactual world."
Defendants believe that Treasury's approval of the Third Amendment demonstrates that the
President would have accepted the Third Amendment even if he had greater control over the
FHFA.  But that is not necessarily the case.  The Third Amendment required the approval of the
FHFA as well as Treasury.  Defendants' argument requires the Court to assume that the FHFA, an
ostensibly independent agency, had no influence on the terms of the Third Amendment and simply
agreed to whatever terms Treasury proposed.  But it is also possible that the FHFA leveraged
whatever independence it had to shape the terms of that agreement, or that Treasury tailored its

14

terms to suit the preferences of DeMarco, the FHFA's acting Director.  In other words, the Third Amendment may have been a compromise of sorts, acceptable to both Treasury and the FHFA, rather than the outcome that the Executive could have obtained with greater control over the FHFA.[3]  Defendants offer no reason for the Court to accept their assumption about the FHFA's subservience to Treasury.  Moreover, Supreme Court precedent allows the Court to avoid this inquiry altogether.

Defendants' argument also ignores the purpose of "[t]he causation requirement of the constitutional standing doctrine," which is "to eliminate those cases in which a third party and not a party before the court causes the injury." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 542 (6th Cir. 2004).  This case does not thwart that purpose.  There is no question that, if anyone caused the injury sustained by Plaintiffs, it was one of the Defendants. Accordingly, Plaintiffs have satisfied their "relatively modest" burden of showing that their injury is "fairly traceable" to the conduct of Defendants.  *See Bennett v. Spear*, 520 U.S. 154, 171 (1997).

### C.  Redressability

Finally, it is likely that Plaintiffs' injury would be redressed by a favorable decision. Plaintiffs ask the Court to sever the provisions in HERA that constrain the President's removal authority and to invalidate the Third Amendment.  These remedies, if available, would redress the alleged injury.  *See Collins*, 938 F.3d at 587 (reaching the same conclusion).

Defendants disagree, asserting that the "appropriate remedy" in this sort of case would be to declare the statutory restriction on removal authority prospectively invalid, but not to invalidate

---

[3] Some courts have reasoned that the apparently lopsided nature of the Third Amendment, which allowed Treasury to receive almost all of Fannie's and Freddie's profits, shows that the Executive received all that it wanted.  Thus, according to this logic, the Third Amendment would have occurred even with greater Executive control over the FHFA.  This logic is also flawed.  It rests on the unsupported assumption that the Executive's primary goal was to enrich the federal government.

past actions by the official protected from removal.   (Br. of FHFA Defs. in Supp. of Mot. to Dismiss 9, ECF No. 25.)   This argument puts the cart before the horse.   Determining the appropriate remedy is another "merits question"; it is not an issue for the Court to decide at this stage.   *Collins*, 938 F.3d at 586-87.

Indeed, none of Defendants' arguments forecloses the possibility of a remedy that sets aside the Third Amendment.   Defendants cite *Free Enterprise Fund*, in which the Supreme Court held that certain statutory restrictions on the President's ability to remove members of the Public Company Accounting Oversight Board ("PCAOB") were unconstitutional.   As part of its decision, the Court rejected the plaintiff's argument that this constitutional defect rendered the Board itself, and "all power and authority exercised by it," in violation of the Constitution.   *Free Enterprise Fund*, 561 U.S. at 508.   The Court "agree[d] with the Government that the unconstitutional tenure provisions are severable from the remainder of the statute."   *Id.*

Defendants contend that the Supreme Court rejected the plaintiff's request to invalidate the PCAOB's prior actions, but the Court never expressly discussed that request, let alone rejected it. Instead, it decided the *separate* question of severability and concluded that severing the removal protections for PCAOB members from the rest of the Sarbanes-Oxley Act was preferable to striking down the Act (and the PCAOB) in its entirety.   *See id.* at 509 (concluding that "[t]he Sarbanes-Oxley Act remains fully operative as a law with [the] tenure restrictions excised" (quotation marks omitted)).

Defendants also cite the Supreme Court's observation that its decision would have no impact on "the validity of any officer's continuance in office"; it simply "affect[ed] the conditions under which those officers might someday be removed[.]"   *Id.* at 508.   But here, the Court was responding to the dissent's concern that the Court's decision could put the *future* work of the

16

PCAOB "on hold." *Id.* The Court did not, as Defendants suggest, expressly uphold *prior* actions by the PCAOB. Nor did it rule that setting aside prior actions by the agency would be an improper remedy for a separation-of-powers violation. Thus, *Free Enterprise Fund* does not support Defendants' argument that Plaintiffs' injury is not redressable by this Court.

Defendants also contend that Plaintiffs' injury is not redressable because the FHFA's actions did not implicate Article II. Defendants characterize the Third Amendment as a "business transaction" by the FHFA, who was acting on behalf of private entities, rather than an "executive governmental" action requiring supervision by the Executive Branch. (Br. of FHFA Defs. in Supp. of Mot. to Dismiss 10.) Defendants may or may not be correct about the nature of the FHFA's actions, but that issue is another merits question to be decided by the Court when reviewing Plaintiffs' claims. It has no bearing on whether Plaintiffs' injury is redressable.

Defendants cite *John Doe Co. v. Consumer Financial Protection Bureau*, 849 F.3d 1129 (D.C. Cir. 2017), to support their theory regarding the need for "executive" action in a separation-of-powers claim, but that opinion reinforces this Court's conclusion that Defendants' argument is misplaced. In that case, the Court of Appeals denied the plaintiff's request for an injunction pending an appeal because the plaintiff failed to show a likelihood of success on the merits of its separation-of-powers claim. *Id.* at 1135. To prevail on the merits, the plaintiff had to show that the agency's action was of the sort "exclusively confined to the Executive Branch"; the plaintiff, however, failed to make that showing. *Id.* at 1132-33. In other words, the court discussed the nature of the agency's action when addressing the *merits* of the plaintiff's claim. The court did not hold that the agency's non-executive action deprived the plaintiff of standing to bring its claim. Indeed, if the plaintiff lacked standing, then the Court of Appeals would have dismissed the case

for lack of jurisdiction before deciding whether an injunction was warranted. Thus, *John Doe Co.* supports the exercise of jurisdiction in this matter.[4]

In short, Plaintiffs have Article III standing to pursue their claims in Counts I and II. Defendants do not challenge Plaintiffs' Article III standing to bring the claims in Counts III to V of the complaint, and the Court discerns no basis for finding that such standing does not exist.

## VI. Direct or Derivative Claims

Defendants also question whether Plaintiffs can proceed with their claims due to the nature of Plaintiffs' injury and, by extension, the nature of their claims. Defendants argue that Plaintiffs' claims are derivative rather than direct because Plaintiffs' injury to the value of their shares is entirely derivative of injuries to Fannie and Freddie. If Plaintiffs' claims are properly characterized as derivative rather than direct, they face three potential hurdles: prudential standing, claim preclusion, and a succession provision in HERA.

### A. Distinguishing Between Direct and Derivative Claims

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a *corporate* cause of action against officers, directors, and third parties.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)). In contrast, a direct cause of action is one that belongs to the shareholder. Federal law governs whether a plaintiff's federal claims are direct or derivative, but state law "also plays a role." *Starr Int'l Co. v. United States*, 856 F.3d 953, 966 (Fed. Cir. 2017). "In the context of shareholder actions, both federal and [state] law distinguish between derivative and direct actions based on

---

[4] The court in *John Doe Co.* also noted that, in separation-of-powers cases, "vacatur of past actions is not routine." 849 F.3d at 1133. To say that vacatur is "not routine" suggests that it is possible in some circumstances, which undercuts Defendants' other argument that a decision in Plaintiffs' favor will not redress Plaintiffs' injury.

whether the corporation or the shareholder, respectively, has a direct interest in the cause of action." *Id.*

### 1. Plaintiffs' claims are derivative.

The parties agree that the state law which informs this case is the law of Delaware and Virginia, because Fannie's charter follows Delaware law, and Freddie's charter follows Virginia law. (*See* Treasury's Mem. in Supp. of Mot. to Dismiss 18, ECF No. 23; Pls.' Br. in Opp'n to Treasury's Mot. to Dismiss 13, ECF No. 31.)  *See also* Responsibilities of Boards of Directors, Corporate Practices & Corporate Governance Matters, 80 Fed. Reg. 72327, 72331 (Nov. 19, 2015) (noting that Fannie has designated Delaware law for corporate governance practices and Freddie has designated Virginia law).

It is a "basic principle" of Delaware corporate law that "directors, rather than shareholders, manage the business and affairs of the corporation."  *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990).  Among other things, the directors are responsible for deciding whether to "redress an alleged harm to the corporation."  *Id.* at 773.  Consequently, a shareholder may file a derivative action to redress harm to the corporation only after "making a demand on the directors to obtain the action desired[.]"  *Id.*

Both sides in this case cite the test in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), for distinguishing between direct and derivative actions.  Under that test, the issue turns "*solely* on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Id.* at 1033.  Put another way, a direct claim is one where "the duty breached was owed to the stockholder" and the stockholder "can prevail without showing an injury to the corporation."  *Id.* at 1039.  A derivative

claim is one where the corporation suffered the injury and would receive the benefit of any recovery or other remedy. *See id.*

Plaintiffs' claims are derivative under the test in *Tooley* because Fannie and Freddie suffered the most direct harm from the Third Amendment. The harm suffered by Plaintiffs is indirect; it is a result of the depletion of assets suffered by the entities themselves. Moreover, Fannie and Freddie would benefit from the relief requested; Plaintiffs would benefit only to the extent that the recovery or retention of assets by Fannie and Freddie would increase the value of Plaintiffs' shares. Indeed, Plaintiffs ask for an order requiring Treasury to return to Fannie and Fannie the payments these entities made to Treasury under the Third Amendment. Plaintiffs do not ask for monetary relief for themselves. These are all features of "classic derivative claims" under Delaware law. *See Roberts v. FHFA*, 889 F.3d 397, 409 (7th Cir. 2018) (holding, based on *Tooley*, that shareholder claims against the FHFA under the Administrative Procedure Act (APA) are derivative); *but see Collins*, 938 F.3d at 575 (holding that shareholder claims against the FHFA under the APA are direct).

The Delaware Supreme Court has clarified that *Tooley* "deal[s] with the distinct question of when a cause of action for *breach of fiduciary duty* or to enforce rights *belonging to the corporation itself* must be asserted derivatively." *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015) (emphasis added). It was not "intended to be a general statement requiring all claims . . . to be brought derivatively whenever the corporation of which the plaintiff is a stockholder suffered the alleged harm." *Id.* at 180. "Because directors owe fiduciary duties to the corporation and its stockholders, there must be some way of determining whether stockholders can bring a claim . . . directly, or whether a particular fiduciary duty claim must be brought derivatively on the corporation's behalf." *Citigroup, Inc. v. AHW Inv. P'ship*,

140 A.3d 1125, 1139 (Del. 2016) (footnote omitted).  Thus, the "more important initial question . . . to be answered" is whether "the plaintiff seek[s] to bring a claim belonging to her personally or one belonging to the corporation itself?"  *Id.  Tooley* does not apply to claims that "only the [plaintiff] can assert" and that "could not possibly belong to the corporation[.]"  *Id.* at 1139-40.

Plaintiffs do not bring claims for breach of fiduciary duty.  Instead, they bring claims involving the separation of powers set forth in the Constitution.  Thus, the Court must decide the "initial question" whether this type of claim belongs to Fannie and Freddie or to Plaintiffs personally (i.e., one that "only Plaintiffs can assert").  The Court concludes that it belongs to Fannie and Freddie in the first instance.  Thus, *Tooley* applies.

In *Bond v. United States*, 564 U.S. 211 (2011), the Supreme Court indicated that "[t]he structural principles secured by the separation of powers protects the individual" as well as the "dynamic between and among the branches" of government.  *Id.* at 222.  Accordingly, "individuals who suffer otherwise justiciable injury may object" when the "constitutional structure of our Government . . . is compromised."  *Id.* at 223-24.  Fannie, Freddie, and their shareholders have all suffered some form of injury from the alleged constitutional violations.  Thus, in theory, Fannie and Freddie could bring a separation-of-powers claim, as could the shareholders.  In other words, this sort of claim is not one that only Plaintiffs could assert and that "could not possibly belong to the corporation."  In this situation, Delaware law would use the *Tooley* test to determine whether the claim is direct or derivative.  As indicated above, that test leads to the conclusion that Plaintiffs' claims are derivative because their injuries derive from the injuries to Fannie and Freddie.  Moreover, Plaintiffs cannot prevail without showing injury to these entities.

Plaintiffs disagree, contending that only they, not Fannie and Freddie, suffered injury from the Third Amendment.  Plaintiffs characterize the Third Amendment as a rearrangement of Fannie's and Freddie's "capital structure" that shifted virtually all of the companies' value to one shareholder (Treasury), at the expense of shareholders like Plaintiffs.  (Pls.' Br. in Opp'n to Treasury's Mot. to Dismiss 13.)  Plaintiffs contend that this arrangement amounted to "discrimination" against a class of shareholders, which can give rise to a direct claim under Delaware law.  *See Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, No. Civ.A 379-N, 2005 WL 1713067, at *8 n.41 (Del. Ch. July 13, 2005) ("Causes of action for the misallocation of shares among competing stockholders or for discrimination against specific stockholders have often been found to be direct and not derivative in nature.").

Plaintiffs' argument is contrary to Delaware law, which rejects the notion that "the extraction of solely economic value from the minority by a controlling stockholder constitutes direct injury."  *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016).  The Third Amendment allowed Treasury to reap the benefit of Fannie's and Freddie's profits at the expense of other shareholders.  Transferring the assets of a corporation to a single shareholder is not a rearrangement of capital structure with a neutral effect on the value of the corporation; it is akin to an "overpayment" claim under Delaware law.  *See id.*  Recognizing such a claim as direct would "swallow the rule that claims of corporate overpayment are derivative by permitting stockholders to maintain a suit directly whenever the corporation transacts with a controller on allegedly unfair terms."  *Id.* (internal quotation marks omitted).  There is an exception to this rule where the transfer includes "both economic value *and* voting power from the minority stockholders to the controlling stockholder," *id.* at 1263, but that exception does not apply here because Plaintiffs do not allege that the Third Amendment transferred any voting power to Treasury.

Plaintiffs also contend that the nature of the relief they seek (injunctive and declaratory relief) gives them latitude to bring direct claims, citing *Grimes v. Donald*, 673 A.2d 1207 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000). *Grimes* is inapposite. In that case, the shareholder plaintiff sought to invalidate employment agreements between the corporation and its director. *Id.* at 1210. The Delaware Supreme Court held that the plaintiff's claim was direct, noting that "'courts have been more prepared to permit the plaintiff to characterize the action as direct when the plaintiff is seeking only injunctive or prospective relief.'" *Id.* at 1213 (quoting A.L.I., *Principles of Corporate Governance: Analysis and Recommendations* § 7.01, cmt. d (1992)). But the court also based its holding on the fact that "[m]onetary recovery will not accrue to the corporation as a result" of the relief requested by the plaintiff in that case. *Id.* The same cannot be said of Plaintiffs' claims, which are premised on the hope that invalidating the Third Amendment will allow Fannie and Freddie will recoup their payments to Treasury, and thereby increase the value of Plaintiffs' shares. Thus, Plaintiffs' claims are distinguishable from the one in *Grimes*.

For similar reasons, Plaintiffs' reliance on cases like *Gatz v. Ponsoldt*, No. Civ.A 174-N, 2004 WL 3029868 (Del. Ch. Nov. 5, 2004), *San Antonio Fire & Police Pension Fund v. Bradbury*, No. 4446-VCN, 2010 WL 4273171 (Del. Ch. Oct. 28, 2010), and *Grayson v. Imagination Station, Inc.*, No. 5051-CC, 2010 WL 3221951 (Del. Ch. Aug. 16, 2010), is misplaced. In each of those cases, the court allowed shareholders to bring direct claims to unwind corporate agreements that did not negatively affect the value of the corporation; thus, granting relief would not benefit the corporation. *See Gantz*, 2004 WL 3029868, at *8 (challenge to "improper book transaction" between two corporate subsidiaries that increased the liquidation preference for some shareholders but had no impact on the value of the corporation); *San Antonio Fire*, 2010 WL 4273171, at *9

(challenge to agreement preventing shareholders from freely electing directors); *Grayson*, 2010 WL 3221951, at \*6 (challenge to a potentially *beneficial* loan transaction approved by an illegitimate board).  In contrast, the Third Amendment negatively impacted the value of Fannie and Freddie.  Moreover, unwinding that agreement would directly benefit those entities by allowing them to retain a greater proportion of their earnings instead of making payments to Treasury.  Thus, Plaintiffs' claims are derivative rather than direct.

### 2. The Fifth Circuit's reasoning to the contrary is not persuasive.

The Court of Appeals for the Fifth Circuit reached a different conclusion in *Collins*, holding that "[a] plaintiff with Article III standing can maintain a direct claim against government action that violates the separation of powers."  *Collins*, 938 F.3d at 587.  To reach this conclusion, that court exclusively relied on the Supreme Court's statement in *Bond* that "individuals who suffer otherwise justiciable injury may object" to a separation-of-powers violation.  *See id.*  But the Supreme Court's statement simply affirmed that government entities are not the only ones who can bring separation-of-powers claims; private entities and individuals can do so as well.  *See Bond*, 564 U.S. at 222-23.  In other words, corporations like Fannie and Freddie could bring such a claim.  There is no indication that *Bond* intended to override longstanding principles governing the relationship between a corporation and its shareholders.  *See Kamen*, 500 U.S. at 97 (noting the "presumption that state law should be incorporated into federal common law").  Indeed, in *Bond*, the Supreme Court also stated that an individual bringing a separation-of-powers claim must satisfy the "prudential rules . . . applicable to all litigants and claims."  564 U.S. at 225.  As discussed below, one of those rules is that shareholders generally cannot bring suit to remedy injury to the value of their shares where that injury is merely a result of injury to the corporation.  Thus, *Collins* is not persuasive.

This Court's determination that Plaintiffs' claims are derivative impacts the Court's analysis of prudential standing, claim preclusion, and a potential statutory bar to relief.

### B. Prudential Standing

Begin with prudential standing. "Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation." *Singleton v. Wulff*, 428 U.S. 106, 113 (1976). "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. This rule recognizes that the "holders of those rights [may] not wish to assert them," and that courts should "construe legal rights only when the most effective advocates of those rights are before them." *Singleton*, 428 U.S. at 113-14.

A related rule, called the "shareholder standing rule," is the "'longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment.'" *In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002) (quoting *Franchise Tax Bd. of Calif. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990)). It is a "general precept of corporate law that a shareholder of a corporation does not have a personal or individual right of action for damages based solely on an injury to the corporation." *Gaff v. FDIC*, 814 F.2d 311, 315 (6th Cir. 1987); *cf. Franchise Tax Bd.*, 493 U.S. at 336 (noting that a shareholder must have a "direct, personal interest in a cause of action to bring suit"). "The reasoning behind this rule is that a diminution in the value of corporate stock resulting from some depletion of or injury to corporate assets is a direct injury only to the corporation; it is merely an

indirect or incidental injury to an individual shareholder." *Id.* The rule also reflects a "common-sense system for recovery," because allowing individual shareholders to bring direct claims for indirect injury would permit "a multiplicity of suits and potentially impair the rights of other claimants." *In re Sunrise Sec. Litig.*, 916 F.2d 874, 888 (3d Cir. 1990).

The interests at stake here are the value of Plaintiffs' shares in Fannie and Freddie and the diminution in that value as a result of the Third Amendment. Those interests fall squarely within the shareholder standing rule. They are not "the type of direct, personal [interests] which [are] necessary to sustain a direct cause of action." *Gaff*, 814 F.2d at 315.

 Nevertheless, equitable standing rules do not prevent Plaintiffs' claims from going forward because Plaintiffs are the "most effective advocates" of the rights at issue. *See Singleton*, 428 U.S. at 114. Prudential standing rules "should not be applied when [their] underlying justifications are absent." *Id.*

Under HERA, the FHFA has complete control over Fannie and Freddie. When the FHFA became conservator, it succeeded to "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity[.]" 12 U.S.C. § 4617(b)(2)(A)(i). It has the right to "operate" Fannie and Freddie "with all the powers of the shareholders, the directors, and the officers" of those entities. *Id.* § 4617(b)(2)(B)(i). Consequently, Fannie and Freddie have no control over whether to bring a cause of action against the FHFA for any injury they suffered as a result of the Third Amendment. Moreover, the FHFA is not apt to sue itself for its own actions. *See United States v. Interstate Com. Comm'n*, 337 U.S. 426, 430 (1949) (recognizing the "general principle that no person may sue himself"). Put another way, although Fannie and Freddie suffered the most direct harm from the Third Amendment, they do not have the power to pursue any claims

26

to remedy that harm.  That leaves shareholders like Plaintiffs, whose financial interests are entwined with the financial interests of Fannie and Freddie, as the "best proponents" of those claims.

Similarly, *Gaff* and *Troutman* recognize that shareholders can bring derivative claims for injury to the corporation where the corporation "fails to act" or "refuses to pursue the same action." *Gaff*, 814 F.2d at 315; *Troutman*, 286 F.3d at 364.  There is no indication that Fannie or Freddie have expressly refused to act; however, permitting Plaintiffs' claims to proceed would be consistent with Delaware law regarding demand futility.  *See Kamen*, 500 U.S. 98-103 (looking to state law to examine this question).  Typically, a shareholder with a derivative claim must first demand that the corporation's directors take action to remedy the injury to the corporation.  This requirement, which is embodied in Rule 23.1 of the Federal Rules of Civil Procedure, "affor[ds] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right."  *Kamen*, 500 U.S. at 96 (internal quotation marks omitted); *see* Fed. R. Civ. P. 23.1(b)(3)(A) (requiring shareholders bringing a derivative action to allege "any effort . . . to obtain the desired action from the directors or comparable authority").

The demand requirement is excused when, for example, "officers and directors are under an influence which sterilizes their discretion" to act.  *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm*, 746 A.2d at 244; *see also Davis ex rel. Woodside Props., LLC v. MKR Dev., LLC*, 814 S.E.2d 179, 182 (Va. 2018) (recognizing futility exception to the demand requirement in Virginia law).  Fannie's and Freddie's directors have no discretion to act.  Those companies remain in conservatorship, subject to the control of the FHFA.  Moreover, the FHFA cannot sue itself; thus, it would be futile to make such a demand of the FHFA.

27

Accordingly, Plaintiffs have prudential standing to bring their claims.

## C.  Claim Preclusion

Defendants contend that Plaintiffs' claims are precluded because other shareholders of

Fannie and Freddie have pursued similar actions attempting to undo the Third Amendment (e.g.,

*Perry Capital* and *Saxton v. FHFA*, 245 F. Supp. 3d 1063 (N.D. Iowa 2017), *aff'd*, 901 F.3d 954

(8th Cir. 2018)), and those actions have failed.

> A claim is barred by the res judicata effect of prior litigation if all of the following elements are present: "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies'; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action."

*Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002) (quoting *Bittinger v. Tecumseh Prods. Co.*,

123 F.3d 877, 880 (6th Cir. 1997)).  Claim preclusion is an affirmative defense. *Taylor v. Sturgell*,

553 U.S. 880, 907 (2008).  "[I]t is incumbent on the defendant to plead and prove such a defense[.]"

*Id.*

Defendants have not demonstrated the second prong of claim preclusion, which requires

an action involving the same parties or their privies.  A privy includes "a successor in interest to

the party, one who controlled the earlier action, or one whose interests were adequately

represented." *Sanders Confectionary Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 481 (6th Cir.

1992).  This case does not involve the first two categories of privity—a successor in interest or

one who controlled the earlier action.  The third category, adequate representation, "requires 'an

express or implied *legal* relationship in which parties to the first suit are *accountable* to non-parties

who file a subsequent suit raising identical issues.'"  *Becherer v. Merrill Lynch, Pierce, Fenner,*

*& Smith, Inc.*, 193 F.3d 415, 423 (6th Cir. 1999) (quoting *Benson & Ford, Inc. v. Wanda Petrol.*

*Co.*, 833 F.2d 1172, 1175 (5th Cir. 1987)).

"[I]n shareholder derivative actions arising under Fed. R. Civ. P.23.1, parties and their privies include the corporation and all nonparty shareholders." *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir. 1981). But in order for preclusion to apply to a nonparty shareholder, "due process limitations" require that the party to the original action adequately represent the interests of the nonparty. *Taylor*, 553 U.S. at 891, 900; *see Nathan*, 651 F.2d at 1226 (noting that the "nonparty shareholders are bound by judgments if their interests were adequately represented"). At a minimum, adequate representation requires: "(1) [t]he interests of the nonparty and her representatives are aligned . . . and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty[.]" *Id.* at 900 (citations omitted). "In addition, adequate representation sometimes requires . . . notice of the original suit to the persons alleged to have been represented[.]" *Id.*

Defendants have not shown that the plaintiffs in *Perry Capital*, *Saxton*, or in any other shareholder suit involving the Third Amendment, adequately represented the interests of Plaintiffs. Indeed, in *Saxton* itself, the district court concluded that the shareholder plaintiffs in *Perry Capital* did not adequately represent the interests of the shareholder plaintiffs in *Saxton*. *Saxton*, 245 F. Supp. 3d at 1075. Among other things, the individual plaintiffs in *Perry Capital* "did not purport to act in a representative capacity." *Id.* at 1074. Consequently, the judgment in *Perry Capital* did not preclude the shareholder claims in *Saxton*.

It is not enough that the courts in *Perry Capital* and *Saxton* determined that the claims in those cases were derivative. Adequate representation requires that the plaintiffs in those cases "understood" that they were "acting in a representative capacity" or that the court "[took] care to protect the interests of the nonpart[ies]." *Taylor*, 553 U.S. at 900. The record before the Court

29

does not establish these facts.[5]   Accordingly, the Court will not dismiss the case due to claim preclusion.

### D.  HERA's Succession Clause

#### 1.  The succession clause transfers derivative claims to the FHFA.

Another potential barrier to Plaintiffs' claims is the succession clause in HERA which provides that, as conservator, the FHFA immediately succeeds to the "rights, titles, powers, and privileges of [Fannie and Freddie], and of any stockholder . . . of such regulated entity with respect to the regulated entity and the assets of the regulated entity[.]"  12 U.S.C. § 4617(b)(2)(A)(i).  The rights of a stockholder "with respect to the regulated entity" encompasses the stockholder's derivative claims.  *See Perry Capital*, 864 F.3d at 624 ("Rights 'with respect to' a Company and its assets are only those an investor asserts derivatively on the Company's behalf.").  Courts have interpreted a nearly identical clause in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1821(d)(2)(A)(i), to transfer derivative claims.  *See, e.g.*, *Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014).  Under that interpretation, Plaintiffs do not have the right to bring a derivative claim on behalf of Fannie and Freddie because HERA transferred that right to the FHFA.

#### 2.  There is no conflict-of-interest exception to the succession clause.

Plaintiffs urge the Court to recognize a "conflict-of-interest" exception to the succession clause in HERA.  Two circuits have recognized such an exception to the succession clause in FIRREA.  *See Delta Sav. Bank v. United States*, 265 F.3d 1017, 1022 (9th Cir. 2001); *First*

---

[5] Defendants cite the Delaware Supreme Court's observation that, "because the real party in interest [in a derivative suit] is the corporation, differing groups of stockholders who seek to control the corporation's cause of action share the same interest and therefore are in privity."  *Calif. State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d 824, 847 (Del. 2018).  But Defendants ignore that court's analysis of the record in that case to determine whether the first set of plaintiffs "understood that they were acting in a representative capacity," and whether the court in the first case "took care to protect the interests of the nonparty [stockholders]."  *Id.* at 851.  Defendants have not conducted that analysis.

*Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1295 (Fed. Cir. 1999).  Under FIRREA, the FDIC succeeds to the rights of shareholders of banks that are in receivership.  *See* 12 U.S.C. § 1821(d)(2)(A)(i).  But in *First Hartford*, the Federal Circuit held that the shareholders could bring a derivative claim against the United States for a breach of contract caused by the FDIC because the FDIC faced a "manifest conflict of interest" in deciding whether to bring a claim for that breach.  *First Hartford*, 194 F.3d at 1295.  After all, the purpose of the "derivative suit mechanism" is to "permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation."  *Id.*  Permitting a derivative action where, as in *First Hartford*, the holder of the direct claim has a conflict of interest would vindicate that purpose.

The Ninth Circuit reached a similar conclusion *Delta Savings*, holding that FIRREA's succession clause does not bar shareholder derivative claims against the FDIC or against a closely-related federal agency.  *Delta Sav. Bank*, 265 F.3d at 1024.  To hold otherwise would, in that court's view, be "impracticable, and arguably absurd."  *Id.*

The Sixth Circuit has not ruled on the conflict-of-interest exception in FIRREA or HERA, but at least two other circuits have declined to apply the rationale in *First Hartford* and *Delta Savings* to HERA.  For instance, the D.C. Circuit has concluded that it makes no sense to use the purpose of derivative suits to create an exception that is not present in the text of HERA.  *Perry Capital*, 864 F.3d at 625.  Likewise, the Seventh Circuit has held that HERA's language is "clear and absolute"; it does not contain a conflict-of-interest exception.  *Roberts*, 889 F.3d at 409.  Had Congress intended such an exception, it could have provided one.  Indeed, "HERA already authorizes derivative challenges to the decision to place the companies into conservatorship or

receivership." *Id.* at 410 (citing 12 U.S.C. § 4617(a)(5)(A)). "What [it] does not authorize are shareholder suits that would interfere with [the FHFA's] decisions as conservator once that conservatorship is underway. Otherwise, shareholders could challenge nearly any business judgment of [the FHFA] using a derivative suit, by invoking a conflict-of-interest exception." *Id.*

This Court agrees with Defendants that *First Hartford* and *Delta Savings* are not persuasive as applied to HERA. The purpose of derivative suits is not an adequate justification for inserting an exception into a statute that expressly assigns the rights of shareholders to the FHFA. *See Saxton*, 245 F. Supp. 3d at 1079 ("[I]t is not for the court to impose such an exception when faced with an unambiguous statute."). Moreover, recognizing a conflict-of-interest exception would potentially render the assignment of shareholder rights to the FHFA meaningless. Shareholders could use the exception to challenge virtually any conservatorship decision by the FHFA. *See Roberts*, 889 F.3d at 410.

Furthermore, the Court is not persuaded that it should give any particular weight to the fact that *First Hartford* and *Delta Savings* were decided before Congress enacted HERA. Plaintiffs have offered no evidence that Congress considered, let alone approved, the holdings of these cases when adopting HERA. Accordingly, there is no evidence that Congress intended HERA's succession clause to contain a conflict-of-interest exception.

### 3. The succession clause does not bar constitutional claims.

Nevertheless, the Court agrees with Plaintiffs that HERA does not prevent them from pursuing *constitutional* claims. Courts generally try to avoid construing statutes to "deny any judicial forum for a colorable constitutional claim" because that would raise a "'serious constitutional question.'" *Webster v. Doe*, 486 U.S. 592, 603 (1988) (quoting *Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 681 n.12 (1986)); *see Bartlett v. Bowen*, 816 F.2d 695, 700 (D.C. Cir. 1987) (noting that "preclusion of judicial review of constitutional claims"

raises due process concerns).  Yet that is what Defendants' construction of HERA would do here. It would deny any judicial forum for shareholders injured by constitutional violations stemming from the FHFA's conduct as conservator.

Defendants sweep these concerns aside, contending that HERA "would merely require the [constitutional] claims to be brought by a party capable of demonstrating direct, personal injury, as opposed to derivative harm to the corporation."  (Treasury's Reply Br. in Supp. of Mot. to Dismiss 5 n.5, ECF No. 34.)  But that assertion begs the question:  what party is capable of bringing such a claim?  Only Fannie and Freddie suffered direct injury from the Third Amendment, but the succession clause has stripped them of the power to act.  The FHFA has sole authority to make decisions for Fannie and Freddie, but it cannot sue itself.  If shareholders like Plaintiffs cannot seek a judicial remedy for injuries caused by the constitutional violations alleged in their complaint, then no one can.  Thus, interpreting HERA to bar Plaintiffs' claims would implicate the constitutional concerns in *Webster*.  *See Collins*, 938 F.3d at 587 (citing *Webster* when examining whether HERA's succession clause would bar shareholders' constitutional claims).

To avoid these constitutional concerns, the Supreme Court requires a "heightened showing" that Congress intended to preclude judicial review of constitutional claims.  *Webster*, 486 U.S. at 603.  Congress's "intent to do so must be clear."  *Id.*  There must be "'clear and convincing' evidence" in the statute or its legislative history that Congress intended to "restrict access to judicial review" of constitutional claims.  *Johnson v. Robison*, 415 U.S. 361, 373 (1974) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)).  Nothing in HERA indicates that Congress intended to prevent review of constitutional claims, and the Court is not aware of any clear and convincing evidence supporting such an intent.  Thus, the Court is not persuaded that

HERA bars Plaintiffs' constitutional claims.  *See Collins*, 938 F.3d at 587 (reaching the same conclusion).

### E.  Conclusion

In summary, Plaintiffs' claims can proceed.  The claims are derivative but Plaintiffs have prudential standing to bring them.  Defendants have not shown that Plaintiffs' claims are barred by the doctrine of claim preclusion or by HERA's succession clause.

### VII.  Counts I & II: Violation of President's Removal Authority

Count I of the complaint contends that the FHFA's structure (an independent agency headed by a single director), combined with the removal protection for the FHFA's director, presents an unconstitutional impediment to the President's removal authority.

Count II contends that, even if it is constitutional for an agency to operate under the leadership of a single individual removable only for cause, this feature violates the separation of powers when combined other features of the FHFA, including the following:  the FHFA's purported lack of "meaningful direction or supervision from Congress"; the FHFA's independent source of funding; and HERA's restrictions on judicial review of the FHFA's actions.  (Am. Compl. ¶¶ 147-149.)

### A.  Precedent

#### 1.  The Constitution gives the President removal authority over certain officers.

"'[A]s a general matter,' the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties[.]'"  *Seila Law*, 140 S. Ct. at 2191 (quoting *Free Enterprise Fund*, 561 U.S. at 513-14).  This authority "follows from the text of Article II," *id.* at 2191-92, which "vest[s]" the "executive Power . . . in a President," who must "take Care that the Laws be faithfully executed."  U.S. Const., Art. II, § 1, cl. 1; *id.* § 3.  "Without [removal] power,

the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enterprise Fund*, 561 U.S. at 514.

### 2. There are two permissible exceptions to the President's removal power.

The Supreme Court has recognized "only two exceptions to the President's unrestricted removal power":  (1) "expert agencies led by a *group* of principle officers removable by the President only for good cause"; and (2) "tenure protections to certain *inferior* officers with narrowly defined duties." *Seila Law*, 140 S. Ct. at 2192.

The Court recognized the first exception in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), upholding a statute that protected FTC Commissioners from removal except for "'inefficiency, neglect of duty, or malfeasance in office.'"  *Humphrey's Ex'r*, 295 U.S. at 622 (quoting 15 U.S.C. § 41).  The Court approved these protections because the FTC was a "multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power."  *Seila Law*, 140 S. Ct. at 2199.

The Court recognized the second exception in *United States v. Perkins*, 116 U.S. 483 (1886), and *Morrison v. Olson*, 487 U.S. 654 (1988).  *Perkins* involved tenure protections for a naval cadet-engineer and *Morrison* involved a good-cause removal protection for an independent counsel appointed to investigate crimes by high-ranking government officials.  *Seila Law*, 140 S. Ct. at 2199.  In *Morrison*, the Court shifted away from reliance on the supposedly non-executive functions of the officer in question; instead, it focused on whether "the removal restriction is of 'such a nature that [it] impede[s] the President's ability to perform his constitutional duty.'"  *Id.* (quoting *Morrison*, 487 U.S. at 691).  The Court concluded that the removal protections for the independent counsel "did not unduly interfere with the functioning of the Executive Branch because 'the independent counsel [was] an inferior officer under the Appointments Clause, with

limited jurisdiction and tenure and lacking policymaking or significant administrative authority.'" *Id.* (quoting *Morrison*, 487 U.S. at 691).

### 3. The FHFA does not fall within the two recognized exceptions.

The FHFA does not fall within either of the exceptions recognized by the Supreme Court. The FHFA is not led by a group of principle officers; instead, a single officer directs the agency. In addition, the FHFA Director is not an inferior officer because the person in that role is not supervised by another appointed officer. *See Free Enterprise Fund*, 561 U.S. at 510 (defining inferior officers as those "'whose work is directed and supervised at some level' by other officers appointed by the President with the Senate's consent") (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)).

### 4. The structure of a similar agency is unconstitutional.

The FHFA is almost identical in structure to the agency examined in *Seila Law*. There, the Supreme Court held that the structure of the Consumer Financial Protection Bureau (CFPB) violates the separation of powers. *Seila Law*, 140 S. Ct. at 2197. The Dodd-Frank Act made the CFPB an "independent" agency headed by a single director who is appointed by the President with the advice and consent of the Senate. *Id.* at 2193; *see* 12 U.S.C. § 5491(a) (referring to the CFPB as an "independent bureau"). The CFPB Director serves a term of five years, during which he or she is removable "only for 'inefficiency, neglect of duty, or malfeasance in office.'" *Id.* (quoting 12 U.S.C. § 5491(c)(3)). And "[u]nlike most other agencies, the CFPB does not rely on the annual appropriations process for funding. Instead, [it] receives funding directly from the Federal Reserve . . . ." *Id.* at 2193-94. That structure, the Court held, contravenes the system created by the Constitution—which "'makes a single President responsible for the actions of the Executive branch,'"—by "vesting significant governmental power in the hands of a single individual accountable to no one." *Id.* at 2203 (quoting *Free Enterprise Fund*, 561 U.S. at 496).

36

The "CFPB Director's insulation from removal by an accountable President [was] enough to render the agency's structure unconstitutional." *Id.* at 2204. But the Court also noted other features that made the removal protection "even more problematic." *Id.* For instance, the Director's five-year term meant that "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities." *Id.* In addition, the CFPB's funding from outside the appropriations process meant that the President could not use "budgetary tools" to influence its Director. *Id.*

The Supreme Court was not persuaded that the grounds for removal of the CFPB Director in the Dodd-Frank Act (inefficiency, neglect of duty, or malfeasance in office) were broad enough to give the President sufficient influence over the Director to implement the President's preferred policies. Among other things, it made no sense for Congress to create an ostensibly "independent" agency while simultaneously requiring its head to "implement the President's policies upon pain of removal." *Id.* at 2207. In short, the Court declined to extend the exceptions in *Humphrey's Executor* and *Morrison* to "an independent agency led by a single Director and vested with significant executive power. . . . Such an agency has no basis in history and no place in our constitutional structure." *Id.* at 2201.

### B.  Comparing the FHFA to the CFPB

The FHFA shares virtually all of the same characteristics that were considered problematic for the agency in *Seila Law*. As indicated above, HERA describes the FHFA as an "independent" agency. The FHFA is headed by a single director, subject to removal only "for cause." 12 U.S.C. § 4512(b)(2). The FHFA Director serves a term of five years. The FHFA receives its funding from outside the congressional appropriations process. *See id.* § 4516(a) (providing that the FHFA will collect funds from the entities it regulates, as necessary to provide for the "reasonable costs . . . and expenses of the Agency").

There are a few differences between the CFPB and the FHFA, and between their respective enabling statutes, but those differences are not significant enough to distinguish the FHFA from the CFPB for purposes of a separation-of-powers claim under Article II.  For instance, the removal standard in HERA ("for cause") is arguably broader than the one in the Dodd-Frank Act ("inefficiency, neglect of duty, or malfeasance in office").  However, there is no plausible interpretation of "for cause" that would give the President authority to remove the FHFA Director based on a policy disagreement.  Such an interpretation would render the removal restriction effectively meaningless.  *Cf. Seila Law*, 140 S. Ct. at 2207 ("[W]e take Congress at its word that it meant to impose a meaningful restriction on the President's removal authority[.]").

Another difference is that the FHFA Director does not wield the same amount of power as the CFPB Director.  The CFPB Director

> possesses the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy.  And instead of submitting recommended dispositions to an Article III court, the Director may unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications.  Finally, the Director's enforcement authority includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*.

*Seila Law*, 140 S. Ct. at 2200 (footnote omitted).

In contrast, the FHFA Director oversees a collection of government-supported private entities, including Fannie, Freddie, and the Federal Home Loan Banks.[6]  *See* 12 U.S.C. §§ 4511(b), 4513.  Granted, these entities are not insignificant; they "provide more than $5.8 *trillion* in funding for the U.S. mortgage markets and financial institutions[.]"  (Am. Compl. ¶ 137.)  But unlike the CFPB, the FHFA does not have broad power to regulate the actions of a wide swath of private

---

[6] Federal Home Loan Banks are private, regional banks established by the Federal Home Loan Bank Act.  *See* 12 U.S.C. § 1422.

actors.  The FHFA's authority is relatively limited in scope.  The FHFA also possesses the "quintessentially executive power" of enforcing regulations and obtaining monetary penalties in federal court, but that power is limited to enforcement against Fannie and Freddie.  *See* 12 U.S.C. §§ 4584, 4585.

Nevertheless, the Court does not believe that the more limited scope of the FHFA's power renders the removal restriction for its Director harmless as a constitutional matter.  The FHFA is an executive agency charged with implementing HERA.  The removal restriction impedes the President's ability to oversee the agency and to perform his constitutional duty to faithfully execute this law.  And as in *Seila Law*, this problem is exacerbated by the Director's five-year term and by the FHFA's independent source of funding.

### C.  Exercise of Executive Power

As discussed in Section V above, Defendants contend that there was no separation-of-powers violation in this particular case because the FHFA did not exercise executive, governmental power when adopting the Third Amendment.  According to Defendants, the FHFA was simply acting in the role of a "private financial manager" for two private entities.  (Treasury's Mem. in Supp. of Mot. to Dismiss 19, ECF No. 23.)  Defendants contend that, when the FHFA became conservator for Fannie and Freddie, it stepped into the shoes of these private entities and, thus, any actions that the FHFA took in its conservator role were "non-governmental in nature." (*Id.* at 20.)

Defendants compare this case to *United States v. Beszborn*, 21 F.3d 62 (5th Cir. 1994), in which the Fifth Circuit held that the Resolution Trust Corporation (RTC), in its capacity as receiver for an insolvent bank, is not the Government for purposes of the Double Jeopardy Clause because the RTC "stands in the shoes" of the bank and acts as a "private, non-governmental entity." *Beszborn*, 21 F.3d at 68; *see also Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017)

("When the [FHFA] stepped into these shoes [as conservator], the FHFA 'shed[ ] its government character and . . . [became] a private party.'") (quoting *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017)).

There are several shortcomings with Defendants' argument. The first is that the FHFA is a conservator for Fannie and Freddie, not a receiver. These two roles are "meaningfully different." *Fisher v. United States*, No. 13-608C, 2020 WL 2764191, at *14 (Fed. Cl. May 8, 2020). HERA makes this difference plain. As receiver, the FHFA must "place the regulated entity in liquidation and proceed to realize upon the assets [of that entity]." 12 U.S.C. § 4617(b)(2)(E). But as conservator, the FHFA "may . . . take such action as may be—(i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D).

One consequence of the difference in these roles is that, unlike a receiver, a conservator does not fully step into the shoes of the entity under its management. As another court explained:

> . . . When FDIC is appointed receiver, it must dispose of the received entity's assets, resolving obligations and claims made against the entity. Notably, "[i]n receivership, the receiver owes fiduciary duties to the creditors, which the corporation would otherwise owe to creditors during a period of insolvency." It logically follows, then, that the receiver steps into the shoes of the private entity, because it assumes the fiduciary duties of that entity.
>
> Conservatorship, in contrast, serves a different function. FHFA has described the purpose of conservatorship is "to establish control and oversight of a company to put it in a sound and solvent condition." Conservators, unlike receivers, have a fiduciary duty running to the corporation itself.
>
> This is "critically distinct" from the fiduciary duties owed as a receiver—the receiver does indeed "step into the shoes" of the entity by assuming the fiduciary duties of the entity, but the conservator does not: it remains distinct, and rather owes a duty to the entity. Given the difference in fiduciary duties, [the] "steps into the shoes" [rationale] makes sense in the context of receivership, but not in the context of conservatorship.

*Fisher*, 2020 WL 2764191, at *14-15 (quoting *Sisti v. FHFA*, 324 F. Supp. 3d 273, 282-83 (D.R.I. 2018)).

Furthermore, unlike a traditional receiver or conservator, the FHFA can act for the benefit of the Government. *See* 12 U.S.C. § 4617(b)(2)(J)(ii) (permitting the FHFA to take action that it determines "is in the best interests of the regulated entity *or the Agency*") (emphasis added). And according to Plaintiffs' complaint, the Third Amendment did just that; it furthered the interests of the Government at the expense of Fannie and Freddie. It does not stand to reason that the FHFA was acting as the equivalent of a private party when making such an arrangement. *Accord Collins*, 938 F.3d at 590 ("FHFA is a federal agency, empowered by a federal statute, enriching the federal government. It adopted the Third Amendment with federal governmental power. And that power was executive in nature."); *cf. Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 53-54 (2015) (concluding that "Amtrak acted as a governmental entity for purposes of the Constitution's separation of powers provisions" because "Amtrak was created by the Government, is controlled by the Government, and *operates for the Government's benefit*.") (emphasis added).

In short, the FHFA is undeniably an executive agency with a variety of powers given to it by a federal statute. It used those powers for the benefit of the Government when adopting the Third Amendment. The Constitution requires the exercise of such power to be subject to the control of the President through the President's removal power, so that the President can faithfully execute the law. The removal protection for the FHFA's Director, when combined with the FHFA's structure (an agency directed by a single individual serving a five-year term), is almost certainly unconstitutional.

### D.  The FHFA's Acting Director

On the other hand, the Court agrees with Defendants that there is no separation-of-powers violation at issue *in this case* because the individual who approved the Third Amendment was not

subject to HERA's removal restriction.  DeMarco was an acting Director.  HERA's removal restriction expressly refers to the Director, *see* 12 U.S.C. § 4512(b)(2); there is no such restriction in the provision discussing the acting Director, *see* 12 U.S.C. § 4512(f).  Moreover, the acting Director does not serve "for a term of five years," so the restriction in § 4512(b)(2) does not readily apply to the acting Director.  "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).  "Congress does not, by purporting to give tenure protection to a Senate-confirmed officer, afford similar protection to an individual who temporarily performs the functions and duties of that office when it is vacant."  Office of Legal Counsel, U.S. Dep't of Justice, *Designating an Acting Director of the Bureau of Consumer Financial Protection*, 2017 WL 6419154, at *7 (Nov. 25, 2017) (interpreting the Dodd-Frank Act).

The majority in *Collins* reasoned that the FHFA's acting Director is protected by the same removal restriction as the Director because "HERA unequivocally says what kind of agency it creates"; it creates an "independent" agency.  *Collins*, 938 F.3d at 589.  "In history and Supreme Court precedent, Presidential removal is the 'sharp line of cleavage' between independent agencies and executive ones."  *Id.*  (quoting *Wiener v. United States*, 357 U.S. 349, 353 (1958)).  The *Collins* majority believed that the "procedural guidance for choosing an acting Director" should not override the "FHFA's central character."  *Id.*

The reasoning in *Collins* is flawed.  Neither history nor Supreme Court precedent supports tenure protection for an acting official designated by the President.  Consider Supreme Court precedent.  "No authority has ever read in tenure protection for acting officials not subject to Senate

confirmation." *Id.* at 620 (Costa, J., dissenting); *cf. Swan v. Clinton*, 100 F.3d 973, 974, 984 (D.C. Cir. 1996) (declining to provide removal protection for a holdover member of the Board of the National Credit Union Administration (NCUA) serving past his term, even though Congress denominated the NCUA an "independent agency").

Plaintiffs, as well as the majority in *Collins*, rely on a single Supreme Court case that read removal protections into a statute where *none* exist, but that precedent does not apply here. In *Wiener*, the Supreme Court determined that Senate-confirmed members of the War Claims Commission were protected from removal at will by the President, even though Congress did not expressly provide for such protection. *See Wiener*, 357 U.S. at 354. But *Wiener* was not a case like this one, where "Congress extended for-cause protection to one kind of officer and not to another." *Collins*, 938 F.3d at 622 n.2 (Costa, J., dissenting).

Moreover, *Wiener* is distinguishable because it relied in large part on the notion that the "judicial" function of the War Claims Commission—an "adjudicatory body" resolving legal claims—required independence from the Executive so that the Commission could "'exercise its judgment without the leave or hindrance of any other official or any department of the government[.]'" *Wiener*, 357 U.S. at 353, 355 (quoting *Humphrey's Ex'r*, 295 U.S. at 625-26). After *Wiener*, the Court moved away from that approach for determining whether and to what extent Congress can protect an appointed official from removal. And in any event, the FHFA is clearly not an adjudicatory body like the War Claims Commission.

As far as Supreme Court precedent is concerned, *Wiener* is perhaps the only exception to the general rule that, "[i]n the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment." *Keim v. United States*, 177 U.S. 290, 293 (1900); *see also In re Hennen*, 38 U.S. 230, 259 (1839) ("[I]n the absence of . . . statutory

regulation" saying otherwise, "the power of removal [is] incident to the power of appointment."). In other words, *Wiener* is the only Supreme Court case limiting the President's removal power despite the lack of an express limitation in the applicable statute.[7]  This Court is reluctant to extend the holding in *Wiener* beyond its particular facts.

Next, consider history.  The *Collins* majority referred to HERA's requirement that the President designates an acting Director as mere "procedural guidance," but in other contexts the difference between an appointed office and a designated office is significant.  When Congress created other independent agencies, it gave tenure protection to *appointed* positions, but not to *designated* ones.  For instance, independent agencies like the Federal Trade Commission (FTC), the National Labor Relations Board (NLRB), the Federal Labor Relations Authority (FLRA), the Federal Energy Regulatory Commission (FERC), the Federal Maritime Commission (FMC), the Federal Mine Safety and Health Review Commission (FMSHRC), the Nuclear Regulatory Commission (NRC), the Occupational Safety and Health Review Commission (OSHRC), the Postal Regulatory Commission (PRC), and the Surface Transportation Board (STB) consist of several members who are appointed to their positions by the President (with the advice and consent of the Senate), and who are protected from removal before the end of set terms; however, the President unilaterally "chooses" or "designates" the chair of each of these agencies from among their respective members.  *See* 15 U.S.C. § 41 (FTC); 29 U.S.C. § 153(a) (NLRB); 5 U.S.C. § 7104(b) (FLRA); 42 U.S.C. § 7171(b)(1) (FERC); 46 U.S.C. § 301(c)(1) (FMC); 30 U.S.C. § 823(a) (FMSHRC); 42 U.S.C. § 5841(a)(1) (NRC); 29 U.S.C. § 661(a) (OSHRC); 39 U.S.C. § 502(d) (PRC); 49 U.S.C. § 1301(c)(1) (STB).  Although only a few of the statutes creating these

---

[7] In *Free Enterprise Fund*, the Supreme Court accepted the parties' agreement that SEC Commissioners could not be removed except for cause.  561 U.S. at 487.  The Court did not review the SEC's enabling statute.

agencies expressly say so,[8] the President's designation is considered to be removable at will.  *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 189 & n.15 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (noting that "the President may designate . . . chairs [of multi-member independent agencies] and may remove [these] agency chairs at will from their positions as chairs"), *abrogated on other grounds by Seila Law*, 140 S. Ct. at 2183.

The same rule should apply to the acting-Director designation in HERA.  Like the other statutes mentioned above, HERA does not expressly prevent the President from withdrawing his or her designation.[9]  The Court should not read a protection into HERA that does not exist in that statute or, as far as the Court is aware, in any other statute creating an acting or designated position.

Furthermore, a recent survey of independent agencies casts doubt on the "consensus view" that a for-cause removal restriction for an agency head is the clear dividing line between independent agencies and executive ones.  *See* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 776 (May 2013).  "[N]ot all agencies considered independent possess such a clause."  *Id.*  "Congress can—and does—create agencies with many different combinations of indicia of independence."  *Id.* at 774.

In their article, Datla and Revesz identify "seven indicia of independence" in the enabling statutes for independent and executive agencies, including:  "removal protection [for the agency head(s)], specified tenure, multimember structure, litigation authority, partisan balance

---

[8] The statutes creating the NRC and PRC expressly state that the President designates the chair of those agencies to serve at the "pleasure of the President."  42 U.S.C. § 5841(a)(1) (NRC); 39 U.S.C. § 502(d) (PRC).  The other statutes mentioned are silent about withdrawal of the President's designation.

[9] Plaintiffs argue that HERA's silence about removal of the acting Director supports "*stronger* protection for the acting Director" than for the Director because the acting Director "'serve[s] . . . until the return of the Director, or the appointment of a [Senate-confirmed] successor,' 12 U.S.C. § 4512(f)[.]"  (Pls.' Br. in Opp'n to FHFA Defs.' Mot. to Dismiss 4 n.1.)  Suffice it to say, the Court is aware of no instance in which Congress gave removal protection to an acting official unilaterally selected by the President, let alone stronger protection than an official appointed with the consent of the Senate.

requirements, budget and congressional communication authority, and adjudication authority." *Id.* at 775. They conclude that "[a]gencies fall along a spectrum ranging from more insulated to less insulated from the President," depending on the number of indicia present. *Id.* at 842. And "[t]here is no perfect correlation between any two features of independence, other than for-cause removal and a term of tenure, so there is no reason to infer additional, unwritten limitations on presidential control from the presence of any given limitation." *Id.* at 842-43.

In the case of the FHFA, tenure protection for the FHFA Director is certainly one aspect of the FHFA's independence. But there are other aspects as well, including the following: the FHFA's independent source of funding; its independence from "the direction or supervision of any other agency of the United States or any State" when acting as conservator or receiver, 12 U.S.C. § 4617(a)(7); and the limits on judicial remedies for the Director's decisions, *see* 12 U.S.C. § 4623(b) (providing that a court may not "modify, terminate, or set aside an action taken by the Director" unless the Court finds that the Director's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with applicable laws"). It is not obvious that, by describing the FHFA as "independent," Congress was referring primarily or exclusively to the removal protection for the FHFA's Director, let alone that Congress intended the acting Director to share that same protection. In light of the other features of the FHFA's independence, Congress could have concluded that the lack of removal protection for the acting Director would not meaningfully detract from the FHFA's "central character" whenever there is an absence or vacancy in the Director position. Indeed, removal protection for acting Directors does not necessarily make them more independent. "[G]iven that [acting Directors] can be replaced whenever a successor is confirmed, all that removal protection achieves is to make [acting Directors] more dependent on

Senate inaction than on the President." *See Swan*, 100 F.3d at 984 (discussing holdover members of the NCUA).

Note, too, that in all the statutes creating federal agencies, "there is only one feature of independence that is perfectly correlated to another:  for-cause removal protection is *always accompanied by a set term of tenure*."  Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 833 (emphasis added).  The FHFA's acting Director does not have a set term of tenure; the length of tenure for that position varies depending upon the duration of the absence or vacancy of a Director.  Thus, as far as the Court can tell, an acting agency head with removal protection would be a singular anomaly in all of administrative law.

Plaintiffs point to evidence that some officials in President Obama's administration may have believed that the President could not remove DeMarco from his position.[10]  However, this Court has a duty to interpret the law using precedent and the traditional tools of statutory interpretation.  News articles and scattered statements by a few administration officials have little bearing on that analysis.

Plaintiffs suggest in their briefing that HERA's limitation on who the President may designate to serve as acting Director presents an impermissible impediment to the President's control, even if the acting Director is not protected from removal.  (Pls.' Br. in Opp'n to FHFA Defs.' Mot. to Dismiss 5-6, ECF No. 32.)  HERA requires the President to choose one of the Deputy Directors to be acting Director, and according to Plaintiffs, the other Deputy Directors during DeMarco's tenure were supportive of DeMarco's policies.  (*Id.* at 6; Am. Compl. ¶ 64.)

---

[10] For instance, the Secretary for the Department of Housing and Urban Development allegedly told reporters that President Obama did not have the authority to fire DeMarco over a policy disagreement.  (Am. Compl. ¶ 62.)  Also, an "internal Treasury document" stated that Treasury believed it could not "compel [the] FHFA to act" because the FHFA is an "independent" agency.  (*Id.*)  And a news website reported that DeMarco had resisted pressure from the White House to step down.  (*Id.*)

No authority supports Plaintiffs' argument.  Moreover, if the President wanted to remove DeMarco and was dissatisfied with the other options for the acting Director role, then he could have appointed a Director to replace DeMarco.  The ability to replace an acting official by appointing a hand-picked successor gives the President sufficient control over an executive agency to fulfill the President's constitutional duties.

Plaintiffs also contend that DeMarco's role is irrelevant because the previous Director, James Lockhart, placed Freddie and Fannie into conservatorship.  HERA's removal restriction *arguably* applied to Lockhart.[11]  Plaintiffs argue that the FHFA's unconstitutional structure with Lockhart at the helm has infected every action taken by the FHFA as conservator, including the Third Amendment.  (*Id.* at 5.)  The Court disagrees.  The salient issue is whether the President had sufficient control over the FHFA when it adopted the Third Amendment.  That transaction, not any actions taken by the FHFA before that time, is the basis for Plaintiffs' complaint and is the source of Plaintiffs' alleged injury.  Thus, if the President had sufficient control over the FHFA when it adopted the Third Amendment, there was no constitutional violation under Article II that caused Plaintiffs to suffer a justiciable injury.

In short, after considering the text of HERA, similar statutes, relevant case law, and the arguments presented by Plaintiffs, the Court is not persuaded that HERA extends for-cause removal protection to the FHFA's acting Director, or imposes any other restrictions on the removal or replacement of the acting Director that would give rise to a separation-of-powers claim under Article II.

---

[11] As explained in more detail in Section VIII.C, Lockhart became the transitional director under 12 U.S.C. § 4512(b)(5).  HERA gives removal protection to the director appointed "for a term of 5 years" under § 4512(b)(2). Lockhart was not appointed for a term of 5 years under § 4512(b)(2), and there is no removal restriction in § 4512(b)(5).

### E. Other Features of the FHFA's Independence

To the extent Plaintiffs contend that other features of the FHFA's independence—including its source of funding, the alleged lack of "meaningful direction or oversight" by Congress, and limits on judicial review of the Director's actions—render the FHFA's structure unconstitutional under Article II (*see* Am. Compl. ¶¶ 148, 149), Plaintiffs fail to state a claim.

The Court is aware of no authority supporting the notion that an independent source of funding creates a separation-of-powers problem. Indeed, in *Seila Law*, the Supreme Court noted that Congress gave the CFPB an independent source of funding, yet the Court determined that the "*only* constitutional defect . . . in the CFPB's structure is the Director's insulation from removal." 140 S. Ct. at 2209 (emphasis added). The Court decided that it could remedy this defect by making the Director "removable at will by the President[.]" *Id.* It did not change the CFPB's source of funding. Thus, the Court strongly implied that CFPB's source of funding was not a problem by itself.

Likewise, the Court is aware of no authority suggesting that a purported lack of meaningful oversight or direction by Congress, or limits on judicial review, present separation-of-powers problems under Article II of the Constitution. Plaintiffs' arguments on this point are wholly conclusory.

### F. Conclusion

Although the removal protection for the FHFA Director is probably unconstitutional in light of *Seila Law*, that protection is not in any way connected to the injuries in this particular case. An acting Director approved the Third Amendment, not the Director. The President's ability to control the FHFA through the removal or replacement of its acting Director was not so impeded that the President could not fulfill his constitutional duties. Plaintiffs have not identified any other defect in the FHFA's structure that would give rise to a separation-of-powers claim under Article

II of the Constitution.  In other words, to the extent there is a constitutional defect in the structure of the FHFA and the tenure protection for its Director, Plaintiffs cannot show a causal connection between that defect and their injuries.  Accordingly, Counts I and II of the amended complaint fail to state a claim.

## VIII.  Count III:  Violation of the Appointments Clause

### A.  Plaintiffs' Constitutional Claim

Plaintiffs claim that DeMarco's tenure as acting Director violated the Appointments Clause of the Constitution because he served in that position for too long.  When he approved the Third Amendment, he had been the acting Director for almost three years.  Plaintiffs contend that there is a limit to the amount of time that an acting official can serve in the role of an appointed official, and that DeMarco exceeded that limit.

The Appointments Clause gives the President power to appoint "public Ministers and Consuls . . . , and all other Officers of the United States" with the "Advice and Consent of the Senate."  U.S. Const., Art. II, § 2, cl. 2.  Put another way, the President can appoint "principal officers" *only* with the advice and consent of the Senate.  *Edmond v. United States*, 520 U.S. 651, 659 (1997).  This is the "default manner" for appointment of "inferior officers" as well, *id.* at 660; however, the Appointments Clause permits Congress to "vest the Appointment of such inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const., Art. II, § 2, cl. 2.

The parties agree that the Director of the FHFA is a principal officer and that DeMarco was an inferior officer when the President designated him to be the acting Director of the FHFA.  Congress has long given the President authority "to direct certain [inferior] officials to temporarily carry out the duties of a vacant [principal] office in an acting capacity, without Senate confirmation."  *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 934 (2017); *cf. United States v. Eaton*, 169

U.S. 331, 343 (1898) (An inferior officer "charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, . . . is not thereby transformed into the superior and permanent official."). And that is what Congress did in HERA. It gave the President power to designate the FHFA's acting Director when there is a "death, resignation, sickness, or absence of the Director." 12 U.S.C. § 4512(f).[12]

Plaintiffs argue that, in order for the Senate to play its proper role in the appointment of principal officers, there must be some limit on how long an inferior officer can perform the duties of a principal officer. Otherwise, Presidents could evade the appointment requirement by allowing an inferior officer to perform the duties of a principal officer indefinitely in an acting capacity. Indeed, the Supreme Court implied as much when opining that inferior officers do not become principal officers when they perform the duties of their superiors "for a limited time, and under special and temporary conditions[.]" *Eaton*, 169 U.S. at 343. In other words, acting officials might become principal officers, and thereby require appointment with the advice and consent of the Senate, if they serve in that role for longer than a "limited time."

If so, then how much time is too much? In their complaint, Plaintiffs argue that an acting director should serve no longer than is "reasonable under the circumstances." This standard comes from a footnote in an opinion by the Office of Legal Counsel. *See* Office of Legal Counsel, U.S. Dep't of Justice, *Designation of Acting Director of the Office of Management and Budget*, 2003 WL 24151770, at *1 n.2 (June 12, 2003). It is not a standard that any court has applied to the issue.

---

[12] The Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. § 3345 et seq., gives the President general authority to designate acting officers for executive agencies, but that Act does not apply here because HERA contains its own provision for designating an acting Director for the FHFA. The FVRA is the "exclusive" means for temporarily authorizing an acting official "unless" another statute expressly authorizes the President to designate an acting official. 5 U.S.C. § 3347(a). HERA provides that authorization for the FHFA's acting Director.

Alternatively, Plaintiffs argue that the Court should apply a standard derived from the Recess Appointments Clause, which gives the President the power to "fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."  U.S. Const. Art. II, § 2, cl. 3.  Due to the Twentieth Amendment, the maximum amount of time that an official could serve under the Recess Appointments Clause is approximately two years.  *See NLRB v. Noel Canning*, 573 U.S. 513, 534 (2014) (noting that, depending on the timing of the appointment, a recess appointment between annual sessions could permit the appointee to serve for about a year, and an intra-session recess appointment could permit the appointee to serve for almost two years).  Plaintiffs contend this time period reflects a "constitutional judgment" that officers commissioned without Senate confirmation ought to serve long enough to give the President a full session of Senate to attempt to secure a regular appointment, and that any longer period of time would be unreasonable.  (Pls.' Br. in Supp. of Mot. for Summ. J. 16 n.4, ECF No. 33.)

### B.  Justiciability

The Court agrees with Defendants that Plaintiffs' claim presents a non-justiciable political question.  Such a question typically has at least one of the following characteristics:

> a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  As at least one other court has found, Plaintiffs' claim has at least two of the foregoing characteristics; it lacks "judicially discoverable and manageable standards for resolving it," and it requires "an initial policy determination of a kind clearly for nonjudicial discretion."  *See Bhatti v. FHFA*, 332 F. Supp. 3d 1206, 1218 (D. Minn. 2018).

Start with the "reasonable under the circumstances" standard.  Is it judicially discoverable and manageable?  The OLC has identified the following considerations that would be pertinent to whether the tenure of an acting director of the Office of Management and Budget (OMB) is unreasonably long:

> the specific functions being performed by the Acting Director; the manner in which the vacancy was created (death, long-planned resignation, etc.); the time when the vacancy was created (e.g., whether near the beginning or the end of a session of the Senate); whether the President has sent a nomination to the Senate; and particular factors affecting the President's choice (e.g., a desire to appraise the work of an Acting Director) or the President's ability to devote attention to the matter.

Office of Legal Counsel, U.S. Dep't of Justice, *Status of the Acting Director, Office of Management and Budget*, 1997 WL 18076, at *3 (Dec. 22, 1977).  Those considerations would also be relevant to the tenure of the acting Director of the FHFA.  The FHFA also proposes the following factors:  "'the difficulty of finding suitable candidates' for 'complex and responsible positions,'" and the "'uncertainties created by delays in the enactment' of pending legislation." (Br. of FHFA Defs. in Supp. of Mot. to Dismiss 26 (quoting Office of Legal Counsel, U.S. Dep't of Justice, *Department of Energy—Appointment of Interim Officers—Department of Energy Organization Act (42 U.S.C. § 7342)*, 1978 WL 15326, at *4 (May 18, 1978)).)  And one could just as easily come up with other relevant factors, such as whether the Senate is able to devote attention to the matter.

The factors relevant to a reasonableness inquiry are fraught with too much complexity and subjectivity to be objectively meaningful.  And they would require the Court to look over the shoulder of at least one of the other branches of government to evaluate internal processes, personnel decisions, and political dynamics that the Court is ill-equipped to assess.  How, for instance, would the Court discover, let alone measure, the President's or the Senate's ability to devote attention to a nomination?

Plaintiffs' two-year limit would be more manageable, but it is wholly arbitrary. Plaintiffs purport to glean this limit from the Recess Appointments Clause, but the rationale for limiting the length of a recess appointment is different from the rationale for limiting the length of an acting officer designation. The Recess Appointments Clause permits the President to appoint officers when the Senate is temporarily unavailable to provide its advice and consent. *See Noel Canning*, 573 U.S. at 540 ("[The] purpose is to permit the President to obtain the assistance of subordinate officers when the Senate, due to its recess, cannot confirm them."). To prevent the abuse of this mechanism by the President, it makes sense to tie the terms of recess appointments to a fixed length of time after the Senate returns from its recess and is available to fulfill its role in the appointment process.

In contrast, acting officers allow executive agencies to continue functioning when the position filled by the appointed officer is vacant or the appointed officer is unavailable. These vacancies can arise at any time and their duration may be unpredictable. And unlike the time limit built into the Recess Appointments Clause, a fixed time limit for the tenure of acting officials could have severe consequences; it would threaten to cripple the work of an agency whenever that limit is reached. An agency without a head may be unable to complete tasks assigned to it by Congress. HERA, for instance, assigns many of the powers created by that statute to the FHFA Director.

Imposing a two-year limit on the tenure of acting officials would be tantamount to making a "policy determination" that two years is sufficient time for the President to determine that a new appointment is necessary,[13] and then to complete the nomination and confirmation process for the

---

[13] In situations where the appointed official is absent due to an illness or other emergency, it might not be immediately apparent when and whether that person will return to their post.

appointee, no matter the circumstances.[14]   Furthermore, Plaintiffs' proposed limit would put the Court's stamp of approval on any tenure up to two years, potentially displacing political pressures that might otherwise favor a *shorter* term for acting officials.[15]   A policy determination of this sort is not suitable for judicial discretion; it is better left to the other branches of government.   Indeed, nothing prevents Congress from curbing the President's reliance on acting officials by imposing time limits on their terms of service, just as Congress did for acting officials designated as such under the FVRA.   Accordingly, Plaintiffs' constitutional claim is not justiciable.

### C.  Plaintiffs' Statutory Claim

Alternatively, Plaintiffs contend that DeMarco's tenure as acting Director was invalid because it did not comply with HERA.   President Obama designated DeMarco to be acting Director after the resignation of Lockhart.   Lockhart was Director of the OFHEO when Congress enacted HERA.   Lockhart became Director of the FHFA under the transitional provision of HERA, which provides:

> Notwithstanding paragraphs (1) and (2), during the period beginning on the effective date of the Federal Housing Finance Regulatory Reform Act of 2008, and ending on the date on which the Director is appointed and confirmed, the person serving as the Director of the Office of Federal Housing Enterprise Oversight of the Department of Housing and Urban Development on that effective date shall act for all purposes as, and with the full powers of, the Director.

12 U.S.C. § 4512(b)(5).   In other words, when the FHFA replaced the OFHEO, HERA installed OFHEO's Director, Lockhart,  to "act for all purposes as, and with the full powers of, the Director" of the FHFA until another Director is "appointed and confirmed."   *Id.*

---

[14] Plaintiffs suggest that an exception might be allowed in "unusual circumstances" (Pls.' Br. in Opp'n to FHFA Defs.' Mot. to Dismiss 14), but determining what circumstances are "unusual" leads back to the problems inherent in applying a reasonableness test.

[15] The FVRA, for instance, imposes a 210-day limit on the tenure of acting officials designated under that statute, with longer terms permitted in certain circumstances.  *See* 5 U.S.C. § 3346.  Although that statute does not apply here, it reflects a judgment about the appropriate tenure of acting officials to which the President may feel pressure to conform.

Plaintiffs interpret § 4512(b)(5) to mean that Lockhart was not a Director of the FHFA; instead, he simply acted as one. Plaintiffs note that the President did not appoint Lockhart to serve as Director of the FHFA "for a term of 5 years," in accordance with 12 U.S.C. § 4512(b)(1), (2). Consequently, when Lockhart resigned, Plaintiffs contend that there was no "death, resignation, sickness, or absence of the Director" that would trigger the acting Director provision in 12 U.S.C. § 4512(f).

### 1. The statutory claim is not properly before the Court.

Plaintiffs' statutory claim is not contained in their complaint. Generally, a plaintiff cannot raise a new claim in a brief responding to a motion to dismiss without seeking leave to amend the complaint. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). Plaintiffs have already amended their complaint once. They have not asked the Court for leave to amend it again.

### 2. The statutory claim is meritless.

Even if the Court were to give Plaintiffs leave to amend their complaint, the Court would dismiss the new claim because it is meritless. Like other courts that have examined this issue, this Court is not persuaded by Plaintiffs' interpretation of HERA. *See Bhatti*, 332 F. Supp. 3d at 1222-23 (rejecting a similar claim); *see also FHFA v. UBS Americas Inc.*, 712 F.3d 136, 144 (2d Cir. 2013) ("Because Lockhart was legally the Director, the President was authorized to appoint Deputy Director DeMarco as Acting Director upon Lockhart's resignation."); *FHFA v. City of Chicago*, 962 F. Supp. 2d 1044, 1054 (N.D. Ill. 2013) (same).

Lockhart was a Director of the FHFA. As the district court explained in *Bhatti*:

Section 4512(b)(5) [of HERA] is the fifth paragraph of subsection (b), which is generally concerned with the appointment of the director. The first four paragraphs of subsection (b) describe the process for appointing a director and govern the

> length of his tenure.  The fifth paragraph, under which Lockhart became the director, begins with the phrase "[n]otwithstanding paragraphs (1) and (2)"—thus indicating that the person designated under (b)(5) *would* be subject to those provisions if not for the excepting language. The structure and language of subsection (b) thus connect the "director" appointed under (b)(5) to the "director" appointed under (b)(1).  For that reason, the better reading of the statute is that (b)(5) is not describing some unique official, but rather a director like those described in (b)(1) (albeit appointed under a special method and with a special tenure not applicable to later directors).
>
> This interpretation is further bolstered by the fact that (b)(5) vests the director's duties in the former director of OFHEO.  Because the office of OFHEO director required Senate confirmation, Lockhart could constitutionally serve as the director (and not merely the acting director) of FHFA without additional Senate confirmation.  *See FHFA v. UBS Americas Inc.*, 712 F.3d 136, 144 (2d Cir. 2013) (holding that Lockhart's duties as FHFA director were "germane" to his duties as OFHEO director and therefore he did not need to be renominated and reconfirmed). And indeed, paragraph (b)(5) states that the appointed individual acts "for *all* purposes as" and "with the *full* powers of" the director.  (Emphasis added.)  This case is therefore unlike *Doolin Security Savings Bank, F.S.B. v. Office of Thrift Supervision*, in which the D.C. Circuit held that the resignation of an acting director who was not appointed in conformity with the Appointments Clause did not trigger a "vacancy" within the meaning of the Vacancies Act.  139 F.3d 203, 207-08 (D.C. Cir. 1998).

*Bhatti*, 332 F. Supp. 3d at 1222-23.

In summary, DeMarco's designation as acting Director was proper because the text and structure of HERA indicate that Lockhart served as Director of the FHFA, even though he had a different term and a different appointment process than the Directors who succeeded him. Lockhart's resignation, therefore, triggered the acting Director provision in § 4512(f), giving President Obama the authority to designate DeMarco as acting Director.

## IX.  Count IV:  Violation of the Nondelegation Doctrine

Count IV of the complaint claims that HERA violates the nondelegation doctrine because it impermissibly delegates legislative power to the FHFA.  Plaintiffs assert that HERA gives broad discretion to the FHFA when it acts as conservator, without articulating an "intelligible principle to guide [the] FHFA's exercise of discretion."  (Am. Compl. ¶ 165.)

Article I of the Constitution vests "all legislative Powers" in Congress.  U.S. Const. art. I, § 1.  Under the nondelegation doctrine, "Congress generally cannot delegate its legislative power to another Branch [of government]."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  Congress can, however, "obtain[] the assistance of its coordinate Branches."  *Id.*  There is no nondelegation problem if Congress provides an "'intelligible principle'" to guide the agency exercising delegated authority.  *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)).  "The cases where Congress violates the nondelegation principle are few and far between."  *Hachem v. Holder*, 656 F.3d 430, 439 (6th Cir. 2011); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) ("In the history of the Court we have found the requisite 'intelligible principle' lacking in only two statutes . . . .").

HERA gives the FHFA several powers when acting as conservator.  For instance, the FHFA may "take over the assets of and operate the regulated entity," "perform all functions of the regulated entity," and "preserve and conserve the assets and property of the regulated entity."  12 U.S.C. § 4617(b)(2)(B)(i)-(iv).  In addition, the FHFA may

> . . . take such action as may be—
>
> (i) necessary to put the regulated entity in a sound and solvent condition; and
>
> (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.

*Id.* § 4617(b)(2)(D).  The FHFA can also exercise "such incidental powers as shall be necessary to carry out" the powers granted to the FHFA as conservator.  *Id.* § 4617(b)(2)(J)(i).  And when exercising its conservator powers, the FHFA "may take any action authorized by this section" that it determines "is in the best interests of the regulated entity or the Agency."  *Id.* § 4617(b)(2)(J)(ii).

Congress provided additional guidance when it established Fannie and Freddie.  It stated that Fannie's role is to "provide stability in" and "ongoing assistance to" the "secondary market

for residential mortgages" by "increasing the liquidity of mortgage investments" and "improving the distribution of investment capital available for residential mortgage financing[.]"  12 U.S.C. § 1716(1)-(3).  Freddie's role is similar.  *See* Federal Home Loan Mortgage Corporation Act, Pub. L. No. 91-351, preamble, 84 Stat. 450 (1970) (indicating that Freddie's purpose is to "increase the availability of mortgage credit for the financing of urgently needed housing"); *see also* 12 U.S.C. § 1454 (giving Freddie the power to purchase and sell residential mortgages).  Collectively, the foregoing provisions provide an intelligible principle to guide the FHFA's discretion as conservator.

Plaintiffs seize on the permissive language in HERA's grant of authority to the FHFA, particularly the statute's use of the term "may," contending that it leaves no intelligible principle to guide the FHFA.  According to Plaintiffs, HERA's grant of discretion to the FHFA somehow suggests that there is no limit to what the FHFA can do.  (*See* Pls.' Br. in Supp. of Mot. for Summ. J. 11.)

On the contrary, HERA is sufficiently clear about the powers that it grants to the FHFA as conservator.  HERA's permissive language simply gives the FHFA flexibility in the exercise of those powers.  "FHFA as conservator may not exercise a power beyond the ones granted."  *Collins*, 938 F.3d at 579.  In short, Plaintiffs' argument is meritless and Count IV of the complaint fails to state a claim.

## X.  Count V:  Violation of the Private Nondelegation Doctrine

Under the private nondelegation doctrine, the branches of the federal government generally cannot delegate their sovereign powers to a private entity.  *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).  "Any delegation of regulatory authority 'to private persons whose interests may

be and often are adverse to the interests of others in the same business' is disfavored." *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) (quoting *Carter*, 298 U.S. at 311).

Plaintiffs have asserted this claim in the alternative, in the event that the Court finds that the FHFA acted as a private entity when adopting the Third Amendment.  (Am. Compl. ¶ 171.) This Court concluded that the FHFA exercised governmental power when adopting the Third Amendment.  In other words, the FHFA is not a private entity and did not act as such.  Thus, the private nondelegation doctrine does not apply here.

## XI.  Treasury

Treasury argues that the Court should dismiss it for an additional reason.  Plaintiffs' claims focus on the structure of the FHFA, the powers delegated to the FHFA by Congress, and the tenure of the FHFA's acting Director.  Treasury is a defendant only because it is a party to the Third Amendment and Plaintiffs contend that the appropriate relief is to unwind that agreement and require Treasury to return the payments that the FHFA made to Treasury.  Even if Plaintiffs had stated a claim against the other Defendants, the Court agrees that Plaintiffs' allegations do not permit a plausible inference that Treasury itself violated the Constitution.  Thus, Plaintiffs fail to state a claim against Treasury.

Plaintiffs' response is that it properly joined Treasury as a defendant.  If Plaintiffs had stated a viable claim against the other Defendants, then the Court would consider whether Rule 19 of the Federal Rules of Civil Procedure permits the Court to retain Treasury as a defendant.  Even where a party is "found not to have violated any substantive right" of the plaintiff, Rule 19 gives the Court authority to retain that party in the lawsuit and subject it to the "minor and ancillary provisions of an injunctive order as the District Court might find necessary to grant complete relief[.]" *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 399 (1982).  In other words,

60

"a plaintiff's inability to state a direct cause of action against [a party] does not prevent [that party's] joinder under Rule 19." *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 781 (9th Cir. 2005). But given that there are no viable claims against the other Defendants, the Court will dismiss Treasury for failure to state a claim.

## XII.  Conclusion

In short, Plaintiffs' amended complaint fails to state a claim.  Accordingly, the Court will grant Defendants' motions to dismiss on that basis.  For similar reasons, Plaintiffs are not entitled to summary judgment.  Therefore, the Court will deny their motion for summary judgment.

An order and judgment will enter consistent with this Opinion.


Dated:   September 8, 2020                          /s/ Paul L. Maloney
                                                    Paul L. Maloney
                                                    United States District Judge