# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  October 04, 2022

Mr. Brian W. Barnes
Mr. Charles J. Cooper
Mr. Peter A. Patterson
Mr. John D Ramer
Mr. David H. Thompson
Cooper & Kirk
1523 New Hampshire Avenue, N.W.
Washington, DC 20036

Mr. Howard N. Cayne
Mr. Robert J. Katerberg
Ms. Asim Varma
Arnold & Porter Kaye Scholer
601 Massachusetts Avenue, N.W.
Washington, DC 20001

Mr. Gerard Sinzdak
Ms. Abby Christine Wright
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Re:  Case No. 20-2071*, Rop, et al. v. Fed. Housing Fin. Agency, et al.*
Originating Case No. : 1:17-cv-00497

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk


Laurie A Weitendorf
Deputy Clerk

cc:  Ms. Ann E. Filkins

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0222p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

MICHAEL ROP; STEWART KNOEPP; ALVIN WILSON,

*Plaintiffs-Appellants,*

*v.*

FEDERAL HOUSING FINANCE AGENCY; SANDRA L. THOMPSON, in her official capacity as Director of the Federal Housing Finance Agency; UNITED STATES DEPARTMENT OF THE TREASURY,

*Defendants-Appellees.*

No. 20-2071

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cv-00497—Paul Lewis Maloney, District Judge.

Argued:  June 9, 2022

Decided and Filed:  October 4, 2022

Before:  GIBBONS, COOK, and THAPAR, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Peter A. Patterson, COOPER & KIRK, PLLC, Washington, D.C., for Appellants. Robert J. Katerberg, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellees Thompson and Federal Housing Finance Agency.  Gerard Sinzdak, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States Department of the Treasury.  **ON BRIEF:**  Peter A. Patterson, David H. Thompson, Charles J. Cooper, Brian W. Barnes, John D. Ramer, COOPER & KIRK, PLLC, Washington, D.C., for Appellants.  Robert J. Katerberg, Howard N. Cayne, Asim Varma, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellees Thompson and Federal Housing Finance Agency.  Gerard Sinzdak, Abby C. Wright, Kyle Edwards, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States Department of the Treasury.

GIBBONS, J., delivered the opinion of the court in which COOK, J., joined.  THAPAR, J. (pp. 19–33), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  Shareholders in Fannie Mae and Freddie Mac sued the Federal Housing Finance Agency ("FHFA"), which is the companies' conservator, and the Treasury Department.  This lawsuit, and many others like it, seeks to nullify an agreement between FHFA and Treasury that "secured unlimited funding for Fannie and Freddie from Treasury in exchange for almost all of Fannie's and Freddie's future profits."  *Rop v. Fed. Hous. Fin. Agency*, 485 F. Supp. 3d 900, 910 (W.D. Mich. 2020).  Shareholders allege that this agreement, known as the third amendment, was authorized by a government official—the Acting Director of FHFA—who was serving in violation of the Appointments Clause.  Shareholders also claim that they are entitled to retrospective relief because the Supreme Court held in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), that FHFA's enabling statute contained an unconstitutional removal restriction.  The district court dismissed shareholders' complaint, finding that the Appointments Clause claim presented a nonjusticiable political question and that the removal restriction claim was not connected to shareholders' alleged injuries.  We reverse and consider the Appointments Clause claim on the merits, holding that the Acting Director was not serving in violation of the Constitution when he signed the third amendment.  We remand to the district court to determine whether, considering *Collins*, the unconstitutional removal restriction inflicted harm on shareholders.

I.

Like the district court, we turn to the Court of Appeals for the District of Columbia Circuit for the third amendment's relevant factual background:

**1.  The Origins of Fannie Mae and Freddie Mac**

Created by federal statute in 1938, Fannie Mae originated as a government owned entity designed to "provide stability in the secondary market for residential mortgages," to "increas[e] the liquidity of mortgage investments," and to

"promote access to mortgage credit throughout the Nation."  12 U.S.C. § 1716; *see id*. § 1717.  To accomplish those goals, Fannie Mae (i) purchases mortgage loans from commercial banks, which frees up those lenders to make additional loans, (ii) finances those purchases by packaging the mortgage loans into mortgage-backed securities, and (iii) then sells those securities to investors.  In 1968, Congress made Fannie Mae a publicly traded, stockholder-owned corporation.  *See* Housing and Urban Development Act, Pub. L. No. 90-448, § 801, 82 Stat. 476, 536 (1968) (codified at 12 U.S.C. § 1716b).

Congress created Freddie Mac in 1970 to "increase the availability of mortgage credit for the financing of urgently needed housing."  Federal Home Loan Mortgage Corporation Act, Pub. L. No. 91- 351, preamble, 84 Stat. 450 (1970).  Much like Fannie Mae, Freddie Mac buys mortgage loans from a broad variety of lenders, bundles them together into mortgage-backed securities, and then sells those mortgage-backed securities to investors.  In 1989, Freddie Mac became a publicly traded, stockholder owned corporation.  *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 731, 103 Stat. 183, 429-436.

Fannie Mae and Freddie Mac became major players in the United States' housing market.  Indeed, in the lead up to 2008, Fannie Mae's and Freddie Mac's mortgage portfolios had a combined value of $5 trillion and accounted for nearly half of the United States mortgage market.  But in 2008, the United States economy fell into a severe recession, in large part due to a sharp decline in the national housing market.  Fannie Mae and Freddie Mac suffered a precipitous drop in the value of their mortgage portfolios, pushing the Companies to the brink of default.

### The 2008 Housing and Economic Recovery Act

Concerned that a default by Fannie and Freddie would imperil the already fragile national economy, Congress enacted the Recovery Act, which established FHFA and authorized it to undertake extraordinary economic measures to resuscitate the Companies.  To begin with, the Recovery Act denominated Fannie and Freddie "regulated entit[ies]" subject to the direct "supervision" of FHFA, 12 U.S.C. § 4511(b)(1), and the "general regulatory authority" of FHFA's Director, *id*. § 4511(b)(1), (2).  The Recovery Act charged FHFA's Director with "oversee[ing] the prudential operations" of Fannie Mae and Freddie Mac and "ensur[ing] that" they "operate[ ] in a safe and sound manner," "consistent with the public interest." *Id*. § 4513(a)(1)(A), (B)(i), (B)(v).

The Recovery Act further authorized the Director of FHFA to appoint FHFA as either conservator or receiver for Fannie Mae and Freddie Mac "for the purpose of reorganizing, rehabilitating, or winding up the[ir] affairs."  12 U.S.C. § 4617(a)(2).  The Recovery Act invests FHFA as conservator with broad authority and discretion over the operation of Fannie Mae and Freddie Mac.  For example, upon appointment as conservator, FHFA "shall . . . immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity, and of any

stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity." *Id*. § 4617(b)(2)(A). In addition, FHFA "may . . . take over the assets of and operate the regulated entity," and "may . . . preserve and conserve the assets and property of the regulated entity." *Id*. § 4617(b)(2)(B)(i), (iv).

The Recovery Act further invests FHFA with expansive "[g]eneral powers," explaining that FHFA "may," among other things, "take such action as may be . . . necessary to put the regulated entity in a sound and solvent condition" and "appropriate to carry on the business of the regulated entity and preserve and conserve [its] assets and property[.]" 12 U.S.C. § 4617(b)(2), (2)(D). FHFA's powers also include the discretion to "transfer or sell any asset or liability of the regulated entity in default . . . without any approval, assignment, or consent," *id*. § 4617(b)(2)(G), and to "disaffirm or repudiate [certain] contract[s] or lease[s]," *id*. § 4617(d)(1). *See also id*. § 4617(b)(2)(H) (power to pay the regulated entity's obligations); *id*. § 4617(b)(2)(I) (investing the conservator with subpoena power).

Consistent with Congress's mandate that FHFA's Director protect the "public interest," 12 U.S.C. § 4513(a)(1)(B)(v), the Recovery Act invested FHFA as conservator with the authority to exercise its statutory authority and any "necessary" "incidental powers" in the manner that "the Agency [FHFA] determines is in the best interests of the regulated entity or the Agency." *Id*. § 4617(b)(2)(J) (emphasis added).

The Recovery Act separately granted the Treasury Department "temporary" authority to "purchase any obligations and other securities issued by" Fannie and Freddie. 12 U.S.C. §§ 1455(l )(1)(A), 1719. That provision made it possible for Treasury to buy large amounts of Fannie and Freddie stock, and thereby infuse them with massive amounts of capital to ensure their continued liquidity and stability.

Continuing Congress's concern for protecting the public interest, however, the Recovery Act conditioned such purchases on Treasury's specific determination that the terms of the purchase would "protect the taxpayer," 12 U.S.C. § 1719(g)(1)(B)(iii), and to that end specifically authorized "limitations on the payment of dividends," *id*. § 1719(g)(1)(C)(vi). A sunset provision terminated Treasury's authority to purchase such securities after December 31, 2009. *Id*. § 1719(g)(4). After that, Treasury was authorized only "to hold, exercise any rights received in connection with, or sell, any obligations or securities purchased." *Id*. § 1719(g)(2)(D).

Lastly, the Recovery Act sharply limits judicial review of FHFA's conservatorship activities, directing that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator." 12 U.S.C. § 4617(f).

\* \* \*

On September 6, 2008, FHFA's Director placed both Fannie Mae and Freddie Mac into conservatorship.  The next day, Treasury entered into Senior Preferred Stock Purchase Agreements ("Stock Agreements") with Fannie and Freddie, under which Treasury committed to promptly invest billions of dollars in Fannie and Freddie to keep them from defaulting.  Fannie and Freddie had been "unable to access [private] capital markets" to shore up their financial condition, "and the only way they could [raise capital] was with Treasury support." *Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Fin. Servs.*, 110th Cong. 12 (2008) (Statement of James B. Lockhart III, Director, FHFA).

In exchange for that extraordinary capital infusion, Treasury received one million senior preferred shares in each company.  Those shares entitled Treasury to: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were dissolved; (ii) a dollar-for-dollar increase in that liquidation preference each time Fannie and Freddie drew upon Treasury's funding commitment; (iii) quarterly dividends that the Companies could either pay at a rate of 10% of Treasury's liquidation preference or a commitment to increase the liquidation preference by 12%; (iv) warrants allowing Treasury to purchase up to 79.9% of Fannie's and Freddie's common stock; and (v) the possibility of periodic commitment fees over and above any dividends.

The Stock Agreements also included a variety of covenants.  Of most relevance here, the Stock Agreements included a flat prohibition on Fannie and Freddie "declar[ing] or pay[ing] any dividend (preferred or otherwise) or mak[ing] any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof" without Treasury's advance consent (unless the dividend or distribution was for Treasury's Senior Preferred Stock or warrants). J.A. 2451.

The Stock Agreements initially capped Treasury's commitment to invest capital at $100 billion per company.  It quickly became clear, however, that Fannie and Freddie were in a deeper financial quagmire than first anticipated.  So their survival would require even greater capital infusions by Treasury, as sufficient private investors were still nowhere to be found.  Consequently, FHFA and Treasury adopted the First Amendment to the Stock Agreements in May 2009, under which Treasury agreed to double the funding commitment to $200 billion for each company.

Seven months later, in a Second Amendment to the Stock Agreements, FHFA and Treasury again agreed to raise the cap, this time to an adjustable figure determined in part by the amount of Fannie's and Freddie's quarterly cumulative losses between 2010 and 2012.  As of June 30, 2012, Fannie and Freddie together had drawn $187.5 billion from Treasury's funding commitment.

Through the first quarter of 2012, Fannie and Freddie repeatedly struggled to generate enough capital to pay the 10% dividend they owed to Treasury under the amended Stock Agreements. FHFA and Treasury stated publicly that they worried about perpetuating the "circular practice of the Treasury advancing funds to [Fannie and Freddie] simply to pay dividends back to Treasury," and thereby increasing their debt loads in the process.

Accordingly, FHFA and Treasury adopted the Third Amendment to the Stock Agreements on August 17, 2012. The Third Amendment to the Stock Agreements replaced the previous quarterly 10% dividend formula with a requirement that Fannie and Freddie pay as dividends only the amount, if any, by which their net worth for the quarter exceeded a capital buffer of $3 billion, with that buffer decreasing annually down to zero by 2018. In simple terms, the Third Amendment requires Fannie and Freddie to pay quarterly to Treasury a dividend equal to their net worth—however much or little that might be. Through that new dividend formula, Fannie and Freddie would never again incur more debt just to make their quarterly dividend payments, thereby precluding any dividend-driven downward debt spiral. But neither would Fannie or Freddie be able to accrue capital in good quarters.

Under the Third Amendment, Fannie Mae and Freddie Mac together paid Treasury $130 billion in dividends in 2013, and another $40 billion in 2014. The next year, however, Fannie's and Freddie's quarterly net worth was far lower: Fannie paid Treasury $10.3 billion and Freddie paid Treasury $5.5 billion. *See* Fannie Mae, Form 10-K for the Fiscal Year Ended December 31, 2015 (Feb. 19, 2016); Freddie Mac, Form 10-K for the Fiscal Year Ended December 31, 2015 (Feb. 18, 2016). By comparison, without the Third Amendment, Fannie and Freddie together would have had to pay Treasury $19 billion in 2015 or else draw once again on Treasury's commitment of funds and thereby increase Treasury's liquidation preference. In the first quarter of 2016, Fannie paid Treasury $2.9 billion and Freddie paid Treasury no dividend at all. *See* Fannie Mae, Form 10-Q for the Quarterly Period Ended March 31, 2016 (May 5, 2016); Freddie Mac, Form 10-Q for the Quarterly Period Ended March 31, 2016 (May 3, 2016).

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 599–602 (D.C. Cir. 2017) (footnotes omitted). The third amendment stayed in place until January 2021, when FHFA and Treasury amended the stock agreements for the fourth time.[1]

The structure of FHFA is also relevant here. "FHFA is led by a single Director who is appointed by the President with the advice and consent of the Senate." *Collins*, 141 S. Ct. at 1771 (citing 12 U.S.C. §§ 4512(a), (b)(1)). "The Director serves a 5-year term but may be

---

[1]The Supreme Court held implementation of the fourth amendment does not moot shareholders' request for retrospective relief. *Collins*, 141 S. Ct. at 1780.

removed by the President 'for cause.'"  *Id.* (quoting 12 U.S.C. § 4512(b)(2)).  In *Collins*, the Supreme Court found this restriction on the President's ability to remove the Director is unconstitutional.  *Id.* at 1787.  The Director still serves a five-year term but is now removable by the President at will.  FHFA is led by three deputies, chosen by the Director.

The Recovery Act provides that, "[i]n the event of the death, resignation, sickness, or absence of [FHFA's] Director, the President shall designate" one of the three deputies "to serve as acting Director until the return of the Director, or the appointment of a successor."  12 U.S.C. § 4512(f).  "Since its inception, the FHFA has had three Senate-confirmed Directors, and in times of their absence, various Acting Directors have been selected to lead the Agency on an interim basis."  *Collins*, 141 S. Ct. at 1771 (citing *Rop v. FHFA*, 485 F. Supp. 3d 900, 915 (W.D. Mich. 2020)).

In August 2009, President Obama exercised this authority by designating Deputy Director Edward DeMarco to serve as Acting Director upon the resignation of FHFA's prior Director, James Lockhart.  President Obama sent a nomination for Director to the Senate in November 2010 that was returned to him in December.  Acting Director DeMarco, therefore, continued to serve.  In August 2012, he signed the third amendment on behalf of FHFA as conservator of Fannie Mae and Freddie Mac.  DeMarco's service terminated upon the appointment of FHFA Director Melvin Watt, who was nominated in May 2013, confirmed in December 2013, and took office in January 2014.

Shareholders in Fannie Mae and Freddie Mac sued FHFA and Treasury, alleging violations of the Appointments Clause and separation of powers and seeking an order vacating the third amendment.  The district court granted the federal parties' motion to dismiss because shareholders' amended complaint failed to state a claim.  *Rop*, 485 F. Supp. 3d at 947.

While this case was held in abeyance for mediation, the Supreme Court decided *Collins*. In *Collins*, the Supreme Court held that the Recovery Act's removal restriction violated the separation of powers.  141 S. Ct. at 1787.  Although the Court held that shareholders were not entitled to vacatur of the third amendment and all actions taken pursuant to it, it did remand for consideration of whether shareholders may be entitled to retrospective relief.  *Id.* at 1788–89.

II.

Shareholders claim FHFA Acting Director DeMarco was serving in violation of the Appointments Clause when he signed the third amendment.  The district court held this claim presents a nonjusticiable political question.  *Rop*, 485 F. Supp. at 941–43.  We disagree.

The political question doctrine is a "narrow exception" to the general rule that a court must decide cases properly before it.  *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).  A political question usually has one of the following characteristics:

> a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  The district court concluded that shareholders' Appointments Clause claim lacked judicially discoverable and manageable standards and required an initial policy determination not suitable for judicial determination.  *Rop*, 485 F. Supp. at 941–43.  But the district court was evaluating shareholders' proposed *solutions* for the alleged Appointments Clause violation, not the threshold question of whether a violation occurred.  *See, e.g.*, *id.* (assessing shareholders' proposed "reasonableness" inquiry and suggested two-year limit).  Instead, the proper question is whether Acting Director DeMarco was serving in violation of the Appointments Clause when he signed the third amendment.  This is not a political question.  It does not require courts to assess whether an Acting Director was serving for "too long."  Instead, it merely asks courts to determine whether the Constitution was violated at a particular moment in time.  The Eighth Circuit addressed the merits of an identical Appointments Clause claim in *Bhatti v. Federal Housing Finance Agency*, 15 F.4th 848 (8th Cir. 2021), reversing the district court's holding that whether an acting official has served for "too long" is a political question.

### III.

Evaluating the merits of shareholders' Appointments Clause claim, we find FHFA Acting Director DeMarco was not serving in violation of the Constitution when he signed the third amendment.    The Appointments Clause requires presidential appointment and Senate confirmation of principal officers.  U.S. Const. art. II, § 2, cl. 2.  By default, inferior officers are appointed in the same manner.  *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021). "But the Framers foresaw that 'when offices become numerous, and sudden removals necessary, this mode might be inconvenient.'"  *Id.* (citation omitted).  Therefore, the Appointments Clause "permits Congress to dispense with joint appointment . . . for inferior officers" and vests appointment in the President, the head of an executive department, or a court of law.  *Id.* (citation omitted).  "The line between 'inferior' and 'principal' officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn."  *Morrison v. Olson*, 487 U.S. 654, 671 (1988).  The Supreme Court's precedent is similarly opaque.[2]  But the Court has clearly addressed inferior officers taking on the responsibilities of principal officers when vacancies arise as a constitutionally permitted practice.

In *United States v. Eaton*, 169 U.S. 331, 332–33 (1898), the consul of Bangkok fell ill, and a vice consul was temporarily charged with his duties.  The Court held that the vice counsel was an inferior officer, explaining that "[b]ecause the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official."  *Id.* at 343. *Eaton* is an old case, but it has been cited favorably by the Court in the years that followed. *See Arthrex, Inc.*, 141 S. Ct. at 1985; *Edmond v. United States*, 520 U.S. 651, 661 (1997); *Morrison*, 487 U.S. at 672.  In *NLRB v. SW General, Inc.*, 137 S. Ct. 929 (2017), the Court again

---

[2]In *Morrison*, the Supreme Court determined that an independent counsel was an inferior officer because her duties, jurisdiction, and tenure were limited.  487 U.S. at 670–73.  In *Edmond v. United States*, 520 U.S. 651, 663 (1997), the Court explained an inferior officer is one "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."  As the independent counsel in *Morrison* was not subject to supervision, and *Edmond* did not overrule *Morrison*, courts have resolved the tension by explaining that supervision is a sufficient but not necessary condition to be an inferior officer.  *See, e.g.*, *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000).  But the Supreme Court recently indicated "[a]n inferior officer *must* be 'directed and supervised.'"  *Arthrex, Inc.*, 141 S. Ct. at 1980 (emphasis added).  We need not resolve this inconsistency here as the Court has spoken clearly on the status of officials temporarily filling the vacancies of principal officers.

tackled the interaction between vacancies and the Appointments Clause.  The Court explained, given the requirement of presidential nomination and Senate confirmation, "the responsibilities of" a principal officer "may go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement." *Id.* at 934.  "Congress has long accounted for this reality by authorizing the President to direct certain officials to temporarily carry out the duties of a vacant [principal] office in an acting capacity, without Senate confirmation." *Id.*

Congress followed this constitutional text and precedent in enacting the Recovery Act and, thereby, creating FHFA.  The Recovery Act requires the FHFA Director be appointed by the President with the advice and consent of the Senate, in compliance with the Appointments Clause.  12 U.S.C. § 4512(b).  Congress then accounted for vacancies by providing for an Acting Director to take on the responsibilities of FHFA Director under certain circumstances:

> ACTING DIRECTOR.–In the event of the death, resignation, sickness, or absence of the Director, the President shall designate either the Deputy Director of the Division of Enterprise Regulation, the Deputy Director of the Division of Federal Home Loan Bank Regulation, or the Deputy Director for Housing Mission and Goals, to serve as acting Director until the return of the Director, or the appointment of a successor pursuant to subsection (b).

*Id.* § 4512(f).  President Obama complied with this procedure when he designated Deputy Director DeMarco to serve as Acting Director upon the resignation of Director Lockhart.

First, the Supreme Court has held that when a government official fills a vacancy of a principal officer, that acting officer is an inferior officer.  And inferior officers can be designated by the President alone, so long as Congress has vested the President with the authority to do so. The Court has not identified any constitutional violations with this practice.  Congress vested the President with the authority to unilaterally designate an Acting Director in the Recovery Act. President Obama designated DeMarco as Acting Director in compliance with the Recovery Act. DeMarco's service terminated, in accordance with the Recovery Act, upon the appointment of the new Director.  Therefore, we find no violation of the Appointments Clause.

Second, we note that § 4512(b) does not provide for the designation of an Acting Director in the case of the Director's *removal*.  Prior to the Supreme Court's decision in *Collins*, the President was unable to remove the FHFA Director except for cause.  The limitations on the

President's ability to appoint an Acting Director to circumstances of death, resignation, illness, and absence—but not, explicitly, removal—alleviate concerns that a President could abuse this provision by unilaterally firing the Director and indefinitely replacing him with an Acting Director, with no intent of ever seeking the advice and consent of the Senate. Should this hypothetical ever come to fruition, Congress can act to limit the amount of time an official may serve as FHFA Acting Director, as it has done in other statutes, discussed below. *See infra* Part IV. Under the facts of this case, we find no violation of the Appointments Clause nor any reason to read an explicit time limit on acting officials into the constitutional or statutory schemes.

Third, although the Court primarily assessed the constitutionality of the Recovery Act's presidential removal restriction in *Collins*, it also discussed the role of FHFA's Acting Director. The Court held that the Acting Director was removable by the President at will. *Collins*, 141 S. Ct. at 1787. In so holding, the Court made several broad statements, including "there is no reason to regard any of the action taken by the FHFA in relation to the third amendment as void" and "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office." *Id.* at 1787–88. Here, the context is different, but the Court's broad language is informative.

## IV.

Shareholders present two arguments for why Acting Director DeMarco's service became unconstitutional during his tenure. Neither is persuasive.

First, shareholders argue constitutional text, history, and precedent support finding Acting Director DeMarco was serving unconstitutionally when he signed the third amendment. Shareholders argue that "[c]ongressional authorization for the [President to appoint] acting officials has almost always been 'limited.'" CA6 R. 31, Appellant Br., at 19 (citation omitted). But Congress is free to establish time limits on acting officials' tenures, and it has not placed any such limit on the FHFA Acting Director. For example, in the Federal Vacancies Reform Act ("FVRA"), Congress authorized certain government officials to fill the vacancies of principal officers for covered agencies. 5 U.S.C. §§ 3345-3347. These interim acting officers serve for statutorily limited periods until a new principal officer can be confirmed pursuant to the

requirements of the Appointments Clause. *Id*. Congress also provided that FVRA applies unless "a statutory provision expressly authorizes the President . . . to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id*. § 3347(a)(1)(A). Thus, Congress has declined to "place time restrictions on the length of an acting officer" in many agency-specific provisions.[3] S. Rep. No. 105-250, at 16–17 (1998) (listing forty statutes that would retain their statute-specific acting official provisions after FVRA's enactment). This indicates Congress's awareness of the tension between the Appointments Clause's requirements and vacancies. It has decided to address the potential for misuse of acting officers through time limits for some, but not all, agencies per its power under the Constitution.

Shareholders claim that because "for most of the first two centuries of the Constitution's history, Congress's customary practice was to impose statutory time limits on the duration of acting officers' tenure," this court should find that a recent statute like the Recovery Act "deserves little weight in the separation-of-powers analysis."[4] CA6 R. 31, Appellant Br., at 20. Shareholders rely on *NLRB v. Noel Canning*, 573 U.S. 513 (2014), for this proposition, arguing that "only 'historical' and 'longstanding practice' is entitled to 'significant weight' when it comes to the separation of powers." *Id*. (quoting *Noel Canning*, 537 U.S. at 524–25). In *Noel Canning*, the Supreme Court interpreted the Recess Appointments Clause by "put[ting]

---

[3]And, as discussed above, the Recovery Act is such a statute.

[4]The dissent goes further, concluding that historical practice suggests that an acting officer may fill a vacancy for up to six months, but any service beyond that is presumptively unconstitutional. In support of that proposition, the dissent asserts both that a six-month limit aligns with pre-Founding English law and that six months represented the outer boundary of congressionally authorized acting officer tenure for most of the first two hundred years of the Republic. This view, however, misconstrues the relevant historical practice. Initially, acting officers could "serve until the permanent officeholder could resume his duties or a successor was appointed." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017) (citing Act of May 18, 1792, ch. 37, § 8, 1 Stat. 281). Soon, though, Congress limited acting officers to six months of service. *Id*. (citing Act of Feb. 13, 1795, ch. 21, 1 Stat. 415). Congress changed the limit to ten days in 1868 and then to thirty days in 1891. *Id*. (citing Act of July 23, 1868, ch. 227, 15 Stat. 168, and Act of Feb. 6, 1891, ch. 113, 26 Stat. 733). In the 1980s, Congress again adjusted the limit, lengthening it to 120 days. *Id*. at 936 (citation omitted). Finally, Congress passed the FVRA in 1998, which, for the agencies it covers, permits acting officials for no longer than 210 days, unless a nomination is pending in the Senate. *Id*. Based on this history, the dissent concludes that because acting officers could not serve longer than six months from 1795 to the 1980s, the Constitution does not permit a tenure beyond that. A better reading of this history, however, is that Congress can determine the length of acting officer tenure and at various points in history chose to adjust the limit according to its policy preferences. Instead of suggesting that one of those choices represents the constitutional limit, this history demonstrates that the Constitution permits Congress to choose.

significant weight upon historical practice."  537 U.S. at 524.  Contrary to shareholders' reading, history is not solely dispositive, and the Court also considered the text of the clause, *id*. at 526-27, the opinions of presidential legal advisers, *id*. at 530, and the interplay between the Clause and acts of Congress, *id*. at 532–33.  Further, shareholders fail to acknowledge the Court's citation to the fact that "a practice of at least twenty years duration 'on the part of the executive department, acquiesced in by the legislative department, . . . is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning.'"  *Id*. at 524 (citation omitted).  The President has installed acting officers, who Congress has declined to place time restrictions on, for well over twenty years.[5]  This represents longstanding congressional acquiescence to the reality that disagreements between the President and the Senate result in vacancies that require principal officers' duties to be carried out temporarily by acting officials.  This acceptance is "entitled to great regard" in interpreting the Appointments Clause.  *Id*.  Shareholders' characterization of acting officials as a recent phenomenon is disingenuous.

Shareholders claim that DeMarco's service was no longer "for a limited time and under special and temporary conditions" when he signed the third amendment.  CA6 R. 31, Appellant Br., at 21 (quoting *Eaton*, 169 U.S. at 343).  But DeMarco's service was temporary because it would terminate upon "the appointment of [the previous Director's] successor."  12 U.S.C. § 4512(f); *cf. Morrison*, 487 U.S. at 672 (holding that despite the lack of a time limit on independent counsel's appointment, counsel's service is "temporary" because "the office is terminated" upon completion of counsel's task).  Shareholders have not pointed to any case in which a court has considered whether the President waited "too long" before the confirmation of a permanent principal officer, nor any that further defined the parameters of a "limited time" or "special and temporary conditions."

Shareholders turn to the Recess Appointments Clause to claim that a presidentially designated acting officer "may serve a maximum of about two years."  CA6 R. 31, Appellant

---

[5]*See* S. Rep. No. 105-250, at 16–17 (1998); *Status of the Acting Director, Office of Management and Budget*, 1 Op. O.L.C. 287, 289–90 (1977); *Acting Officers*, 6 Op. O.L.C. 120, 121 (1982) (tracing the practice to the Hoover Commission Report of 1949, the findings of which were incorporated into the Reorganization Plans issued under the Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203).

Br., at 21.  The Recess Appointments Clause "gives the President alone the power 'to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.'"  *Noel Canning*, 573 U.S. at 519 (quoting U.S. Const. art. II, § 2, cl. 3).  The Supreme Court's interpretation of this clause allows an official appointed under this clause to serve for, at most, almost two years.  *Id*. at 534.

Acting officials, however, are not "appointed," and there is no indication in the Constitution, case law, or historical precedent indicating that the Recess Appointments Clause applies to any officer of the United States other than those appointed during Senate recess. "[T]he rationale for limiting the length of a recess appointment is different from the rationale for limiting the length of an acting officer designation."  *Rop*, 485 F. Supp. 3d at 942.  The Recess Appointments Clause governs vacancies filled during Senate recess, when the Senate is temporarily unavailable to confirm presidential nominees.  Therefore, "it makes sense to tie the terms of recess appointments to a fixed length of time after the Senate returns from its recess and is available to fulfill its role in the appointment process."  *Id*. at 943.

The presidential practice of appointing acting officers to fill vacancies, which can arise at any time and last for unknown duration, cannot be logically tied to the comings and goings of the Senate.  The Framers' decision to impose limits on the length of recess appointments has no bearing on the presidential practice of designating acting officials.  Moreover, Congress has acquiesced to this practice and is free to impose time limits on acting officials' terms of service. The Recess Appointments Clause has no relationship—textually, historically, or precedentially—to the presidential practice of, and congressional acquiescence in, designating acting officers.  Although a per se two-year time limit would be "more manageable," we agree with the district court's conclusion that lifting the Recess Appointments Clause's two-year limit and imposing it on acting officials would be "wholly arbitrary."  *Rop*, 485 F. Supp. 3d at 942.

Second, shareholders claim a "functionalist" approach demonstrates DeMarco was serving in violation of the Appointments Clause when he signed the third amendment.  CA6 R. 31, Appellant Br., at 22–24.  Shareholders rely on an Office of Legal Counsel ("OLC") memorandum advising the Executive Branch on whether an individual who had served for three months as Acting Director of the Office of Management and Budget ("OMB") could continue to

do so.  The memo first concludes that there is no statutory limitation on the Acting Director's service.  OLC gave its opinion, however, that implicit in Congress's direction that the Deputy Director of OMB act as the Director during a vacancy is a requirement that acting service "not continue beyond a reasonable time."  *Status of the Acting Director, Office of Management and Budget*, 1 Op. O.L.C. 287, 289–90 (1977).  Shareholders claim this type of "reasonableness" inquiry shows that, "[b]y any measure," DeMarco's acting service exceeded a reasonable length of time.  CA6 R. 31, Appellant Br., at 24.

Shareholders fail to address why this court should give any legal weight to an agency's internal memorandum.  The opinion merely gives *advice* to the Executive Branch, and shareholders have not pointed to any case law indicating it should be stretched to impose judicially enforceable *requirements*.  Moreover, the OLC memo's recommendations do not override the text of the Appointments Clause and Supreme Court precedent on vacancies.  The district court noted that the OLC opinion does not provide a "judicially discoverable and manageable standard[ ]" for *judicial* inquiry into whether the President has allowed an acting official to serve for too long.  *Rop*, 485 F. Supp. 3d at 942.  Shareholders' proposed reasonableness inquiry contemplates an evaluation plainly committed to the political branches and wholly irrelevant to interpreting the text of the Appointments Clause.

V.

Shareholders' second claim on appeal is that the Recovery Act's unconstitutional removal restriction inflicted compensable harm entitling them to relief.  The district court disagreed.  *Rop*, 485 F. Supp. 3d at 940.  Consistent with the Supreme Court's recent decision in *Collins*, we reverse and remand to determine whether the unconstitutional removal restriction inflicted harm on shareholders.

The Recovery Act's removal restriction, which permitted presidential removal of FHFA's Director only for cause, was held unconstitutional in *Collins*.  141 S. Ct. at 1787.  The Court remanded for consideration of whether the restriction inflicted compensable harm on the shareholders.  *Id*. at 1789; *see also Bhatti*, 15 F.4th at 854 (remanding to the district court to determine if shareholders suffered compensable harm).  Before *Collins*, the district court here

concluded that "the removal protection for the FHFA Director is probably unconstitutional," but "that protection is not in any way connected to the injuries in this particular case" because the third amendment was implemented by an *Acting* Director, as opposed to a Director subject to the removal restriction. *Rop*, 485 F. Supp. 3d at 940. This distinction was considered in *Collins*, and the Court agreed. 141 S. Ct. at 1787. The Court noted, "the Acting Director who *adopted* the third amendment was removable at will." *Id.* This fact defeated "the shareholders' argument for setting aside the third amendment in its entirety." *Id.* It did not, however, address "the shareholders' contention about remedy with respect to only the actions that confirmed Directors have taken to *implement* the third amendment during their tenures." *Id.* Still, the Court was skeptical of the shareholders' argument because there was no constitutional defect with the confirmed Directors' appointments, and therefore, "no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void." *Id.*

Despite this, the Court noted that the shareholders may be entitled to retrospective relief. *Id.* at 1788. As an example, the Court hypothesized that shareholders could have suffered harm if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if [the removal restriction] did not stand in the way." *Id.* at 1789. Here, the shareholders claim that "a recent statement by former President Trump" demonstrates they "suffered compensable harm caused by the unconstitutional removal restriction." CA6 R. 31, Appellant Br., at 37.[6] He apparently wrote:

> The Supreme Court's decision asks what I would have done had I controlled FHFA from the beginning of my Administration, as the Constitution required. From the start, I would have fired former Democrat Congressman and political hack Mel Watt from his position as Director and would have ordered FHFA to release these companies from conservatorship. My Administration would have also sold the government's common stock in these companies at a huge profit and fully privatized the companies. The idea that the government can steal money from its citizens is socialism and is a travesty brought to you by the Obama/Biden administration. My Administration was denied the time it needed to fix this problem because of the unconstitutional restriction on firing Mel Watt.

---

[6] It is unclear if this statement is properly in the record, as we find it only in shareholders' appellate brief. The argument itself—that shareholders are entitled to relief because the removal restriction is unconstitutional—is properly preserved. Regardless of President Trump's statement, reverse and remand is the appropriate remedy under *Collins* since this "should be resolved in the first instance by the lower court[ ]." 141 S. Ct. at 1789.

*Id*. at 38 (quoting Letter from Donald Trump to Sen. Rand Paul, Real Clear Politics (Nov. 11, 2021), https://bit.ly/3ped1sP).  Shareholders claim this clearly demonstrates President Trump would have removed Director Watt and replaced him with an FHFA Director more willing to carry out his Administration's policy agenda.  Shareholders ask this panel to "direct the district court to issue an injunction that puts [them] in the position they would be in if the President had the ability to implement his policy of either zeroing out Treasury's liquidation preference or converting Treasury's senior preferred stock to common stock."  *Id*. at 46.

First, the federal parties claim shareholders proffer an entirely new claim for prospective relief for the first time on appeal.  Shareholders' amended complaint requests the "return to Fannie and Freddie [of] all dividend payments made pursuant to the [third amendment's net worth sweep] or, alternatively, recharacterizing such payments as a pay down of the liquidation preference and a corresponding redemption of Treasury's Government Stock."  DE 17, Am. Compl., Page ID 271.  This is a request for retrospective relief that corresponds with shareholders' requested relief on appeal.  Both FHFA and Treasury claim shareholders are seeking prospective cancellation of Treasury's quarter trillion-dollar liquidation preference, which the federal parties claim is untethered to the third amendment because the third amendment changed the formula for dividends.  But, on appeal, like in *Collins*, shareholders ask only for relief effecting a zeroing out of Treasury's liquidation preference or converting of Treasury's senior preferred stock to common stock.[7]  The Court identified this as retrospective relief, *Collins*, 141 S. Ct. at 1787 & n.22, and this request for retrospective relief is tethered to shareholders' argument that the Recovery Act's removal restriction is unconstitutional.

Second, as the federal parties point out, it is speculative whether President Trump— regardless of what he has claimed publicly since then—would have actually removed FHFA Director Watt in January 2017 and whether his replacement would have, at the time, asked Treasury to either reduce its liquidation preference or convert its preferred stock to common stock.  As Justice Gorsuch's partial concurrence in *Collins* asks:  "*how* are judges and lawyers

---

[7]Shareholders' Amended Complaint claims that Fannie and Freddie paid Treasury $215.6 billion in net worth sweep dividends from January 2013 to June 2017, which is allegedly $83.3 billion more than they received, and that Treasury's liquidation preference for its government stock amounts to $117 billion for Fannie and $72 billion for Freddie.

supposed to construct the counterfactual history?"  141 S. Ct. at 1798 (Gorsuch, J., concurring in part).  He explains that:  "It is no less a speculative enterprise than guessing what Congress would have done had it known its statutory scheme was unconstitutional.  It's only that the Court prefers to reserve the big hypothetical (legislative) choice for itself and leave others for lower courts to sort out."  *Id*.  And, as Justice Thomas stated in his *Collins* concurrence, "I seriously doubt that the shareholders can demonstrate that any relevant action by an FHFA Director violated the Constitution.  And, absent an unlawful act, the shareholders are not entitled to a remedy."  *Id*. at 1795 (Thomas, J., concurring).  We agree that this retrospective enterprise is no easy feat.

Nevertheless, the majority in *Collins* instructed that the proper remedy for the FHFA Director's unconstitutional insulation from removal is remand for further consideration of whether the restriction actually affected any actions implementing the third amendment that allegedly harmed shareholders.  *Id*. at 1770.  The district court determined shareholders' alleged injuries were not connected to the removal restriction because it was adopted by an Acting Director, but the district court did not have the benefit of *Collins* to guide its analysis.  Following *Collins,* and the Fifth and Eighth Circuits' examples, we remand for the district court to determine whether the unconstitutional removal restriction inflicted compensable harm on shareholders entitling them to retrospective relief.  *See Bhatti*, 15 F.4th at 854; *Collins v. Yellen*, 27 F.4th 1068, 1069 (5th Cir. 2022).

## VI.

We reverse the district court's holding that shareholders' Appointments Clause claim poses a nonjusticiable political question.  Addressing the merits of that claim, we hold that Acting Director DeMarco was not serving in violation of the Appointments Clause when he signed the third amendment, so dismissal of this claim was appropriate.  We remand to the district court to determine whether the unconstitutional removal restriction inflicted harm on shareholders.

————————————

## DISSENT

————————————

THAPAR, Circuit Judge, concurring in part and dissenting in part.[1]  The words of the Constitution are not suggestions or mere formalities.  The Founders consciously chose each one.  And when they drew up the Appointments Clause, they had a specific task in mind:  to stop the President from appointing "unfit characters," to "check . . . favoritism," and to create "stability in the administration."  The Federalist No. 76, at 457 (Alexander Hamilton) (C. Rossiter ed., 1961).  So they set a simple rule.  The Senate must confirm the President's appointees to high office.  Because the majority permits the President and Congress to scrap this constitutional requirement, I respectfully dissent.

### I.

This case arises from the 2008 mortgage crisis's waning days, when an unconfirmed officer held the fate of the nation's two largest mortgage companies in his hands.

### A.

Congress wanted to help Americans buy homes.  So it founded Fannie Mae in 1938 and Freddie Mac in 1970.  Together, these companies bought existing mortgages from banks (freeing banks to make new mortgages), bundled the mortgages together, and sold shares of the bundles ("securitizing" the mortgages).  Bundling reduced risk.  If an investor held a single mortgage, he lost everything if it defaulted.  But when one mortgage in a bundle failed, the rest of the bundle could still turn a profit.  So risk dropped, more investors wanted in, and the mortgage market grew.  And that meant mortgages for more Americans.

Fannie and Freddie did well.  And after Congress privatized the companies, so did their shareholders.  Professional investors and average citizens bought and sold the companies'

---

[1]The majority and I agree that the shareholders' second claim should be remanded.  *See Collins v. Yellen*, 141 S. Ct. 1761, 1787–89 (2021).

No. 20-2071          *Rop, et al. v. Fed. Housing Fin. Agency, et al.*          Page 20

shares on public exchanges, and the companies' combined mortgage portfolios swelled to $5 trillion—nearly half of the national mortgage market.

Then in 2008 the market collapsed.  That hit the companies hard.  For a while, Congress even worried they might fail.  And that would cripple an already bleeding economy.  So Congress passed the Housing and Economic Recovery Act ("HERA").  12 U.S.C. § 4501 *et seq.*  The act allowed the director of the Federal Housing Finance Agency ("FHFA") to put Fannie and Freddie into "conservatorship"—that is, to run the companies with an eye toward rehabilitating them.  12 U.S.C. § 4617(a)–(b).

On September 6, 2008, the FHFA director exercised his power.  The next day, representing the companies as conservator, the FHFA director negotiated a deal with the Treasury Department.  Using taxpayer dollars, Treasury committed to purchase billions of dollars of the companies' stock—giving them needed capital—in exchange for a variety of repayment guarantees.  And if the companies couldn't pay, the parties would amend the agreement.

This dispute arises from the so-called Third Amendment, signed on August 17, 2012, by acting FHFA director Edward DeMarco.  Under this agreement, DeMarco promised Treasury basically all of the companies' net worth.  Whatever the companies earned, less a small reserve, would go to Treasury.  In exchange, Treasury guaranteed Fannie and Freddie whatever money they needed to stay afloat.

For companies in crisis, it was a good deal.  Even if Fannie and Freddie earned nothing, they no longer faced bankruptcy.  That's how the government justified the Amendment.  It claimed that even after receiving billions in loans, Fannie and Freddie still were not solvent.  So the companies needed an unlimited credit line.  And in exchange, an unlimited claim on the companies' profits was only fair.

Except the companies weren't in crisis—at least not anymore.  As the mortgage market rebounded, Fannie and Freddie became profitable again.  So rather than securing Fannie's and Freddie's future, the Third Amendment enriched the government instead.  Because of the agreement, almost all of the companies' profits went to Treasury.  Unable to keep what they

earned, they remained dependent on government largess.  And their shareholders suffered from depressed share prices and denied dividends.  All told, the Amendment routed more than $215 billion to Treasury—at least $130 billion more than if the prior agreements had been left in place.

### B.

In 2017, the shareholders sued, targeting the Third Amendment with a slew of claims. One matters here:  that DeMarco's tenure violated the Appointments Clause.  DeMarco began acting as the FHFA's director in 2009, and he did not sign the Third Amendment until three years later.  During this time, the Senate never confirmed him.  Therefore, the shareholders argue, by the time of the Third Amendment's signing, DeMarco's tenure violated the Appointments Clause.  And since he could no longer lawfully occupy his office or wield the FHFA's power, the Third Amendment is void.

The defendants—the FHFA, its director, and Treasury (collectively, "the government")—moved to dismiss all claims, and the district court agreed.  *Rop v. Fed. Hous. Fin. Agency*, 485 F. Supp. 3d 900, 947 (W.D. Mich. 2020).  As relevant, the district court held that how long an unconfirmed acting officer may serve is a political question that is nonjusticiable.  *Id*. at 941–43.

The shareholders now appeal.  They argue that how long an unconfirmed acting officer may serve is justiciable, and that DeMarco's tenure did violate the Appointments Clause.

### II.

### A.

The Appointments Clause "is more than a matter of etiquette or protocol; it is among the significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520 U.S. 651, 659 (1997) (cleaned up).

Before independence, appointment was the king's prerogative, and the king and his governors abused it.  Michael W. McConnell, *The President Who Would Not Be King* 20,

155–161 (2020).[2]   Royal appointees "swarm[ed]" American shores.   The Declaration of Independence para. 12 (U.S. 1776).   The crown's men harassed colonists, collected taxes, seized goods, and drained treasuries.   Rather than mete out justice, royally appointed judges barred the courthouse doors.   And when the colonies' best men sought appointments, the king and his governors passed them over for royal favorites, leaving talents like George Washington, Ben Franklin, and James Otis Sr. to languish.   Ahkil Reed Amar, *The Words That Made Us: America's Constitutional Conversation, 1760–1840*, at 32–33 (2021).

To end this and other abuses, our forebearers fought a revolution.   When they won, one measure the Framers took to preserve liberty was to divide the appointment power.   From hard experience, these men knew the royal prerogative could be abused.   So rather than leave it entirely in executive hands, the Framers split the power in two.   The President would nominate, but the Senate would confirm.

This labor bore fruit in the Appointments Clause.   It provides that "[the President] shall nominate, and by and with the advice and consent of the Senate, shall appoint . . . [the] Officers of the United States."   U.S. Const. art. II, § 2, cl. 2.

The Framers saw that exclusive control over nominations endows the presidency with energy and accountability.   A President with assistants of his own choosing can be certain they will pursue his objectives faithfully and efficiently.   And that ensures effective administration. At the same time, it also promotes accountability.   When the President nominates alone, the "blame of a bad nomination . . . fall[s] upon the [P]resident singly and absolutely."   *United States v. Arthrex, Inc*., 141 S. Ct. 1970, 1979 (2021) (quoting The Federalist No. 77, at 517 (Alexander Hamilton) (J. Cooke ed., 1961)).   Thus a President must pick his assistants wisely.   Otherwise, voters might punish the President at the election booth.

Granting the Senate the power of "advice and consent" allows the Senate to ensure qualified candidates ultimately fill vacancies.   In 1787, the memory of tyranny still lingered.

---

[2]Two thoughtful scholars, Michael McConnell and Akhil Amar, have written extensively on the executive powers and the drafting of the Constitution.   While most of this history will be apparent to the reader, their work provides additional context.   *See generally* Akhil Reed Amar, *The Words That Made Us: America's Constitutional Conversation, 1760–1840* (2021); Michael W. McConnell, *The President Who Would Not Be King* (2020).

McConnell, *The President Who Would Not Be King* 1–2.  The Framers feared that the President, if unsupervised, might abuse the appointment power just as the king had done.  Left to his own devices, a President might pick favorites or ideologues to fill important posts.  The Federalist No. 76, at 457 (Alexander Hamilton) (C. Rossiter ed., 1961).  Or the President might simply choose his own family members.  So the Framers added the Senate to the appointments process in a supervisory role.  The President nominates, but the Senate can reject.

This division operates "silent[ly]" yet "powerful[ly]."  *Id.*  "The possibility of rejection" gives a President a "strong motive" to pick potential appointees wisely.  *Id.* at 458.  A confirmation hearing gone awry or the rejection of a nominee not only promises embarrassment; it can derail the President's agenda or even put his reelection in jeopardy.

Moreover, the Clause also imposes accountability on the Senate.  When an appointee errs, the Senate cannot pass the buck either.  *Arthrex*, 141 S. Ct. at 1979.  Since the President and the Senate make appointments jointly, they "share[] in the public blame 'for both the making of a bad appointment and the rejection of a good one.'"  *Id.* (quoting *Edmond*, 520 U.S. at 660).  Checking executive mismanagement becomes a matter of senatorial concern.

To be sure, this appointment process can be cumbersome.  The President needs many aides, and the Senate cannot confirm each one.  So the Appointments Clause makes a further division, this time between principal officers and inferior ones.  Principal officers, like the FHFA director, must be nominated by the President and confirmed by the Senate.  By contrast, Congress may vest the appointment of inferior officers "in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  To ensure accountability, only a principal officer may ordinarily exercise unreviewable executive power.

So where do unconfirmed acting officers fit in?  Typically, an acting officer is an inferior officer who is temporarily filling in for a principal officer, despite being unconfirmed to the post. While the Appointments Clause itself makes no express mention of acting officers, Congress frequently authorizes the President to appoint them, and the Supreme Court has approved the

practice.[3]  *United States v. Eaton*, 169 U.S. 331, 343 (1898).  For example, the President may plug a regularly occurring vacancy with an acting officer while searching for a permanent appointee.  *NLRB v. Noel Canning*, 573 U.S. 513, 600 (2014) (Scalia, J., concurring in the judgment) ("Congress can authorize 'acting' officers to perform the duties associated with a temporarily vacant office—and has done that, in one form or another, since 1792.").  Congress also has allowed acting officers to serve in emergencies.  *Eaton*, 169 U.S. at 343.

The number of acting officers is striking.  A recent survey shows that from 1981 to 2020, nearly as many acting officers have filled cabinet positions as confirmed cabinet secretaries—a ratio of 147 to 171.  Anne Joseph O'Connell, *Actings*, 120 Colum. L. Rev. 613, 642 (2020).  And no definitive tally exists for the sub-cabinet level.  This species of officer is as little documented as it is pervasive.

B.

Recognizing, then, that practice and precedent establish an acting-officer exception to the Appointments Clause, we must determine whether DeMarco's tenure fits within it.  Some statutes expressly limit an acting officer's tenure.  Others do not.  But no acting officer can serve without confirmation longer than the Constitution permits.  Since the Appointments Clause does not discuss the acting-officer exception, other interpretive tools must define its scope.  And these tools suggest three possible tests for deciding when an acting officer has overstayed his welcome.[4]

*First*, historical practice suggests a line at six months.  For up to six months, an acting officer may fill a regularly occurring vacancy, while service beyond that mark is presumptively unconstitutional.  This line traces its origins to the Republic's earliest days.  In 1792, Congress first authorized acting officers, and in 1795, it set their tenure limit at six months.  Act of May

---

[3]Since Congress has authorized the appointment of an acting FHFA Director under 12 U.S.C. § 4512(f), it is not necessary to decide if the President has inherent authority to appoint an acting official without congressional approval.

[4]*United States v. Eaton*, 169 U.S. 331 (1898), forecloses a fourth possibility, that the acting-officer exception does not exist at all.  *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

8, 1792, ch. 37, § 8, 1 Stat. 279, 281; Act of Feb. 13, 1795, ch. 21, 1 Stat. 415.[5]  Consistent practice then entrenched it.  Not only did the six-month limit accord with prior English understandings, but it remained the outer boundary of what Congress expressly authorized for over two-hundred years.[6]  Where the constitutional text is silent, "the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs it was intended to enshrine."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 378 (1995) (Scalia, J., dissenting).

Of course, congressional practice doesn't necessarily define the exception's scope.  But when history does not fully decide the question, judgment must fill the gap.  *Id*. at 375.  And here, the absence of any explicit acknowledgement of the acting-officer exception in the Clause argues that the exception should be construed narrowly.  Moreover, in this particular context, the history is compelling.  When it comes to appointments, historical practice bears "significant weight."  *See Noel Canning*, 573 U.S. at 514 (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819)).  Doubly so for acts of the early congresses and the conduct of President Washington.  *See Myers v. United States*, 272 U.S. 52, 136 (1926); Akhil Reed Amar, *America's Constitution: A Biography* 197 (2005) (noting the "special authority of the settlements and understandings reached during the Washington Administration").  So historical practice orients us toward a six-month limit.

To be sure, *United States v. Eaton* adds a narrow exception to the six-month rule. 169 U.S. 331 (1898).  Most vacancies occur when an official in Washington resigns.  But sometimes an officer falls ill at a diplomatic post half a world away.    Then, when

[5]The majority places weight on the lack of an express limit in the Act of May 8, 1792.  That act authorized the President to appoint acting officers to fill in for the Secretaries of State, Treasury, and War, as well as their subordinates.  But the lack of a limit doesn't prove much.  At the time, President Washington's original picks filled all three cabinet posts:  Thomas Jefferson (State), Alexander Hamilton (Treasury), and Henry Knox (War).  All three were confirmed by the Senate in September 1789, and all three were already serving by 1792.  Only when these men began retiring between December 31, 1793, and January 1795 did Congress have to seriously confront the problem of transitions.  And when it did, it enacted a six-month limit.

[6]Before the American Revolution, legal lexicographers identified the "longstanding limit under old English law" as allowing officers to serve no more than six months after the King's death.  Andrew Hyman, *Old English Law Indicates that "Six Months" Is the Maximum Necessary and Proper Constitutional Limit on Tenure of Acting Cabinet Secretaries*, The Originalism Blog, Nov. 16, 2018, https://perma.cc/S2GG-ZGHM.  And Congress did not expressly authorize more than six months until 1998, when it passed the Federal Vacancies Reform Act.  O'Connell, *Actings*, 120 Colum. L. Rev. at 625–27, 630–31.

communications are tenuous and the principal officer's fate is doubtful, an acting officer may fill in "for a limited time, and under special and temporary conditions."  *Id*. at 343.  So long as these conditions hold, an acting officer may serve for more than six months (although even *Eaton*'s officer served only for ten).  Add this to the history, and precedent and practice suggest the Constitution permits six months of acting service in regular cases, with maybe a little more "under special and temporary conditions."  *Id*.

DeMarco's tenure exceeded this line.  When he signed the Third Amendment, he had already been serving for three years—well beyond the presumptive six-month limit.  And he does not fit within *Eaton*'s exception.  The acting officer in *Eaton* stepped in when illness felled the appointed American consul to Siam, in an era before telephones, automobiles, or airplanes. 169 U.S. at 332.  Contrast that with DeMarco.  His vacancy opened when a holdover official from the previous administration resigned.  That's not a "special" circumstance.  During a change in presidential administration, such vacancies are routine.  Nor was DeMarco's service "temporary" in any meaningful way.  DeMarco's three years is a far cry from *Eaton*'s ten months.  So DeMarco fails this test.

*Second*, the Constitution's text and structure suggest an alternative line:  An acting officer may serve until the current Senate expires—that is, for up to two years or as little as one day, depending on when the vacancy occurs.  Two inferences support this view.  For starters, the Appointments Clause itself states that appointees must be confirmed by "the Senate."  If "the Senate" refers to "the Senate in existence when the acting officer's service begins," that gives the acting officer at most two years to seek confirmation before a new Senate sits.  And if the Senate's term expires before it confirms him, his service must expire too.

The Recess Appointments Clause, which authorizes recess appointees to serve for a similar period, buttresses this theory.  *Noel Canning*, 573 U.S. at 534.  To begin, it demonstrates that the Framers accepted that at least some officers would serve for up to two years without Senate confirmation.  Moreover, the rule against surplusage dictates that the Recess Appointments Clause must be as large as the acting-officer exception or larger.  Otherwise, the

President could do with acting officials what he could not with recess appointments, and the Recess Appointments Clause would become a dead letter.**⁷**

Applying this rule, DeMarco's lawful tenure expired on January 8, 2011, when the 111th Senate ended—over a year and a half before the Third Amendment was signed.  Again, on this reading, the shareholders prevail.

*Third*, a 1977 Office of Legal Counsel ("OLC") opinion suggests that a reasonableness standard is the line.  Under this test, an acting officer may serve for a "reasonable" time, though not "indefinitely."  *Status of the Acting Dir., Off. of Mgmt. & Budget*, 1 Op. O.L.C. 287, 287 (1977).  To determine what is "reasonable," OLC has identified six factors.  These include (i) the nature of the acting officer's duties, (ii) the cause of the vacancy, (iii) when the vacancy occurred, (iv) whether the President has sent a nomination to the Senate, (v) "the President's ability to devote attention to the matter," and (vi) "particular factors affecting the President's choice," such as his "desire to appraise the work" of the acting officer.  *Id*. at 290.

Since the circumstances surrounding vacancies vary, this standard's flexibility has an obvious appeal.  But it lacks any apparent rooting in the Appointments Clause's text, historical practice, or the Constitution's structure.  Even *Eaton* does not expressly invoke "reasonableness" as its standard.  Moreover, the standard's very flexibility should give us pause.  *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1178–81 (1989).  For one thing, the standard's haziness would deprive the government and public of predictability in matters of significant importance.  For another, the determinations it requires, such as "the importance of an acting officer's duties" or "the President's ability to devote attention to the matter," involve difficult policy assessments better left to the political branches.  And perhaps most concerningly, the absence of a firm rule would likely sap the courage of the judiciary. Facing the combined weight of the two democratically elected branches of government, a judge with no constituency of his own may be tempted to duck rather than invalidate an unlawful act. Under a flexible standard, a judge can wriggle loose.  But with a clear rule blocking retreat, a judge must stand and say what the law actually requires.

---

**⁷**These two exceptions function differently in that Congress may shorten an acting officer's tenure by statute, while it cannot limit a recess appointee's term.

In any event, DeMarco flunks even this amorphous standard.  The post he filled was significant:  DeMarco ran an agency charged with overseeing a multi-trillion-dollar mortgage industry during one of the most severe financial downturns in the nation's history.  The vacancy he filled was routine:  The FHFA directorship only opened because an outgoing administration official resigned.  And the President appears to have made little effort to find a permanent replacement.  During the three years between DeMarco's appointment and the signing of the Third Amendment, the White House only sent one nomination to the Senate.  *See* 156 Cong. Rec. 17516 (2010).  And that nomination was only pending for one month before rejection.  *See id.* at 23565.  On these facts, nothing supports the conclusion that DeMarco's three-year tenure was "reasonable."

In short, whichever metric we choose, DeMarco's tenure violated the Appointments Clause.  No viable interpretation of the Clause permits an acting officer to skip confirmation for three years under these circumstances.  By the time DeMarco signed the Third Amendment, he signed it unlawfully.

## C.

None of the arguments to the contrary persuade.[8]  Relying on 12 U.S.C. § 4512(f), the majority's principal theory is that Congress authorized DeMarco to serve indefinitely via statute.  Section 4512(f) identifies the three deputies who may run the FHFA "[i]n the event of the death, resignation, sickness, or absence of the Director."  12 U.S.C. § 4512(f).  And it provides that whichever deputy the President selects shall "serve as acting Director until the return of the Director, or the appointment of a successor."  *Id.*  The section places no time limit on how long

---

[8]The government did toss away one argument that might have decided the issue.  Drawing on principles of agency law, other circuits have held that a validly appointed officer can ratify an invalidly appointed officer's actions.  *See, e.g.*, *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017); *NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 162 (2d Cir. 2021); *Kajmowicz v. Whitaker*, 42 F.4th 138, 147–48 (3d Cir. 2022); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1127 n.1 (9th Cir. 2021).  One circuit even held that the very same transaction at issue here had been validly ratified.  *See Bhatti v. FHFA*, 15 F.4th 848, 853–54 (8th Cir. 2021).  But the government forfeited this argument by failing to raise it before the district court.  *See Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.*, 689 F.3d 793, 799 (6th Cir. 2012).  And it *again* failed to develop the argument at any length, even after the shareholders noted the forfeiture in their opening brief.  Then at oral argument, the government admitted as much.  And while the government asked us to forgive the forfeiture due to "extraordinary circumstances," it did not say what those "extraordinary circumstances" were.  It's not the court's job to invent arguments for parties.  Since the government did not develop the ratification argument, I will not either.

the chosen deputy may serve.  *Id*.  Therefore, the majority reasons, this provision authorizes an acting FHFA director to serve for as long as it takes to appoint a new director—that is to say, for *any* length of time.

But both the Constitution and binding precedent bar this understanding.  "[T]he separation of powers does not depend . . . on whether 'the encroached-upon branch approves the encroachment.'"  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*., 561 U.S. 477, 497 (2010) (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).  The Framers specifically divided the appointment power to ensure senatorial vetting of presidential nominees.  That vetting checks presidential cronyism and promotes both presidential and senatorial accountability.  Ultimately, it does so to protect the people from incompetent, corrupt, or overzealous appointees.  Confirmation is not a Senate prerogative to be disposed of for the government's convenience.  It is a check designed to protect the people against the misuse of governmental power.  That is why "[n]either Congress nor the Executive can agree to waive this structural protection" any more than they can waive the Bill of Rights or the Fourteenth Amendment.  *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991).

Nor is the government's attempt to use historical practice to justify DeMarco's tenure persuasive.  By way of support, the government cites a smattering of acting officers who held their posts for as long as seven years.  But all of these examples date to the past three decades.  Assuming that history decides this case, it is the historical practice at the Founding and shortly thereafter that matters.  *See* Amar, *America's Constitution* 197; *McIntyre*, 514 U.S. at 371–72 (Scalia, J., dissenting).  A few isolated acts taken centuries later tell us little about what the founding generation thought or understood about the Constitution.[9]

Similarly, congressional authorization of acting officers without express limits on how long such officers may serve proves little.  Congressional silence ought not be taken to abrogate a constitutional requirement.  *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The*

---

[9]In fact, unless challenged and upheld, the mere fact that the government has engaged in a practice says nothing about the practice's constitutionality.  Imagine if an officer secretly entered a person's home and searched it without a warrant.  Does the absence of a challenge to this secret, warrantless search make it constitutional?  No.  Just because the government gets away with something doesn't make it lawful.

*Interpretation of Legal Texts* 247–51 (2012).  Instead, these statutes' silence is best and most easily read as incorporating whatever limit on an acting officer's tenure the Constitution imposes.

   To the extent *Morrison v. Olson* retains any vitality, it does not authorize the sort of indefinite service the majority envisions either.  487 U.S. 654 (1988).  True, in *Morrison* the independent counsel's authorizing statute lacked a numerical limit on how long she could serve, and still the Supreme Court deemed her term of service "temporary."  *Id.* at 672.  But the Court treated the office as "temporary" because it contained a self-executing limit.  By statute, the independent counsel's tenure ended as soon as her investigation finished.  *Id.*; *see* 28 U.S.C. § 596(b).  Like a bee with a single sting, the office brought about its own end by exercising its power.  HERA imposes no such limit.  *See* 12 U.S.C. § 4512(f).  DeMarco could (and did) perform every function of his office indefinitely, with no end in sight.  If anything, his tenure was temporary only in the sense that a cabinet secretary's tenure is temporary—that is to say, limited only by the President's inclination to appoint a successor.

   Finally, the Senate's rejection of a presidential nominee also does not restart the constitutional clock.  An acting officer's tenure is measured from the date he first fills the vacancy, and it cannot reset simply because the Senate rejected the President's intended replacement.  Otherwise, the President could evade the Appointments Clause entirely by installing his preferred choice as the acting officer and then sending a stream of unconfirmable nominees to the Senate.

   On one matter, though, the majority and I agree:  This question is justiciable.  For proof, consider *Eaton*.  There, the Supreme Court addressed an Appointments Clause challenge to an acting officer's status without hesitation.  *Eaton*, 169 U.S. at 343–44.  That's pretty good evidence that a challenge to an acting officer's tenure is justiciable.  And even if the political question doctrine has evolved since then, current doctrine confirms what *Eaton* suggests.  An issue is nonjusticiable if "there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (cleaned up).  Neither is the case here.  The text of the Appointments Clause does not bar judicial

review.  *Compare* U.S. Const. art. I, § 3, cl. 6 (assigning "the *sole* Power to try all Impeachments" to the Senate (emphasis added)), *with* U.S. Const. art. II, § 2, cl. 2 (giving the President "the power, by and with the advice of the Senate" to appoint officers); *cf. Nixon v. United States*, 506 U.S. 224, 229 (1993).  Nor are "judicially discoverable and manageable standards" lacking.  *Zivotofsky*, 566 U.S. at 195.  While questions of pure political philosophy or voter preference may be beyond judicial analysis, *cf. Luther v. Borden*, 48 U.S. (7 How.) 1, 41–42 (1849), whether the Senate has given "advice and consent" is not so ethereal.

D.

But identifying an Appointments Clause violation does not guarantee relief.  For most of our history, the shareholders' suit would likely have found little traction even with a violation as clear as this.  As Judge Murphy has thoroughly explained, the remedies available for an improper appointment were narrow at the founding.  *See Calcutt v. FDIC*, 37 F.4th 293, 342 (6th Cir. 2022) (Murphy, J., dissenting).  Two legal devices, the writ of *quo warranto* and the de facto officer doctrine, defined the field.

To remove an officer at common law, a litigant could seek a writ of *quo warranto*.  *Id.* This writ acted to eject improperly appointed officials by inquiring into the soundness of their titles to office.  In England, the writ issued in the name of the king, since the challenged officer purported to exercise the king's power.  3 William Blackstone, *Commentaries* *262; *see* Albert Constantineau, *A Treatise on the De Facto Officer Doctrine* § 452, at 636–37 (1910).  In America, most states duplicated the writ in common law or by statute, and they authorized their attorneys general to bring a *quo warranto* action on the public's behalf.  Constantineau, *A Treatise on the De Facto Officer Doctrine* § 455, at 639–40; *see also* Floyd R. Mecham, *A Treatise on the Law of Public Offices and Officers* § 476–77, at 304–05 (1890).[10]  In fact, a federal version of *quo warranto* survives today.  *See* D.C. Code § 16-3501 *et seq.*[11]

---

[10]Some jurisdictions also allowed a relator to bring the suit.  *See, e.g.*, *Newman v. United States ex rel. Frizzell*, 238 U.S. 537, 549–51 (1915).

[11]The federal writ has seen some action in recent years.  *See, e.g.*, *Michaels v. Whitaker*, No. 18-CV-2906 (D.D.C. Dec. 11, 2018) (challenging Matthew Whitaker's occupancy of the attorney general's office via the writ); Letter from Ronald A. Fein, Legal Dir. of Free Speech for Free People, *et al.* to Rod J. Rosenstein, Deputy Att'y

But the writ of *quo warranto* only tested an official's right to office.  If someone wished to challenge the officer's *actions*—for example, by seeking to overturn a decision on the ground that the officer who made it was unlawfully appointed—then the de facto officer doctrine came into play.  *Calcutt*, 37 F.4th at 343 (Murphy, J., dissenting); *see, e.g.*, *People ex rel. Bush & Higby*, 7 Johns. 549, 553–54 (N.Y. Sup. Ct. 1811).  The doctrine provided that an error in an official's appointment was not a sufficient ground to challenge his decisions.  *Calcutt*, 37 F.4th at 343 (Murphy, J., dissenting).  Even if an appointment was later proved invalid, the appointee's acts retained legal force.  Only the acts of a "mere usurper" occupying an unlawfully constituted office were subject to challenge.  *Id*. at 342.  With common-law roots stretching as far back as 1431, the doctrine commanded significant respect.  On American shores, it applied even to constitutional claims.  *Id*. at 343.

Together, these legal devices created stability.  *Quo warranto* preserved a narrow avenue for relief against an improperly appointed official.  The de facto officer doctrine, in turn, protected reliance interests by blocking challenges to that official's actions.  By limiting relief, the doctrine allowed both citizens and the government to rely on official acts without fear the acts might unexpectedly be invalidated.  This regime of remedies and limits structured appointments litigation for the first century-and-a-half of the nation's existence.  *See* Joseph Jarrett, *De Facto Public Officers: The Validity of Their Acts and Their Rights to Compensation*, 9 S. Cal. L. Rev. 189, 201–07 (1936) (collecting cases).

The regime began to crack in 1962.  That year, in *Glidden Co. v. Zdanok*, a plurality of the Supreme Court declined to apply the de facto officer doctrine to a constitutional challenge. 370 U.S. 530, 536 (1962).  Writing for the plurality, Justice Harlan dismissed the doctrine's legal roots and stabilizing purpose, recasting it instead as a forfeiture rule barring late-brought challenges to an officer's appointment.  *Id*.  He then declined to apply it.  When an important separation-of-powers issue was at stake, he explained, the doctrine could be set aside.  *Id*.

After a brief reprieve, *Ryder v. United States* sounded the doctrine's death knell.  In *Ryder*, a defendant brought an Appointments Clause challenge against the Coast Guard Court of

Military Review.  The Court noted that in *Glidden* it had declined to apply the de facto officer doctrine because "basic constitutional protections" were involved.  *Ryder*, 515 U.S. at 182 (quoting *Glidden*, 370 U.S. at 536 (plurality opinion)).  To the Court, *Glidden*'s decision reflected a sound policy of promoting Appointments Clause challenges.  *Id*. at 183.  So, embracing the policy, the Court announced a new rule:  Anyone raising a timely Appointments Clause challenge is entitled to a decision on the merits and relief.  *Id*. at 182–83.  In case anyone missed the message, the Court then buried past precedents applying the doctrine.  To the extent that it had previously employed the de facto officer doctrine in Appointments Clause cases, the Court declared, it was "not inclined to extend [these cases] beyond their facts."  *Id*. at 184.

Since *Ryder*, the Court has doubled down.  In *Lucia v. SEC*, the Court again affirmed that the de facto officer doctrine has no place when Appointments Clause challenges are involved. 138 S. Ct. 2044, 2055 (2018).  This time, *Lucia* extended the rule into the administrative context, invalidating an ALJ's appointment and then reiterating that parties raising timely Appointments Clause challenges are entitled to relief.  *Id*. (quoting *Ryder*, 515 U.S. at 182–83).  Why?  Again, to incentivize Appointments Clause challenges.  *Id*. at 2055 n.5.

Since this is an Appointments Clause challenge, *Ryder* and *Lucia* apply.  Thus, the de facto officer doctrine does not prevent the shareholders from obtaining relief.

\*     \*     \*

We have long understood that the Constitution's structural protections are as important for individual liberty as amendments like the First or Fourth.  But while no jurist would suggest that Congress and the President can do away with the Bill of Rights or the Fourteenth Amendment, that's exactly what the majority proposes to do with the Appointments Clause.  The Constitution's structural protections are no more ours to give away than the people's enumerated rights.  Respectfully, I dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 20-2071

MICHAEL ROP; STEWART KNOEPP; ALVIN WILSON,

    Plaintiffs - Appellants,

     v.

FEDERAL HOUSING FINANCE AGENCY; SANDRA L.
THOMPSON, in her official capacity as Director of the
Federal Housing Finance Agency; UNITED STATES
DEPARTMENT OF THE TREASURY,

    Defendants - Appellees.

> **FILED**
> Oct 04, 2022
> DEBORAH S. HUNT, Clerk

Before:  GIBBONS, COOK, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is
REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk